# 24-936

## United States Court of Appeals
## For the Second Circuit

---

DIANA RENE,

Plaintiff-Appellant,

v.

TANZIA MUSTAFA, M.D., personally, EJIKE ONUOGU, M.D., personally, TAHIRA SIAL, M.D., personally, BRUNSWICK HOSPITAL CENTER,

Defendants-Appellees.

---

---

**BRIEF FOR PLAINTIFF-APPELLANT**
**(with Special Appendix)**

---

WILLIAM M. BROOKS
Center for Justice, Civil Rights and
Liberties, Inc.
*Attorney for Plaintiff-Appellant*
P.O. Box 421
Port Washington, New York 10050
(516) 439-5169
Williamb@cjcrl.org

<u>TABLE OF CONTENTS</u>

Page

STATEMENT OF SUBJECT MATTER AND
    APPELLATE JURISDICTION……………………………………………1

QUESTIONS PRESENTED…………………………………………………1

STATEMENT OF THE CASE………………………………………………3

STATEMENT OF FACTS…………………………………………………..10

    1.    Relevant Background Information About Diana Rene……………...10

    2.    The Period of Time Leading Up to Rene's Hospitalization…………11

    3.    Rene's Mental Status Upon Presentation to Stony Brook…………..13

    4.    Rene's Time at Stony Brook………………………………………...14

        a.    The Emergency Department Doctor Misinterprets
            a Statement  by Rene…………………………………………14

        b.    Rene Meets Nurse Thomas Fining…………………………...15

        c.    Rene Next Meets a Social Work Student…………………….17

        d.    A Resident Works Up Rene…………………………………..19

        e.    Mustafa Facilitates Rene's Involuntary
            Psychiatric Confinement……………………………………..21

    5.    The Patient Referral Process From Stony Brook
        to Brunswick to Which Rene Was Subject…………………………23

    6.    Rene's Time at Brunswick Hospital………………………………...24

        a.    Onuogu Meets Briefly With Rene and
            Certifies Her For Involuntary Admission……………………24

TABLE OF CONTENTS

Page

b.    Sial Authorizes Further Confinement…………………………...26

SUMMARY OF ARGUMENTS……………………………………………………27

SUMMARY JUDGMENT STANDARDS…………………………………………29

ARGUMENTS…………………………………………………………………31

I.   THE DISTRICT COURT ERRED IN FINDING
THAT RENE SUBMITTED A SHAM
AFFIDAVIT BECAUSE RENE'S AFFIDAVIT
WAS COMPLETELY CONSISTENT WITH HER
DEPOSITION TESTIMONY AND THE COURT
FAILED TO CITE ANY INSTANCES OF
CONTRADICTORY TESTIMONY………………………………………31

A.   Second Circuit Jurisprudence Requires a Court
to Find an Actual Conflict Between an Affidavit
and Deposition Testimony Before Striking an
Affidavit as a Sham……………………………………………31

B.   Rene Testified Completely Consistently
Between Her Deposition Testimony and Her
Affidavit Testimony……………………………………………33

C.   The Striking of the Rene Affidavit Impacted
on the District Court's Summary Judgment Determination…………36

D.   The District Court Erred in Striking the Declaration
of Rene's Expert……………………………………………..37

E.   No Other Basis Exists to Strike Rene's Affidavit…………………..39

1.   Rene's Affidavit Cannot be Discredited on
the Ground That it Consisted of Blanket or
Bare Denials……………………………………………..39

TABLE OF CONTENTS

2. This Court May Not Discredit Rene's Affidavit
on the Ground That it is an Uncorroborated
"Self-Serving" Affidavit……………………………………..42

3. This Court May Not Assume as True Entries in
Rene's Charts Simply Because They are Hospital
Chart Entries…………………………………………………44

II. UNDER RENE'S VERSION OF THE FACTS, MUSTAFA
IS NOT ENTITLED TO SUMMARY JUDGMENT……………………...48

A. Mustafa Lacked Probable Cause to Believe Rene Suffered
From Mental Illness and Posed a Substantial Threat of Harm………..48

B. Mustafa Did Not Act in an Objectively Reasonable
Manner When Determining That Rene Met the
Civil Commitment Criteria…………………………………………54

C. The District Court Incorrectly Held That Rene's
Fifth Cause of Action, a Federal False Imprisonment
Claim, Duplicated Her Fourth Amendment
Unreasonable Seizure Claim…………………………………….…..57

III. BECAUSE UNDER RENE'S VERSION OF THE
FACTS ONUOGU AND SIAL DID NOT EXERCISE
INDEPENDENT MEDICAL JUDGEMENT WHEN
AUTHORIZING RENE'S HOSPITALIZATION,
THE DISTRICT COURT ERRED IN DISMISSING RENE'S
SUBSTANTIVE DUE PROCESS CLAIM………………………………..59

A. A Failure to Conduct Independent Medical Evaluations
Rendered Onuogu and Sial State Actors……………………………59

TABLE OF CONTENTS

Page

B.    Because Questions of Fact Exist as to Whether
       Onuogu and Sial Performed in a Competent
       Manner, the District Court Erred in Finding that
       They are Entitled to Qualified Immunity on
       Objective Reasonableness Grounds…………………………….64

CONCLUSION…………………………………………………………………...67

TABLE OF AUTHORITIES

Page

<u>Cases</u>

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999))…………………………………………………...59

*Aouatif v. City of N.Y.,*
    No 07-CV-1302, 2019 WL 2410450 (E.D.N.Y. May 31, 2019))…………37

*Bickerstaff v. Vassar College,*
    196 F.3d 435 (2d Cir. 1999)…………………………………………..31

*Bieluch v. Sullivan*,
    999 F.2d 666, 670 (2d Cir. 1993),
    *cert. denied*, 510 U.S. 1094 (1994)…………………………………...29

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,*
    531 U.S. 288 (2001)…………………………………………………..59

*Broughton v. State of New York,*
    37 N.Y. 2d 451 (1975)………………………………………………..58

*Brown v. Henderson,*
    257 F.3d 246 (2d Cir. 2001)…………………………………………..31

*Bryant v. Iheanacho,*
    859 Fed. Appx. 604 (2d Cir. 2021)…………………………………...44

*Bryant v. Steele,*
    93 F. Supp. 3d 80 (E.D.N.Y. 2015)…………………………………..60

*Buttry v. General Signal Corp.,*
    68 F.3d 1488 (2d Cir. 1995)…………………………………………..32

*Cameron v. City of New York,*
    598 F.3d 50 (2d Cir. 2010)…………………………………………….30

TABLE OF AUTHORITIES

Page

<u>Cases</u>

*Campo v. City of New York,*
    No. 19-CV-04364, 2022 WL 970730  (E.D.N.Y. Mar. 31, 2022)…………33

*Catalyst Advisors, L.P. v. Catalyst Advisors Investors Global*, *Inc.,*
    No. 21 Civ. 4855, 2024 WL 522751 (S.D.N.Y. Feb. 9, 2024)……………33

*Cooper v. U.S. Post Serv.,*
    577 F.3d 479 (2d Cir. 2009)…………………………………………..59

*D'Amico v. City of New York,*
    132 F.3d 145 (2d Cir. 1998)…………………………………………..30

*Danzer v. Norden Systems, Inc.,*
    151 F.3d 50 (2d Cir. 1998)………………………………………….42, 43

*Demarco v. Sadiker,*
    952 F. Supp. 134 (E.D.N.Y.  1996)………………………………...56

*Dieffenbach v. Attorney General of Vermont,*
    604 F.2d 187 (2d Cir. 1979)…………………………………………..59

*Doe v. Rosenberg,*
    166 F.3d 507 (2d Cir. 1999),
    *aff'g, Doe v. Rosenberg,* 996 F. Supp. 343 (S.D.N.Y. 1998)………………60

*Escalera v. Lunn*,
    361 F.3d 737 (2d Cir. 2004)…………………………………………..55

*Fabrikant v. French,*
    691 F.3d 193 (2d Cir. 2012)…………………………………………..59

*Fed. Deposit Ins. Corp. v. Murex LLC,*
    500 F. Supp. 3d 76 (S.D.N.Y. 2020)………………………………………33

## TABLE OF AUTHORITIES

Page

<u>Cases</u>

*Ferran v. Town of Nassau,*
　　471 F.3d 363 (2d Cir. 2006)…………………………………………..39

*Frost v. New York City Police Dep't,*
　　980 F.3d 231 (2d Cir. 2020)…………………………………………29, 30

*Glass v. Mayas,*
　　984 F.2d 55 (2d Cir. 1993)……………………………………………48

*Harig v. City of Buffalo,*
　　574 F. Supp. 3d 163 (W.D.N.Y. 2021)………………………………….33

*Hayes v. N.Y.C. Dep't of Corrs.,*
　　84 F.3d 614 (2d Cir. 1996)……………………………………………31

*Heller v. Bedford Cent. Sch. Dist.,*
　　144 F. Supp.3d 596 (S.D.N.Y. 2015)…………………………………..50

*Hollender v. Trump Village Cooperative, Inc.,*
　　58 N.Y. 2d 420 (1983)………………………………………………..58

*Hunter v. Bryant,*
　　502 U.S. 224 (1991)…………………………………………………..56

*In re Fosamax Prods. Liab. Litig.,*
　　707 F.3d 189 (2d Cir. 2013)…………………………………………..31

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.,*
　　758 F.3d 202 (2d Cir. 2014)…………………………………………..32

*Kenny v. Nassau Univ. Med. Ctr,*
　　No. 14-CV-7505, 2016 WL 10566999 (E.D.N.Y. Mar. 14, 2016)………...60

## TABLE OF AUTHORITIES

Page

<u>Cases</u>

*Kerman v. City of New York,*
    261 F.3d 229 (2d Cir. 2001)……………………………………………49, 50

*Luna v. Pico,*
     356 F.3d 481 (2d Cir. 2004)……………………………………………54

*M.C. v. Cnty of Westchester,*
    No. 16-CV-3013, 2018 WL 1275435(S.D.N.Y. Mar. 6, 2018)……………60

*McGugan v. Aldana-Bernier,*
    752 F.2d 244 (2d Cir. 2014)…………………………………………..60

*Myers v. Patterson,*
    819 F.3d 625 (2d Cir. 2016)…………………………………………..48

*Olivier v. Robert L. Yeager Mental Health Ctr.,*
    398 F.3d 183 (2d Cir. 2005)…………………………………………..48

*Palazzo ex rel. Delmage Corio,*
    232 F.3d 38 (2d Cir. 2000)……………………………………………32

*Pearson v. Callahan,*
    555 U.S. 223 (2009)…………………………………………………..55

*Piesco v. City of New York, Dep't of Personnel,*
    933 F.2d 1149 (2d Cir. 1991)……………………………………....29

*Project Release v. Prevost,*
    722 F.2d 960 (1983)…………………………………………………..5, 64

*Rodriguez v. City of New York,*
    72 F.3d 1051 (2d Cir. 1995)………………………………..49, 53, 54, 56, 64

*Rodriguez v. Plymouth Ambulance Serv.,*
    577 F.3d 816 (7th Cir. 2009)…………………………………………62

viii

## TABLE OF AUTHORITIES

Page

<u>Cases</u>

*Russo v. City of Bridgeport,*
    479 F.3d 196 (2d Cir. 2007)……………………………………………..57

*Scott v. Coughlin,*
    344 F.3d 282 (2d Cir. 2003)…………………………………………….44

*Tewksbury v. Dowling,*
    169 F. Supp. 103 (E.D.N.Y. 2001)………………………………………60

*Villanova v. Abrams,*
    972 F.2d 792 (7th Cir. 1992)……………………………………………48

*Weafri Well Servs.,Co. v. Fleet Bank, Nat'l. Assoc.,*
    98 Civ. 888 (JSM), 2000 WL 1472724 (S.D.N.Y. Sep. 29, 2000)………...33

*Weyant v. Okst,*
    101 F.3d 845 (2d Cir. 1996)……………………………………………48, 49

*Wilson v. Layne,*
    526 U.S. 603 (1999)……………………………………………………..54

*Young v. Lugo,*
    No. 18-CV-04216, 2023 WL 2815718 (E.D.N.Y. Feb. 6, 2023)…………..60

*Zalaski v. City of Hartford,*
    723 F.3d 382 (2d Cir. 2013)……………………………………………..55

<u>Statutes</u>

N.Y. Mental Hyg. Law § 9.01…………………………………………………..50

N.Y. Mental Hyg. Law § 9.13(b)………………………………………………..50

N.Y. Mental Hyg. Law § 9.37…………………………………………………..50

N.Y. Mental Hyg. Law § 41.05…………………………………………………...62

ix

# United States Court of Appeals
# For the Second Circuit

---

DIANA RENE

*Plaintiff-Appellant,*

v.

TANZIA MUSTAFA, M.D., personally, EJIKE ONUOGU, M.D., personally, TAHIRA SIAL, M.D., personally, BRUNSWICK HOSPITAL CENTER,

Defendants-Appellees.

---

### BRIEF FOR PLAINTIFF-APPELLANT

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This is a civil rights lawsuit in which jurisdiction existed in the district court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). This Court has jurisdiction to hear this appeal pursuant to 28 U.S. C. § 1291, as plaintiff-appellant Diana Rene appeals a final judgment. A-23 – A-24; SA-1 – SA-2. The district court entered a final judgment on behalf of the defendant-appellees on March 28, 2024. *Id.* Ms. Rene filed her notice of appeal on April 9, 2024. A-3063.

QUESTIONS PRESENTED

1.      Did the district court err when it struck Rene's affidavit in opposition to the defendants' summary judgment motions on the ground that a party's summary judgment affidavit cannot contradict her deposition testimony when the

district court failed to cite one instance of contradictory testimony, Rene's affidavit was completely consistent her deposition testimony, and consistent with the affidavit and deposition testimony of Rene's four closest contacts?

2.    Did the district court err when it struck Rene's expert affidavit on the following grounds:

(a)    the district court determined that once it struck Rene's affidavit it was proper to strike her expert's affidavit because the expert relied on her affidavit testimony; and

(b)    when forming opinions on the performance of the defendant-appellees, Rene's expert relied on after-the-fact information unavailable to the defendants even though a reading of the expert's affidavit details that he (1) based his opinion on the actions of the defendants and (2) relied on information available to the defendants at the time they interacted with Rene?

3.    Does any other basis exist to discredit Rene's affidavit testimony?

4.    Does detailed opinion testimony from Rene's expert that defendant Tanzia Mustafa, M.D., substantially departed from professional standards and otherwise lacked a reasonable basis to believe Rene met the criteria for civil commitment preclude the granting of summary judgment on the merits of Rene's Fourth Amendment claim and further warrant a denial of summary judgment to Mustafa on qualified immunity grounds because questions of fact exist as to

2

whether Mustafa lacked arguable probable cause to believe Rene met the criteria for involuntary hospitalization?

5.    Did the district court err in dismissing Rene's fifth cause of action as duplicative of her first cause of action when Rene's fifth cause of action was a federal false imprisonment claim based on state law and under New York law the burden of establishing the legality of the confinement rests with the defendants whereas the burden of establishing a Fourth Amendment violation rests with Rene?

6.    Do questions of fact exist as to whether defendants Ejike Onuogu, M.D., and Tahira Sial, M.D., exercised independent medical judgment when they authorized Rene's confinement and does such a failure to exercise independent medical judgment render them state actors?

7.    Did testimony from Rene's expert that defendants Onuogu and Sial substantially departed from professional standards when they authorized Rene's involuntary hospitalization create issue of fact that precluded the granting of summary judgment to them on qualified immunity grounds?

## STATEMENT OF THE CASE[1]

In 2015, Diana Rene was a 51 year-old women with no mental health history. All of her close contacts, including her husband and best friend, viewed

---

[1] All factual assertions contained in this case overview will be cited to in the Statement of Facts.

3

her as a psychologically healthy person, never noticing any behavior suggestive of a mental illness.  However, for three months in 2015, Diana Rene suffered from a gland disorder that produced a substantial amount of pain in her mouth and face.  In early July 2015, Ms. Rene underwent surgery to correct the problem.  The surgery failed to do so, and Ms. Rene found the post-operation period over the next few weeks that much more painful and difficult.

On July 24, 2015, Rene went to the emergency room at Stony Brook University Medical Center ("Stony Brook") with chest pain.  When meeting with the emergency department physician who conducted an intake, Rene made the following statement:  "I don't know how people can live with such pain in the face."  The doctor interpreted this statement as a suicide statement and had her sent to the Stony Brook Comprehensive Psychiatric Emergency Program ("CPEP").  At CPEP, she first met a nurse who rushed through what was supposed to be a detailed assessment and made numerous wrong chart entries; a few of which suggested Rene suffered from depression and suicidal thoughts.  She then saw two inexperienced clinicians, a social work student, and a resident.  Both incorrectly interpreted difficulties arising from her gland disorder and unsuccessful surgery as symptoms of depression.

Decades ago, this Court held that "the layers of professional . . . review" under New York Mental Hygiene Law Article 9 were a reason why New York's

civil commitment law comported with due process. *See Project Release v. Prevost,* 722 F.2d 960, 975 (1983) (internal quotes omitted). One would have expected experienced psychiatrists to carefully assess this person with no mental health history and recognize the difference between symptoms arising from a painful physical disorder and a mental illness. However, the doctors who were supposed to serve as layers of professional review failed Rene. Defendant Mustafa who authorized Rene's initial detention, met with Rene for no more than ten minutes, five of which were spent talking about the medication Mustafa wanted Rene to take. Mustafa authorized Rene's transfer to Brunswick Hospital Center ("Brunswick") for admission. At Brunswick, defendant Onuogu authorized Rene's admission after meeting her for no more than ten minutes also, with half the time involving Rene's discussion about her desire to leave the hospital and the steps she could take to do so. Defendant Sial authorized additional confinement although she made up her made about Rene's clinical condition before they met: Sial's first words to Rene upon meeting were "you are a very sick woman." Rene remained confined at Brunswick for five days. Rene subsequently filed this lawsuit pursuant to 42 U.S.C. § 1983 with supplemental state law claims challenging her confinement.[2]

---

[2] Rene alleged that Mustafa violated the Fourth Amendment by authorizing her seizure and initial detention in the absence of probable cause to believe Rene met the criteria for hospitalization. Rene raised three claims against only Onuogu and

Following discovery, the defendant-appellees moved for summary judgment. The district court (Seybert, J.) granted summary judgment to all the individual defendants and chose not to exercise supplemental jurisdiction over Rene's supplemental state law claims.

The district court first ruled that Rene's reliance on her affidavit to establish disputed facts was unavailing because the court found the affidavit "to be inconsistent with her prior deposition testimony and which inconsistencies Plaintiff fails to adequately reconcile or otherwise explain." A-49; SA-27. In so ruling the district court recognized that is well-established that a court need not rely on a "sham affidavit." *Id* . However, the district court cited no inconsistencies between Rene's affidavit and her deposition testimony. A-45 – A-51; SA-23 – SA-29. As a result its decision, the court ruled that it would not consider Rene's affidavit and to the extent that portions of her 56.1 counter-statement relied upon Rene's affidavit testimony to dispute the defendants' 56.1 statements, the court considered all of such statements by the defendants undisputed. A-51; SA-39. In so doing, the district court also ignored the affidavit and deposition testimony of Rene's

_____

Sial. She alleged that they wrongly confined her when she did not pose a danger to herself as a result of mental illness. A-109 (¶ 80). She also alleged a Fourth Amendment unreasonable seizure claim and a second due process claim on the ground that their examinations did not promise some degree of accuracy. A-108 – A-109 (¶ 76). Rene also brought a federal false imprisonment claim against Mustafa, Onuogu and Sial. *Id.,* (¶ 78). The complaint also contained a claim against a Brunswick nurse named Melina Francoeur alleging an illegal search. The parties settled this claim.

6

husband, her best friend, and her boss cited in Rene's 56.1 Counter-Statements. A-2525 – A-2529; A-2611.

The district court then concluded that a seizure to transport someone to a psychiatric hospital does not violate the Fourth Amendment if probable cause exists for the transport, *i.e.,* reasonable grounds, for believing that the person seized poses a danger to herself or others. A-63; SA-41. The court then ruled that undisputed evidence existed that at the time Rene presented at Stony Brook she posed a danger to herself. A-64; SA-42. The court found that Rene's chart contained multiple, consistent notations that she felt depressed, suffered episodes of crying, felt badly about past events, encountered difficulty sleeping , did not enjoy life, and wanted to jump off a bridge. *Id.* The district court further found that Mustafa evaluated Rene at least three times ranging from ten to forty-five minutes. A-65; SA-43. The court further found Mustafa recorded that Rene's medical issues led to poor sleep, poor appetite, weight loss, hopelessness, worthlessness, and suicidal ideation, all of which supported her medical judgment that the Rene posed a danger to herself. *Id.*

The district court also held that even if probable cause did not exist, Mustafa would be entitled to qualified immunity because it was objectively reasonable for Mustafa to believe that Rene posed a substantial chance of danger to herself based upon the facts Mustafa knew at the time. A-68; SA-46. In so holding, the court

7

first held that Rene could not rely on her "blanket denial of the accuracy of her medical record" and "bare denials" of statements that she allegedly made. *Id*. The court then rejected the opinion testimony of the plaintiff's expert, Peter Stastny, M.D., because he accepted Rene's version of the facts when a factual conflict existed. A-68 – A-69; SA-46 – SA-47. The court further held that Stastny relied on non-contemporaneous information to support his conclusions, such as affidavits from the plaintiff's husband, friend and employer. This was not permissible because "'courts must look to 'the specific observations and information available' *at the time of the seizure*'" when determining whether probable cause existed. A-69; SA-47 (quoting *Aouatif v. City of N.Y.,* No 07-CV-1302, 2019 WL 2410450 at *9 (E.D.N.Y. May 31, 2019)) (emphasis added by district court) (internal citations omitted by district court).

The district court then dismissed Rene's fifth cause of action, a federal false imprisonment claim. The court held that this claim amounted to a federal § 1983 claim based upon a violation of a state statute, New York Mental Hygiene Law § 9.37, which rendered this claim unsustainable. A-71 – A-72; SA-49 – SA-51. The court further ruled that to the extent the plaintiff sought to clarify this claim as to raise a Fourth Amendment claim, such an attempt could not save the claim. First it would amount to an impermissible attempt to amend the complaint on a summary judgment motion. A-72; SA-50. Moreover, if the court were to interpret this claim

8

as a Fourth Amendment claim, it would mean that this cause of action was identical to and hence, duplicated the first cause of action. A-72 – A-73; SA-50-SA-51.

The district court then dismissed the federal claims against Onuogu and Sial. It held that as physicians employed at a private medical facility they were not state actors because the actions of private doctors in involuntarily committing a person with mental illness could not satisfy any of the state action tests. A-89 – A-91; SA-67 – SA-69.

The district court then held that even if the defendants were found to be state actors qualified immunity protected them because it was objectively reasonable for them to believe that Rene posed a danger to herself. A-92; SA-70. In so holding, the court rejected the testimony of Rene's expert, Dr. Stastny, who opined that Onuogu and Sial substantially departed from professional standards. The court concluded that Stastny relied on Rene's unsubstantiated claim that Onuogu spent no more than ten minutes with her and a similar assertion by Rene that Sial spent a minimal amount of time with her. A-93 – A-94; SA-71 – SA-72. The district court then declined to exercise supplemental jurisdiction over Rene's state law claims. A-95- A-97; SA-73 – SA-75.

<u>STATEMENT OF FACTS</u>[3]

1.      <u>Relevant Background Information About Diana Rene</u>

Diana Rene is an individual who, prior to July 2015 had no mental health history.  A-2950 (¶ 2).  She was never diagnosed with any mental disorder and never suffered from depression, although she is an anxious person.  *Id.*

Rene's life has been marred by a series of very unfortunate events.  Her fiancé died in 1992 of complications from juvenile diabetes.  *Id.* (¶ 3).  Her first husband died in 2003.  *Id.* (¶ 4).  In 2012, he sister died when a car struck her when bicycle riding.  A-2951 (¶ 4).  However, Rene's best friend, Dolores Calleja, testified that while Rene grieved following these events, as would any normal person, there was never a moment when Rene appeared overwhelmed.  A-3016 (¶¶ 1-2).  Rene testified that she grieved after these tragedies but then went back to living life as before, not dwelling on her losses.  A-2951 (¶ 5).

---

[3] Ordinarily, a statement of facts can be premised on a recognition that under ordinary summary judgment principles, a court must accept as true factual submissions made by the party opposing summary judgment.  *See infra* at 29. However, because the district court's decision has brought Rene's credibility into issue, particularly those statements in her affidavit, on the ground that they conflicted with Rene's deposition testimony, the Statement of Facts will also include testimony from individuals close to Rene whose testimony buttresses two of Rene's overarching contentions: she never suffered from depression and was never suicidal.

Rene is a very religious person. She prays every day, often attends church, reads the Bible about once a week, and listens to Christian radio. A-2951 (¶ 6); A-3012 (¶ 4).

2. The Period of Time Leading Up to Rene's Hospitalization

Rene testified that in March 2015, she developed a glandular problem that caused substantial pain in her mouth and cheek. A-2951 – A-2952 (¶¶ 7-9). While the pain was a source of frustration and anxiety, it did not interfere with her life. Rene continued to work. When her work day ended, she came home, cooked dinner, and walked her dog. *Id.* (¶ 10). She cleaned daily and saw friends just as she had before the pain started. *Id.* (¶ 11). She continued to engage in sexual activity. *Id.* (¶ 14).

Calleja provided the following testimony:

during the period from March through June 2015, she did not notice that Rene had any less interest in the activities she enjoyed such as watching baseball, going on walks, going to dinner, and meeting with her friends; A-2667 – A-2668; A-3016;

at no time did Rene express to her that she felt helpless or hopeless; A-2669; and,

11

when Rene's fiancé, first husband, and sister died, Rene went through a normal period of grieving, moved on with a strong positive attitude, and never appeared overwhelmed by these deaths. A-3016 (¶ 2).

At no time during the period of January 2015 through June 2015 could Rene's boss, Katie D'Esposito, recall a change in Rene's productivity at work. A-2630 – A-2631. D'Esposito further testified that she could recall no time during this period when Rene appeared depressed and added that if she appeared depressed it is something that she would remember. A-2637 – A-2638.

Rene's husband, Joseph Rene, also testified that at no time did Rene's show signs of depression. A-1634. He described Rene as someone who had always been, including in 2015, an upbeat, optimistic person who thought things would improve. A-1634; A-1737. He further testified that from March through July 2015, Rene continued to function at the same level that she always did. A-3012 (¶ 5). He added that at no time did Rene come home and go straight to bed. A-1653. He further corroborated that he and Rene continued to engage in sexual relations from March 2015 through July 2015. A-1717.

Eventually, a physician diagnosed Rene's problem as sialandenitis but doctors could not remedy the situation. A-2952 (¶ 15). On July 2, 2015, Ms. Rene had surgery called a Sialendoscopy, but the surgery did not remedy the problem. A-2953 (¶ 16).

12

The surgery created some ancillary problems for Rene.  It made it difficult for her to eat and she lost about five or six pounds.  *Id.* (¶ 18).  The pain and swelling from the surgery also made it more difficult to sleep.  *Id.* (¶¶ 19-20).  She would awaken about every two hours, although she would then quickly fall back to sleep.  *Id.* (¶ 19).

Following the surgery, a physician prescribed steroids and a medication called Salgen.  The medication caused chest pain, dizziness, and nausea; on July 24, 2015, Rene experienced these symptoms.  *Id.* (¶¶ 22-23).  Her husband drove her to Stony Brook.  A-2954 (¶ 23).

### 3.    Rene's Mental Status Upon Presentation to Stony Brook

Rene's expert explained why Rene did Rene not meet the criteria for either major depression or a depressive disorder when she presented at Stony Brook: she did not meet the diagnostic criteria for these orders set for by the American Psychiatric Association.  A-2976 – 2979 (¶¶ 20-33).  This included, but is not limited to the following: Rene never had any thoughts of suicide or self-harm, functioned at work, and continued to engage in appropriate activities, including interacting with her close contacts; Rene did not have any feelings of worthlessness or excessive guilt; Rene did not have a diminished ability to think or concentrate; whatever distress from which she suffering was related to a medical condition and did not impair her social or occupational functioning; and, the six

13

pound weight loss that Rene experienced was not 5% of her body weight and was attributable to difficulty in eating following surgery. A-2977 – 2978 (¶¶ 25; 27-31).

    4.    <u>Rene's Time at Stony Brook</u>

        a.    <u>The Emergency Department Doctor Misinterprets a Statement by Rene</u>

Shortly after her arrival, Rene met with a physician in the emergency department. She spoke of her frustration with her medical condition and stated "I don't know how people can live with such pain in the face." A-263; A-2954 (¶ 24). Rene meant to express frustration; at no time did she intend this statement as an expression of a suicide thought or intent to take her life. A-264; A-2954 (¶ 24). The emergency department physician dictated a note that stated that Rene had no diagnosis of depression although she reported that she has been increasingly distraught over her salivary gland problem. The note added that Ms. Rene suffered from dry mouth and a metallic taste, nausea, vomiting, loss of appetite, and Rene stated that she wants to take her life as result of these symptoms. A-1553. An order was written placing Rene on 1:1 observation as person who was severely suicidal or posed a significant risk of injury to herself. A-1495.

The physician told Rene she wanted her to go for a psychiatric evaluation. A-2954 (¶ 26). Rene went involuntarily. A-2955 (¶ 27).

14

b.    Rene Meets Nurse Thomas Fining

Rene's first meeting with a Stony Brook clinician was with nurse Thomas Fining.  The meeting lasted ten to fifteen minutes with Fining taking notes with a pad and pen.  A-2955 (¶ 28).

Following the meeting, Fining entered a chart note indicating Rene stated that the "quality of her life has gone down and she has lost her zest for life." Fining further stated that Rene also reported "that she has had thoughts of wanting to leave this earth and does not want to be a burden to anyone" and had a history of depression and anxiety.  A-1455.  Fining acknowledged that Rene denied current suicidal ideation, *i.e.,* thoughts, and had no history of suicide attempts.  *Id.*

Although Fining met with Rene for ten to fifteen minutes, he made a chart entry that contained ninety-four pieces of data, most of which related to Rene's mental status; this entry included twenty-eight questions related to suicide.  A-1456 – A-1457.  Fining also indicated Rene did not suffer from a mood disturbance, did not feel hopeless, was not hallucinating, did not suffer from anxiety, lacked long-term relationships, also lacked spiritual and religious convictions, and felt lonely.  A-1456.  Fining then recorded that Rene had (1) no non-specific suicide ideas in both her lifetime and in the past month, (2) no suicide idea, method or plan in the past month and in her lifetime, and (3) no suicide idea intent or plan in both the past month and in her lifetime.   A-1457.

15

Fining then turned around and under the categories that contained a numerical rating system for any suicidal ideation from which a patient might suffer, directly contradicted some of what he had just written:

> Most severe ideation (Past month):: 1 = Wish to be Dead
> Frequency of thoughts (Past month): 3 = 2-5 times a week
> Duration of thoughts (Past month): 3 = Can control thoughts with difficulty
> Impact of deterrents (Past month): 2 = Deterrents probably stopped subject
> Rationale for suicide (Past month): 5 = Completely to stop the pain.

*Id*. Fining based his chart entry on what Rene told him and the information set forth in Rene's chart. A-1458.

In her affidavit, Rene challenged the accuracy of some of Fining's note. Rene was emphatic: she never had a suicidal thought or intent in her life. *Id.* (¶ 35). Rene added that she never spoke to Fining about suicide and no one a Stony Brook asked her if she had any possible suicidal thoughts prior to meeting with Fining. *Id.* (¶ 35).

Rene also denied saying that she had thoughts of "wanting to leave this earth" as her faith counsels against suicide. A-2954 (¶ 25). Rene added that she may well have said "I am a Christian woman. I would never want to leave this earth" with staff not hearing the words "would never." *Id*. In her deposition, Rene also denied telling anyone that she had thoughts of wanting to leave this earth. A-280.

16

Rene denied feeling lonely, stating that she had a good relationship with her husband and daughter and interacted with her mother, step-daughters and best friend. A-2956. (¶ 32). She added that Fining was wrong about her lacking religious convictions as demonstrated by her church attendance, religious cards that she sends, Bible reading, and listening to Christian radio. A-2951 (¶ 6); A-2956 (¶ 34). Rene denied telling Fining the quality of her life had gone down. A-2955 (¶ 29). Rene also denied telling Fining that she had a history of depression. A-2955 (¶ 28).

Rene acknowledged feeling anxious but denied feeling depressed, except to acknowledge that she found her doctors' inability to cure her medical condition depressing. *Id.* (¶ 29). Finally, in both her affidavit and deposition Rene denied saying that she "lost my zest for life," as it was a term she never used. A-2956 (¶ 30); A-280.

### c.   Rene Next Meets a Social Work Student

Later that afternoon, Rene met with a social work student named Kristy Graziano. This meeting lasted about twenty minutes. A-2958 (¶ 43). Graziano then entered the following note:

> Patient reported "I originally came here because I was dizzy and having chest pains." "I have not had an appetite for 2 days and I am just not myself." "I haven't slep (sic) in two weeks, sweating and worrying about this taste in my mouth." I maybe get two hours of sleep per night." "I don't feel like doing the things taht (sic) I used to enjoy like watching Yankee games after work." "I don't even watch

17

my favorite shows" "Instead I just go home and go to bed." Patient
reported "It all started in March when I kept having this salty taste in
my mouth." "I had surgery on my gland and it did not solve it." "I
seem to obsess about what could be causing this." "I am upset that it
is not overwith (sic) by now." "I feel over the top." "I just worry non
stop." "And then I feel depressed because I worry and that the
situation is not resolved." Patient reported ["]I know I said that I
wanted to leave this earth, but I do not want to kill myself" I am a
christian (sic) and I love my family too much to do that."
Patient reported "I have been through so much loss." "My fiancé died
when I was 27, my first husband died in 2008 form (sic) a staph
infection in this hospital, and I lost my sister 2 years ago." "And I am
my mother's support system."
Patient denied suicidal ideation, suicide attempts, treatment,
hospitalizations, abuse, access to guns, substance abuse or use, legal
issues, and family history or mental disorders.
Patient reported history of treatment as "I used to see a therapist for
grief in 1989, then again in 2004 for grief again."

A-1527.

In her affidavit Rene challenged the accuracy of much of Graziano's note,

stating that much of it was wrong or taken out of context. She denied stating that

she slept only two hours a night. Rather, she stated that she told Graziano that she

had been waking up every two hours. A-2957 (¶ 38). Rene further explained that

the statement about going to bed was taken out context. Rene came home from

work, took a nap, and then cooked dinner, and walked the family dog. *Id.* (¶ 39).

Rene pointed out other inaccuracies in the chart entry. Her fiancé died when

she was twenty-nine, not twenty-seven, her first husband died in 2003, and her

sister died three years prior to the interview. A-2957 (¶ 40). Rene also denied

going to a grief therapist in 1989, stating that she took her daughter to a grief

therapist in 2003, although she did not go herself.  A-2958 (¶ 42).

        d.     <u>A Resident Works Up Rene</u>

Rene's chart indicates that at approximately 8:00 p.m. she next met with a

resident named Sridhar Kadiyala.  A-790 (p. 9); A-1475.  Kadiyala testified that it

at the time of Rene's evaluation it was the practice at Stony Brook for the resident

to assess a patient, take information from the social worker, and present the case to

the attending psychiatrist.  A-793 (pp. 20-21).   The assessment lasted no more

than fifteen minutes.  A-2958 (¶ 43).  Following the evaluation, Kadiyala did not

make his chart entry.  Rather he waited over an hour and a half to do so,

specifically at 9:38, A-1480,  Kadiyala entered the following note:

> [W]as transferred from [Emergency Department] secondary to
> [patient] acknowledging thoughts of passive suicidal ideation crossing
> her mind.  [Patient] reports for the last 3 weeks she has no appetite . . .
> She reports depressed mood . . . States that she hasn't slept in weeks,
> not enjoying life, her anxiety is high, doesn't feel like answering
> phones at home, not going out with friends, isolating herself, goes to
> work and goes home and hit (sic) bed without sleep, and having bad
> thoughts about her past (things happened to her in the past). . . .
> Reports her sleep is bad (2 hrs), for three months, apetite(sic) was
> poor and this week nothing (lost 6 lbs in 1 [week], endorses crying
> episodes, secondary to hurting her family, endorces (sic) helpless and
> hopeless ideation.  She reports ocassioanl (sic) thoughts of hurting
> herself cross her mind, but she denies ever having a plan, and intent.
> She states that she can't do that to her family (husband and daughter),
> she is "Christian and go to church". (sic)  She states that she
> acknowledged that she made statement to her PCP (primary care
> physician), "thoguhts (sic) of jumping off the bridge 2 months ago,
> and states people say different things that doesn't mean anything.

19

A-1475 – A-1476.  Even though Dr. Kadiyala found that Ms. Rene endorsed

helpless and hopeless ideation he also concluded that Ms. Rene  expressed "a sense

of purpose in life and hopefulness about plans for the future."  A-1474.

In her affidavit Rene denied feeling depressed and telling Kadiyala that she

was depressed although she found the inability to find a cure for her medical

condition depressing.  A-2958 – A-2959 (¶¶ 44; 46).  She further denied saying

that she had difficulty controlling suicidal thoughts because she never

acknowledged having suicidal thoughts.  A-29 58 (¶ 44).

Rene denied stating she does not enjoy life.  A-2958 (¶ 44).  Rene added that

any period following unsuccessful surgery is not a good period and can make a

person unhappy, which made life difficult.  However, she enjoyed life as a whole.

A-2959 – A-2960 (¶ 51).  In both her affidavit and deposition, Rene denied having

bad thoughts about things that happened in the past.  A-278;  A-2959 (¶ 48).  Rene

added that Kadiyala kept bring up her losses and making their impact worse than

they were.  A-2959 (¶ 48).

In both her affidavit and deposition Rene denied saying that she told her

primary care physician that she had thoughts of jumping off a bridge.  A-2960 (¶

52); A-233 – A-235; A-292.  In her affidavit she explained how Kadiyala may

have mistakenly come to make this incorrect chart entry.  While in the emergency

20

room Rene met another patient named Lisa who informed her that she had attempted to jump off a bridge.

Rene added that she had asked Kadiyala to contact her primary care physician who could inform him that Rene's difficulties were not psychiatrically related. A-2960 (¶ 52). However, Kadiyala seemed uninterested in her gland problem serving as an explanation all her perceived psychiatric difficulties. A-2961 (¶¶ 53-54).

Rene also denied stating that she had not slept in weeks, although she acknowledged she could have said had not been sleeping. In doing so she meant that she encountered difficulty sleeping since her surgery. A-2959 (¶ 48). She denied sleeping two hour a night for three months. Rather, she had difficulty sleeping for about two weeks. *Id.* Rene further denied saying that she was not going out with friends or isolating herself or that she comes home hits the bed without sleep. *Id.*

  e. Mustafa Facilitates Rene's Involuntary Psychiatric Confinement

At 9:38 p.m. Kadiyala entered a note indicating that he discussed the case with Mustafa. A determination was made that Rene would benefit from admission and would be started on a medication regimen that including Seroquel to treat hallucinations. A-1480. A few minutes later, Kadiyala entered another note in which he stated that Rene "is judged to require inpatient treatment." A-1474. He

21

added that "[u]nderstanding and agreement with the plan were expressed by the patient." A-1475.

At 10:00, Mustafa applied for Rene's involuntary admission to a psychiatric hospital pursuant to Mental Hygiene Law § 9.37. A-1541 – A-1543. Mustafa subsequently entered a note that contained the following information:

> No past psychiatric history, presented at MER (medical emergency room) for depression and Si (suicidal ideation). The patient has been having a metallic taste in her mouth which prompted her to seek treatment for parotid gland disease and underwent surgery only to be disappointed that the taste remained inher(sic) mouth leading to poor sleep, poor appetite, weight loss, hopelessnesxs (sic) worthlessness and recently suicidal ideations.

A-1481.

In both her affidavit and deposition Rene testified that she met with Mustafa once, at about 11:00 p.m., and the meeting lasted less than ten minutes. A-2961 – A-2962 (¶¶ 55; 57); A-286; A-506. At this time, Mustafa asked her about the losses in her life and then informed Rene that she was going to prescribe medication to help her with her olfactory nerve called Celexa. A-2961 (¶ 56); A-283 – A-284; A-286 – A-287. Rene tried to explain that her problems had been caused by a painful gland condition and unsuccessful surgery, but Mustafa appeared disinterested in this explanation. Rene asked Mustafa to contact her doctors but she did not do so. A-2961 (¶ 56). Mustafa then informed Rene that

22

she would be going to a hospital to be monitored for two days; perhaps at Brookhaven or Mather Hospital. *Id.*

In both her affidavit and deposition Rene testified that at no time in her life did she ever feel hopeless, helpless, or worthless and denied telling anyone at Stony Brook that she felt worthless or hopeless. A-2962 (¶ 59); A-279. Rather, she always felt good about herself and these feelings did not change even when going through the difficult period following surgery. A-2962 (¶ 59). While Rene did not remember the entire discussion with Mustafa, she never would have told Mustafa that she felt hopeless, helpless or worthless because she told Mustafa the truth. *Id.* Finally, Rene denied that she was in agreement with the plan to send her for inpatient psychiatric treatment. A-2960 (¶ 53).

5.    The Patient Referral Process From Stony Brook to Brunswick to Which Rene Was Subject

The Admission Director for Brunswick for twenty-one years, Richard Cirillo, testified about how the process of transferring patients from Stony Brook to Brunswick worked. When Stony Brook referred a patient to Brunswick for hospitalization it first sent over information about the patient. A-2063 – A-2064. A nurse practitioner or nursing supervisor reviewed the information. A-2066. If the patient met Brunswick's own admission criteria Brunswick accepted the patient but did not legally admit the patient until a psychiatrist conducted an admission evaluation and completed the appropriate psychiatric assessment form. A-2076.

23

During Cirillo's tenure, Brunswick admitted about two thousand patients a year, ninety to ninety five percent of whom were involuntary. A-2078 – A-2079; A-2113.  In the twenty-one years leading up to Rene's hospitalization, Brunswick psychiatrists failed to screen out even one patient sent by Stony Brook; rather every one of the approximately 38,000 to 40,000 patients initially referred was found to meet the criteria for involuntary hospitalization by the evaluating physician and Brunswick involuntarily confined every such patient except those patients who were not admitted for physical problems unrelated to their psychiatric condition.  A-2079; A-2127 – A-2129.

6. <u>Rene's Time at Brunswick Hospital</u>

a. <u>Onuogu Meets Briefly With Rene and Certifies Her For Involuntary Admission.</u>

The following evening, July 25th, an ambulance transported Rene to Brunswick.  A-2963 (¶ 63).  Upon arrival, Brunswick staff subjected Rene to a strip search.  A-377 – A-386.

At 11:00 p.m., Brunswick staff took Rene to meet with Onuogu.  She walked into a room where he appeared to be looking at papers and writing into a loose-leaf binder.  A-2963 – A-2964 (¶ 68).  A-2963 (¶ 63).  In both her affidavit and deposition Rene testified that she first said to Onuogu that she wanted to write a

24

letter requesting her release. A-2964 (¶ 69).[4]  Onuogu informed her that writing

such a letter would result in her confinement for at least a month because that is the

time it would take a judge to review the document. *Id.* ¶ (69); A-410 - 411.

Onuogu then asked Rene the same questions Stony Brook clinicians had asked her,

such as does she feel like hurting herself and is she depressed. *Id.* (¶ 71); A-411.

Rene responded that she told Onuogu that she is a Christian woman, loves her

family, was never depressed and would never do anything to herself. *Id.* (¶ 72).  In

both her deposition and affidavit Rene testified that the meeting with Onuogu

lasted less than ten minutes. *Id.* (¶ 73); A-418.  Rene added that half the time

involving discussion about the letter Rene wanted to write and the consequences of

writing the letter.  A-2964 (¶ 73).

Onuogu wrote an admission note that contained the following content, some

of which contained the same incorrect information found in the social work student

note:

> Reason for admission: Depressed mood with suicidal ideation.
> History of present illness:  Patient is 51-year old, married wife,
> presenting with depressed mood since two weeks after surgery of right
> parotid gland.  She has not been able to sleep.  She has been feeling
> helplessness (sic), having suicidal ideation, but no specific plans.  She
> reports multiple losses.  Death of sister two years ago, first husband

---

[4] While Rene was at Stony Brook, another patient told her that she could request
her release from the hospital by writing a letter asking for her release.  A-2963 (¶
63).  Rene had received wrong information.  The writing of a letter as a means for
a patient to obtain release relates to voluntary patients.  *See* N.Y. Mental Hyg. Law
§ 9.13(b).

died in 2008, fiancé died when she was 27 years. She is going through menopause and is not sexually active. She denies any hallucinations or manic symptoms.

A-758 – A-761; A-2176 – A-2177. Onuogu authorized Rene's involuntary

admission to Brunswick pursuant to Mental Hygiene Law § 9.37. A-2298; A-700.

> b.   Sial Authorizes Further Confinement

The next morning Rene met Sial. In both her deposition and affidavit, Rene

testified that upon meeting, Sial immediately said to her "you are a very sick

woman." A-419; A-2965 – A-2966 (¶ 78). Rene then described what occurred

next in her deposition:

> Q.   And how did you respond?
> A.   I said I am not very ill and I want to go home. I don't belong here. This is all a big mistake.
> Q.   Okay. And what else do you recall about that meeting with Dr. Sial?
> A.   She said she was going to give me the medication that they wanted me to go on, that Dr. Mustafa said I should take or wanted to start to start me on. I said I didn't need any of the medication. I wanted to go home. She asked me if I was depressed. I said absolutely not. She asked me about the losses in my life. Again, someone else asking me about that. If I would hurt myself. Absolutely not. And I want to go home. I told her I wanted to write the letter. And she said that's not a good idea, they'll keep you here longer.

A-419.

In both her deposition and affidavit Rene testified that Sial met with her for

less than ten minutes. A-418; A-2966 (¶ 82). Rene further testified that she never

told Sial that she felt hopeless or helpless. A-2966 (¶ 83). Nevertheless, following

26

the meeting, Sial wrote a note in which she concluded that Rene felt hopeless and helpless and suffered from a major depressive disorder. A-2235 – A-2236; A-820 (p. 21). On day later, July 27, 2015, Sial authorized Rene's continued hospitalization at Brunswick pursuant to Mental Hygiene Law § 9.37 in which she labeled Rene suicidal. A-2301. Rene remained confined at Brunswick until July 30, 2015. A-2967 (¶ 89).

## SUMMARY OF ARGUMENTS

The district court erred when it struck Rene's affidavit as a sham affidavit. The court made no attempt to determine what portions of Rene's affidavit, if any, conflicted with her deposition testimony. Moreover, Rene's affidavit testimony was completely consistent with her deposition testimony.

No other basis exists to discredit Rene's affidavit testimony. Rene testified in detail and did not make blanket denials. It cannot be said that Rene submitted an uncorroborated, self-serving affidavit. Binding precedent from this Court holds that an uncorroborated affidavit can create issues of fact on a summary judgment motion. Moreover, Rene submitted corroborating testimony from those with personal knowledge of her mental status and conduct. In addition, to credit chart entries when Rene has testified otherwise is to make an impermissible credibility determination.

27

Mustafa lacked probable cause to believe Rene met the criteria for involuntary hospitalization. While ample information existed that Rene did not suffer from mental illness or was dangerous, Mustafa substantially departed form professional standards by meeting with Rene for less than ten minutes and failing to take the time to gather the information that would have made clear that Rene did not suffer from mental illness or was dangerous. For similar reasons, Mustafa lacked even arguable probable cause, which means she lacked an objectively reasonable basis to believe Rene met the commitment criteria. Hence, Mustafa forfeited her qualified immunity.

The district court wrongfully dismissed Rene's federal false imprisonment claim on the ground that this claim was identical to, and therefore duplicated, her Fourth Amendment claim. With a federal false imprisonment claim, the burden of establishing the unlawfulness of the confinement rests with the party that deprived the plaintiff of confinement. With a federal Fourth Amendment claim, the burden rests with the plaintiff to establish the illegality of confinement.

Under Rene's version of the facts Onuogu and Sial engaged in state action. Numerous courts have unanimously held that private individuals engage in state action when they rely on a determination by a state actor to hospitalize an individual and fail to exercise independent medical judgment. Onuogu certified Rene for admission after meeting with Rene for no more than ten minutes, with

some of the time being taken to discuss Rene's desire to leave the hospital. Sial also met Rene for no more than ten minutes and apparently decided that Rene met the commitment criteria before meeting Rene. Moreover, because questions of fact exist as to whether Onuogu and Sial performed in a competent manner, these doctors are not entitled to qualified immunity.

## SUMAMRY JUDGMENT STANDARDS

This Court subjects a district court decision granting summary judgment to a de novo standard of review when reviewing whether the district court correctly concluded there were no issues of material fact and the moving party was entitled to judgment as a matter of law. *Frost v. New York City Police Dep't,* 980 F.3d 231, 241 (2d Cir. 2020). A fact is material if it might affect the outcome of the lawsuit under governing law. *Id.* at 242. An issue of fact is genuine when a reasonable jury could return a verdict for the nonmoving party. *Id.*

The burden rests with the moving party to establish the absence of genuine factual disputes. *Id.* As a general rule, the party who defends against the motion will have her allegations taken as true, *Piesco v. City of New York, Dep't of Personnel*, 933 F.2d 1149, 1154 (2d Cir. 1991). The nonmoving party will also receive the benefit of the doubt when her assertions conflict with those of the movant. *Bieluch v. Sullivan*, 999 F.2d 666, 670 (2d Cir. 1993), *cert. denied*, 510 U.S. 1094 (1994).

29

A court must resolve all ambiguities and draw all permissible favorable factual inferences in favor of the nonmoving party. *Frost,* 980 F.2d at 242. Finally, as a general rule a court should not weigh the evidence or assess the credibility of witnesses. *Id.*

However, this Court's obligation to draw all inferences in favor of the non-moving party does not mean that this Court must credit a version of the facts that is belied by the record. *Cameron v. City of New York,* 598 F.3d 50, 59 (2d Cir. 2010). This Court will give credence to evidence that supports the moving party that is uncontradicted and unimpeached, such as a videotape, at least when it comes from disinterested witnesses. *Id.* at 60. When a movant presents incontrovertible evidence that "so utterly discredits the opposing party's version" of the facts that no reasonable juror could fail to believe the version advanced by the moving party, this Court will grant summary judgment to the moving party. *Id* (internal quotes omitted). Similarly, the non-moving party may not rely on conclusory allegations nor speculation but must offer some hard evidence that its version of events is not wholly fanciful. *D'Amico v. the City of New York,* 132 F.3d 145, 149 (2d Cir. 1998). A court may grant summary judgment only when no rational jury could find in favor of the non-moving party. *Id.*

ARGUMENTS

I.  THE DISTRICT COURT ERRED IN FINDING THAT RENE
    SUBMITTED A SHAM AFFIDAVIT BECAUSE RENE'S AFFIDAVIT
    WAS COMPLETELY CONSISTENT WITH HER DEPOSITION
    TESTIMONY AND THE COURT FAILED TO CITE ANY INSTANCES
    OF CONTRADICTORY TESTIMONY.

    A.  Second Circuit Jurisprudence Requires a Court to Find an Actual
        Conflict Between an Affidavit and Deposition Testimony Before
        Striking an Affidavit as a Sham.

        Well-settled law provides that party may not create issues of fact when

opposing a summary judgment motion by submitting an affidavit that contradicts

her deposition testimony.  *See, e.g., Hayes v. N.Y.C. Dep't of Corrs.,* 84 F.3d 614,

619 (2d Cir. 1996).  However, any contradictions in testimony must be

"inescapable and unequivocal in nature."  *In re Fosamax Prods. Liab. Litig.,* 707

F.3d 189, 194 (2d Cir. 2013).  Hence, no one can seriously dispute that application

of this principle requires a court to find contradictory testimony if it is going to

disregard affidavit testimony of a party opposing a summary judgment motion.

*See, e.g., Brown v. Henderson,*  257 F.3d 246, 256 (2d Cir. 2001) (refusing to give

credence to assertion in affidavit that workplace harassment was related to status as

a woman when plaintiff testified in a deposition that her union activities produced

harassment that she suffered); *Bickerstaff v. Vassar College,* 196 F.3d 435, 454-55

(2d Cir. 1999)  (rejecting affidavit testimony of a professor in a discrimination

lawsuit who, in affidavit, testified that course evaluation questionnaires ("CEQ's")

31

were not the primary mode of evaluating professors by college when in deposition testimony she stated college relied almost exclusively on CEQs to judge teaching); *Buttry v. General Signal Corp.,* 68 F.3d 1488, 1493 (2d Cir. 1995) (rejecting affidavit testimony of plaintiff who asserted that he relied on union misrepresentations when he testified in deposition that he did not rely on any alleged misstatements from union).

The district court made absolutely no attempt to find deposition testimony by Rene that contradicted her affidavit. A-45 – A-51; SA-23 – SA-29. Hence, the actions of the district court amounted to an unwarranted rejection of Rene's affidavit.

The district court further erred when it ruled that Rene was not allowed to elaborate on any topic addressed covered her deposition because the "[p]laintiff's time to explain what she meant by her responses to various Stony Brook and [Brunswick] Hospital personnel evaluators, including Mustafa and Hospital Doctors was during her deposition when those issues were being explored." A-50; SA-28. This is wrong. The sham affidavit doctrine permits a party to testify in an affidavit about any matter that "'addresses an issue that . . .was not thoroughly or clearly[] explored'" at the party's deposition. *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.,*758 F.3d 202, 213 (2d Cir. 2014) (quoting *Palazzo ex rel. Delmage Corio*, 232 F.3d 38, 43 (2d Cir. 2000)). Hence, a party can

32

supplement her deposition testimony in an affidavit as long as the testimony does not contradict the deposition testimony. *See, e.g., id., Catalyst Advisors, L.P. v. Catalyst Advisors Investors Global, Inc.,*, No. 21 Civ. 4855, 2024 WL 522751, at * 12 (S.D.N.Y. Feb. 9, 2024); *Campo v. City of New York,* No. 19-CV-04364, 2022 WL 970730, at * 18, n.8 (E.D.N.Y. Mar. 31, 2022); *Weafri Well Servs.Co. v. Fleet Bank, Nat'l. Assoc.*, No. 98 Civ. 888 (JSM), 2000 WL 1472724, at *8 n.9 (S.D.N.Y. Sep. 29, 2000). Rene's affidavit does not contradict her deposition testimony. *See infra* at 33-36.

Finally, even if there exists some conflict between Rene's affidavit and deposition testimony of which she is unaware, the proper course of action is not to strike the entire affidavit. It is to strike the inconsistent testimony. *See Harig v. City of Buffalo,* 574 F. Supp. 3d 163, 183 (W.D.N.Y. 2021); *Fed. Deposit Ins. Corp. v. Murex LLC,* 500 F. Supp. 3d 76, 95-96 (S.D.N.Y. 2020).

B.    Rene Testified Completely Consistently Between Her Deposition Testimony and Her Affidavit Testimony.

Nor can the defendants assert that even though the district court made no attempt to document any conflicts in Rene's deposition and affidavit testimony, the striking of her affidavit was warranted because of testimonial conflicts. This is because, as detailed below, Rene testified very consistently between her affidavit and her deposition:

33

**Deposition testimony:** acknowledged telling someone she does not "know how people can live with such pain in their face," but denied telling anyone she wanted to take her life as a result of her symptoms; A-263 – A-264;

**Affidavit testimony:** made the comment to the emergency department doctor that "I don't know how people can live with such pain in the face," which was a statement of frustration and not an expression of a suicide thought or an intent to take her life; A-2954 (¶ 24);

**Deposition testimony:** denied telling anyone at Stony Brook that she had thoughts of wanting to leave this earth; A-280;

**Affidavit testimony:** never acknowledged that she said I want to leave this earth. A-2958 (¶ 41); believes that she may well have said "I am a Christian woman. I would never want to leave this earth" and added that the words "would never" were not heard; A-2954 (¶ 25);

**Deposition testimony:** denied saying that she lost her zest for life; A-280;

**Affidavit testimony:** denied saying that she "lost her zest for life" as that is a term she never used; A-2956 (¶ 30);

**Deposition testimony:** denied telling anyone at Stony Brook that the quality of her life had gone down; A-280;

**Affidavit testimony:** denied telling nurse Fining that the quality of her life had gone down; A2955 (¶ 29);

**Deposition testimony:** denied that she told her primary care physician that she wanted to jump off a bridge; A-233 – A-235;

**Affidavit testimony:** denied saying that she had thoughts of jumping off a bridge; A-2960 (¶ 52);

**Deposition testimony:** never felt hopeless, helpless or worthless and denied telling anyone that she felt hopeless, helpless, worthless or lonely; A-279; A-295;

**Affidavit testimony**: never acknowledged feeling helpless or hopeless, with the possible exception that she felt hopeless about her medical situation, A-2959 (¶ 49); at no time did Rene feel hopeless, worthless or helpless; A-2962 (¶ 59);

34

**Deposition testimony:** testified that she met with Mustafa one time for less than ten minutes; A-285 – A-286; A-506

**Affidavit testimony:** met with Dr. Mustafa for less than ten minutes; A-2962 (¶ 57);

**Deposition testimony:** denied having bad thoughts about events that happened in her past; A-278;

**Affidavit testimony:** grieved after her fiancé, first husband, and sister died but after a period of grieving went back to living life as she did before and has not dwelled on these losses; A-2950 – A-2951 (¶¶ 3-5);

**Deposition testimony:** denied telling anyone that she ever saw a therapist and while she took her daughter to a grief counselor in 2003 when her father, Rene's husband, died, she never told anyone she saw a grief counselor herself in 1989 or 2009; A-233; A-294;

**Affidavit testimony:** denied telling Graziano that she saw a grief therapist in 1989 or at any time; rather she took her daughter to a grief therapist in 2003 when her daughter's father died; A-2958 (¶ 42);

**Deposition testimony:** told Stony Brook staff that she felt depressed because she worries that her health situation was not resolving itself; A-293 – A-294;

**Affidavit testimony:** never felt depressed although she found the lack of cure for her medical condition depressing; A-2955 (¶ 29);

**Deposition testimony:** acknowledged that she likely said she was not sleeping but explained that the difficulty in sleeping she experienced resulted from the pain she from which she was suffering; A-276;

**Affidavit testimony:** never said she had not slept in weeks although she may have said she had not been sleeping. This was meant to convey that she had difficulty sleeping since her surgery; A-2959 (¶ 48);

35

**Deposition testimony:** stated that she met with Onuogu for less than ten minutes with some of the time involving Rene's desire to take legal steps to leave the hospital by writing a letter seeking he release. A-410 – A-411; A-418;

**Affidavit testimony:** entire meeting with Onuogu lasted less than ten minutes; A-2964 (¶ 73);

**Deposition testimony:** met Dr. Sial for no more than ten minutes the morning after admission and before Rene could speak Sial said "you are very sick;" A-418 – A-419;

**Affidavit:** testified that the first thing Sial said to Rene was "you are a very sick woman," entire meeting with Sial did not last more than ten minutes; A-2965 - A-2966 (¶¶ 78; 82);

**Deposition testimony:** told Dr. Sial that she was "absolutely not" depressed or that she would hurt herself; A-419;

**Affidavit testimony:** told Sial that she was "absolutely not" depressed; A-2966 (¶ 79).

C.   The Striking of the Rene Affidavit Impacted on the District Court's Summary Judgment Determination.

In granting summary judgment to Mustafa, the district court relied much information that Rene disputed. This included, but not limited to, the finding that Rene wanted to jump of a bridge and leave this earth, no longer engaged in activities that she enjoyed; had protracted trouble sleeping and not being able to sleep, felt bad about past events, felt hopeless and worthless, and manifested recent suicidal ideation. A-64 – A-65; SA-42 – SA-43. The district court further based its judgment to Mustafa on the ground that she evaluated Rene at least three times. A-65. Rene disputed all of this in her affidavit. A-2951 – A-2961 (¶¶ 5; 10; 11;

13; 25; 35; 49; 52; 59.).  Similarly, in finding that Onuogu and Sial were entitled to qualified immunity, the district court concluded that the testimony of the plaintiff's expert did not create issues of fact because he relied on Rene's affidavit testimony, which she struck.  A-93 – A-94; SA-71 – SA-72.

D.   The District Court Erred in Striking the Declaration of Rene's Expert.

The district court gave two reasons for striking the declaration of the appellant's expert, Peter Stastny, M.D.  First, Stastny assumed as true statements of Rene.  A-68 – A-69; SA-46 – SA-47.  This brief has established that the district court erred in striking the affidavit of Rene.  Hence, reliance on Rene's statements in forming his opinions cannot serve as a valid reason to strike Stastny's declaration.

The district court further concluded that Stastny relied on non-contemporaneous information to support his conclusion that Ms. Rene did not suffer from a major depressive disorder whereas "courts must look to 'the specific observations and information available' *at the time of the seizure'* when determining whether probable cause existed to justify the detention for transport." A-69; SA-47 (quoting *Aouatif v. City of New York,* 09-CV-1302, 2019 WL 2410450, at * 9 (E.D.N.Y. May 31, 2019)) (emphasis in district court opinion). This included information gathered from Stastny's visit and affidavits from Rene's husband, friend and employer.  *Id*.  However, a reading of the affidavits details that

37

these individuals addressed the facts and circumstances that existed prior to Ms. Rene's hospitalization; all information available to the defendant physicians if they conducted psychiatric evaluations that comported with professional standards. A-3011 – A-3018.[5]

Most significantly, Stastny based his opinions relating to the substantial departure from professional standards by Mustafa, Onuogu, and Sial on the very cursory evaluations conducted by these physicians that necessarily meant that they lacked the ability to gather the information that professional standards required them to gather. A-2984 – A-2986 (¶¶ 49-56). This is information that has nothing do with information unavailable to the defendant doctors.

Moreover, a reading of Stastny's declaration details that when assessing whether Ms. Rene suffered from a major depressive disorder and posed a danger to herself and whether an objectively reasonable basis existed to believe that Rene posed a danger to herself, Stastny relied on what the psychiatric profession relies upon to determine a person's dangerousness: an assessment of risk and mitigating factors. A-2975 (¶ 17); A-2980 (¶¶ 37-38). This was information available to the defendant-physicians. This included the following: Rene was not an impulsive person; did not use poor judgment; did not abuse alcohol or drugs; lacked a history

---

[5] Stastny's declaration details that in his interview with Rene he gathered information pertaining to events and circumstances leading up to Rene's presentation at Stony Brook. *See* A-2978 (¶ 30); A-2981 – 2982 (¶¶ 40; 41).

of acting in a harmful way toward herself; was religious and had religious beliefs against suicide; had a supportive family; had a sense of responsibility toward family members; was engaged in her work; and, had future plans. *Id*.

E.     No Other Basis Exists to Disregard Rene's Testimony.

It is well-settled that this Court may affirm the district court on any basis for which support in the record exists, including grounds not relied on by the district court. *See, e.g., Ferran v. Town of Nassau,* 471 F.3d 363, 365 (2d Cir. 2006). Hence, this brief will address alternate bases for relief set forth by the district court or the defendants below; all of which lack merit.

1.     Rene's Affidavit Cannot be Discredited on the Ground That it Consisted of Blanket or Bare Denials.

While the district court struck Rene's affidavit on the ground that it was a sham, the court indicated that it would not have credited it anyhow because it amounted to bare and blanket denials of her medical records. A-68; SA-46. This is wrong.

Rene submitted a nineteen page, ninety-four paragraph affidavit in which she acknowledged symptoms that Stony Brook staff diagnosed as symptoms of depression but which Rene asserted resulted from her gland condition. Rene acknowledged some difficulty in sleeping resulting from post-surgical pain. A-2953 (¶¶ 19-20). Similarly Rene acknowledged a loss of appetite from her the bad taste in her mouth and pain from surgery. *Id.* (¶¶ 18-19). Rene stated that she may

39

have told Graziano that she comes home and goes to bed but explained by that she came home and took a nap before taking care of the household. A-2952 (¶ 10); A-2957 (¶ 39).

Rene testified that she found her medical condition depressing, explained that she found the failure of doctors to find a cure for her gland disorder depressing and distinguished between her feeling depressed about her medical condition and feeling depressed as a whole. A-2958 – A-2959 (¶¶ 44; 46). Rene's outright denials involved chart entries that suggested that she was suicidal and suffered from major depression. *E.g.,* denying ever having suicidal thoughts, including denying that she had thoughts of jumping off a bridge and not enjoying life; denying feeling hopeless helpless or worthless (A-2958 – A-2960 (¶¶ 44; 46; 52).

Rene went into as much detail as one could reasonably remember after five years when describing her meeting with the emergency department doctor and the assessments by Fining, Graziano, Kadiyala, Mustafa, Onuogu and Sial. In each instance she described what was and was not discussed to the best of her memory, and how long each interaction took. A-2954 – A-2967 (¶¶ 24-86).

Significantly, Rene's testimony was completely consistent with the testimony of her husband, best friend and boss. *See supra* at 11-12; *infra* at 41-42. Moreover, the defendants took the deposition of not only Joe Rene, Calleja, D'Esposito but also of Rene's daughter, step-daughter and mother. A-1605 –

40

A2014; A-2617 – A-2671. Although the summary judgment record contained only

excerpts from some of these depositions, the depositions totaled over 1,000 pages.

The defendants questioned these witnesses about both Rene's mental status and

behavior leading up to her hospitalization and their knowledge of facts that would

have substantiated the accuracy of the chart entries that Rene denied. All this

testimony supported such contentions of Rene as she was not overwhelmed by the

death or her fiancé, first husband, and sister and did not suffer from depression,

particularly during the period of time leading up to her confinement. *E.g.,* A-2627

– A-2629 (Rene's boss testified that she never noticed Rene to be depressed, Rene

never said she was not enjoying life and did not appear more sad than usual); A-

2636 – A-2637 (Rene's boss testified that only changes in behavior during period

of bad taste in her mouth was the verbalizing of frustration and being a little

quieter); A-2642; A-2644 (mother testified that after fiancé and husband died,

Rene went through a period of grief but was fine afterward); A-2647; A-2657; A-

2665 (mother and Calleja testified Rene never attended bereavement therapy

herself); A-2650 – A-2651 (mother testified that after sister's death there was no

change in Rene's behavior); A-2653 (mother testified that during period of bad

taste in her mouth, Rene did not appear to be sleeping less); A-2656 (mother

testified that Rene never appeared hopeless or helpless); A-2669 (Calleja testified

that Rene never expressed helplessness or hopelessness); A-2674 (step-daughter

41

Jodi Lucena-Pichardo described Rene as optimistic, positive, joyful); A-1652 – A-1653 (husband testified that he did not notice any decrease in amount of sleep Rene was getting, never appeared tired and did not come home and go straight to bed).

On the other hand, a reading of the defendants' Rule 56.1 Statements establishes that the defendants could not cite to once piece of evidence from the individuals that supported their contention that Rene suffered from major depression and was suicidal. Nor could the defendants cite to any testimony that controverted any of Rene's statements in which she challenged the accuracy of the Stony Brook and Brunswick charts. *See* A-162 – A180; A-2445 – A-2465.

       2.    <u>This Court May Not Discredit Rene's Affidavit on the Ground That it is an Uncorroborated "Self-Serving" Affidavit.</u>

Rene expects the Brunswick defendants to argue, as they vigorously did below, that even if this Court recognizes that the district court erred in labeling Rene's affidavit a sham affidavit, it should nevertheless strike the affidavit because it is an uncorroborated, "self-serving" affidavit. However, this Court has held that "[t]here is nothing in . . . [R]ule [56(c)] . . . to suggest that nonmovants' affidavits alone cannot – as a matter of law – suffice to defend against a motion for summary judgment." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 57 (2d Cir. 1998). An uncorroborated affidavit is sufficient to defeat a summary judgment motion as long as it detailed and not conclusory. *Id.,* n.8. Rene went into detail describing

her lone meetings Mustafa and Onuogu and her first meeting with Sial. A-2961 – A-2962 (¶¶ 55-56; 58); A-2963 – A-2964 (¶¶ 68-73); A-2965 – A-2966 (¶¶ 78-82).

More significantly, this Court's recognition for the need for the rule that a non-moving party's affidavit alone can create issues of fact applies fully to the present situation. In *Danzer*, this Court recognized that some claims involve situations in which a plaintiff lacks the ability to provide corroborating information because third-party witnesses are often unavailable. 151 F.3d at 57. A psychiatric evaluation is one such situation. These evaluations almost always involve one-on-one assessments between patient and doctor.[6]

Furthermore, Rene provided corroborating testimony in the only form available to one who has been psychiatrically hospitalized: testimony from people with intimate knowledge of her mental well-being and actions. This included her husband, best friend, and, boss. These individuals personally observed Rene during a period when she when she was supposedly going through a mental illness. Together with Rene's expert, they provided testimony that substantiated her contention that she did not suffer from symptoms of depression. *See supra* at 11-14; 41-42.

---

[6] In those rare instances in which another staff member observes the evaluation, the staff member, who will interact with hundreds, of not thousands, of patients annually is likely not going to have a recollection of a patient with whom he or she was in brief contact years earlier. This was the case with Melina Francoeur who observed Onuogu's evaluation with Rene. A-2964 (¶ 69); A-2024 – A-2025; A-2035.

Nor does this Court's decision in *Bryant v. Iheanacho,* 859 Fed. Appx. 604 (2d Cir. 2021), weaken *Danzer* as authority. In *Bryant*, this Court rejected an uncorroborated affidavit from a plaintiff who claimed a psychiatrist who authorized commitment failed to examine him. This Court rejected this affidavit testimony because the plaintiff at some point also admitted that the psychiatrist evaluated him and the plaintiff's expert also opined that the psychiatrist evaluated the plaintiff. 859 Fed. Appx. at 605. Moreover, as noted, in this case, Rene submitted corroborating testimony.

### 3. This Court May Not Assume as True Entries in Rene's Charts Simply Because They are Hospital Chart Entries.

Rene expects Mustafa to argue, as she did below that because there was "no evidence that the statement attributed to the plaintiff in the Stony Brook chart were fabricated or misunderstood . . . they must be accepted as true." Mustafa Mem. Law in Support of Summary Judgment at 3 (Doc # 118). First, any crediting of notations in Rene's hospital record over her version of what she said amounts to making an impermissible credibility determination. *See Scott v. Coughlin,* 344 F.3d 282, 289-90 (2d Cir. 2003) ("[b]y finding against Scott on the basis of the disparity between some of Scott's medical records and statements in his affidavit, the district court made an impermissible credibility determination and weighed contradictory proof"). Second, as detailed below, a reasonable jury could credit Rene's version of the facts.

A jury could find that it is inconceivable that Fining gathered all of the information set forth in Rene's chart in the ten to fifteen minutes during which he spoke to Rene and recorded information with a pen and pad. Hence, a jury could reasonably conclude that Fining made assumptions about Rene. To illustrate, he noted that Rene lacked spiritual or religious convictions. A-1456. This is contrary to Rene's religious nature. *See supra* at 11; 17. Fining also documented that Rene lacked close long-term relationships. *Id.* This is clearly inaccurate as Rene has close relationships with her husband, daughter, mother, and best friend. A-2956 (¶ 32); A-3016 (¶ 1). If Fining was willing to make assumptions about this information, he could have been willing to assume information about Rene's supposed suicidal thoughts based upon erroneous information that her chart contained, including that she wanted to take her life because of the symptoms of her gland disorder. A-1553. Perhaps Fining needed to attend to other patients or simply wanted to leave his shift as early as possible.

A reasonable jury could find that Kadiyala simply wrote wrong information about Rene telling her primary care physician she wanted to jump off a bridge a few months before her Stony Brook presentation. The charts for her two primary care physicians (she changed physicians around the time she supposedly made this statement) contain no documentation of any such threat. A-2694 – A-2947. Rene's expert testified that it was likely that her chart would have contained such

45

documentation if she made such a threat. A-2991 – A-2992 (¶ 75). Hence, a jury could find that Kadiyala, having waited at least an hour to document his meeting with Rene, A-1475; A-1480, confused Rene with another patient that Rene spoke to who had thoughts about jumping off a bridge. A-2960 (¶ 52). A jury could also look at Kadiyala's note that Rene was in agreement to have her hospitalized, A-1475, and question his ability to process information completely accurately.

A jury could also find that Graziano was not a particularly accurate record keeper. She quoted Rene as saying her first husband died in 2008. A-1527. Rene asserted that her first husband died in 2003. A-2957 (¶ 40). The death certificate substantiates Rene's contention. A-2949.

Graziano also quoted Rene as saying that she saw a grief therapist in 1989 and 2004. A-1527. However, she quoted Rene as saying her fiancé died when she was twenty-seven, which would have been in 1990 and her first husband died in 2008. *Id.* These dates don't add up. If Graziano could not accurately record this objective data, she may well have mistaken Rene's statement that she woke up every two hours, A-2957 (¶ 38), and wrongfully concluded that Rene had been sleeping only two hours a night.

A jury could find Mustafa is not a particularly credible witness. While Rene testified that Mustafa met with her once, at 11:00 p.m., Mustafa testified that she saw Rene at least four times, the first time at approximately 6:00 p.m. A-554 - A-

555.  However, Kadiyala testified that the Stony Brook practice called for the resident to assess a patient and present information about the patient to the attending psychiatrist.  A-793 (pp. 20-21).  The Stony Brook chart details that Kadiyala first met with Rene at approximately 8:00 p.m. and presented the case to Mustafa between 8:00 and 9:38.  A-1475; A-1480.

Similarly, Mustafa testified that Rene lost fifteen pounds in a week.  Tr. at 68.  One would have expected Mustafa to document such a significant weight loss.  She did not.  Nor does Rene's Stony Brook chart remotely suggest such a weight loss.  *See* A-1446 – A-1562.

Mustafa testified that she believed that Rene's not having sex with her husband contributed to her suicidality.  A-606.  However, both Rene and her husband testified that they continued to engage in relations.  A-1717; A-2952 (¶ 14).

A reasonable jury could credit Rene's testimony and conclude that Onuogu subjected Rene to a cursory, "rubber-stamp" evaluation with the substantial majority of Onugu's findings having been copied from Rene's Stony Brook chart.  It is inconceivable that Brunswick would subject a patient to a strip search (A-377 – A-386) whom it believed it might not admit.  Similarly, Onuogu's evaluation is consistent with a process in which every one of approximately 40,000 individuals

47

referred by Stony Brook over twenty-one years were found to meet the criteria for involuntary hospitalization.  A-2079; A-2127 – A-2129.

## II.    UNDER RENE'S VERSION OF THE FACTS, MUSTAFA IS NOT ENTITLED TO SUMMARY JUDGMENT.

### A.    Mustafa Lacked Probable Cause to Believe Rene Suffered From Mental Illness and Posed a Substantial Threat of Harm.

This Court has recognized that "[t]he Fourth Amendment requires that an involuntary hospitalization  'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.'"  *Glass v. Mayas,* 984 F.2d 55, 58 (2d Cir. 1993) (quoting *Villanova v. Abrams,* 972 F.2d 792, 795 (7th  Cir. 1992)). Probable cause to deprive someone of liberty exists when "the specific observations and information available" at the time of the seizure, *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016), enable a "person of reasonable caution" to determine that the person detained is subject to seizure.  *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996).

This Court has recognized that in the context of a due process challenge to an involuntary hospitalization, a plaintiff must produce expert testimony because a lay jury lacks the ability to analyze questions pertaining medical standards without expert testimony.  *See Olivier v. Robert L. Yeager Mental Health Ctr.,* 398 F.3d 183, 190  (2d Cir. 2005).  An expert is equally necessary to aid in a jury's

48

determination of whether a reasonable basis existed for a psychiatrist to authorize a seizure of a person. This is because compliance with the New York Mental Hygiene Law and due process requires a determination of any assessment of danger to be "made on a reasonably competent basis." *Rodriguez v. City of New York,* 72 F.3d 1051, 1065 (2d Cir. 1995). Only an expert can testify as to whether psychiatrists acted competently.

When assessing how a psychiatrist of reasonable caution should act, *see Weyant,* 101 F.3d at 852, it must be remembered that generally, a psychiatrist is differently situated than a police officer who must often, but as detailed below, not always, make an on-the-spot decision regarding the existence of probable cause. The psychiatrist has time to speak to the patient as the patient is already in a confined setting. Hence, the "information available" to a psychiatrist of reasonable caution is whatever information the psychiatrist can learn from the patient when conducting an evaluation that comports with professional standards.

Instructive to the present situation is *Kerman v. City of New York,* 261 F.3d 229 (2d Cir. 2001). In *Kerman*, this Court denied summary judgment on objective reasonableness grounds to officers who seized an allegedly mentally ill individual but who choose to not speak to both a psychiatrist and a lay person with knowledge of the plaintiff who could have provided information about the plaintiff. *Kerman,* 261 F.3d at 232; 241. In so holding this Court recognized that the officers did not

49

have to make an on-the-spot decision, but had the opportunity to gather information that would have informed their decision about the plaintiff's dangerousness. 261 F.3d at 241.

Accordingly, as detailed below, whether a reasonable basis exists to believe that an individual is mentally ill and dangerous turns on both (a) whether a psychiatrist put herself in a position to make an informed decision to assess mental illness and danger by conducting an evaluation that comported with clinical standards and (b) based upon information that could have reasonably been gathered in the clinical evaluation and from collateral sources, a reasonable basis existed to believe that the individual meets the criteria for hospitalization under the governing statute; in this case Mental Hygiene Law § 9.37.[7]

Rene detailed though competent expert testimony why Mustafa lacked a reasonable basis to believe that she suffered from mental illness and posed a substantial threat of harm. Stastny testified that clinical standards require a psychiatrist to conduct a face-to-face evaluation to gather information about the patient's mental status and dangerousness. A-2972 (¶ 9). In so doing, the

---

[7] The district court, citing *Heller v. Bedford Cent. Sch. Dist.,* 144 F. Supp.3d 596, 622 (S.D.N.Y. 2015), incorrectly noted that a mental health seizure does not require actual harmful behavior, only a substantial chance of such behavior. Slip op at 41-42. This is wrong. Mental Hygiene Law § 9.37 requires a finding of homicidal or other violent behavior or attempts or threats of suicide or other conducting demonstrating that the person poses a substantial threat of harm to herself. *See* N.Y. Mental Hyg. Law § 9.01; 9.37.

psychiatrist must attempt to corroborate collateral information because collateral information may be inaccurate. *Id.* (¶ 10). The psychiatrist must gather enough information to determine whether a perceived symptom of mental illness is a symptom of mental illness or that of a physical disorder. A-2974 (¶ 14). The assessment of dangerousness requires as assessment of many factors related to harm-causing behavior.[8]

Stastny opined that Mustafa lacked any reasonable basis, from an objective perspective, to conclude Rene posed a substantial threat of harm. This is because Mustafa could not have gathered enough information in ten minutes to make an informed decision about Rene. A-2981 (¶ 39). Stastny also testified how if Mustafa conducted an evaluation that comported with professional standards she would have learned that what was perceived as symptoms of mental illness were difficulties arising from her gland disorder and otherwise attributable to difficulty following surgery. A-2985 – A-2986 (¶¶ 51-53; 55). Stastny further noted that Mustafa may not have even evaluated Rene prior to authorizing her detention, making Mustafa's actions that much more egregious. A-2989 (¶ 64).

The district court first engaged in flawed analysis because it relied on Mustafa's version of the facts, instead of Rene's. The district court assumed

---

[8] This includes, but is not limited to the following: intent to act on harmful thoughts; whether the patient has acted harmfully in the past; substance abuse; a lack of impulse control; community support; religious beliefs; engagement in meaningful activities, such as work; and, future plans. A-2975 (¶ 17).

Mustafa conducted at least three face-to-face interviews that ranged from ten to forty five minutes. A-65; SA-43. Rene testified it was one evaluation that lasted less than ten minutes. A-2962 (¶ 57).

The chart entries relied upon by the district court as a basis for commitment consisted of the following:

> feeling depressed; suffering episodes of crying; feeling badly about past events; having protracted trouble sleeping and not being able to sleep; not enjoying life as exemplified by not wanting to socialize with friends and isolating herself and by no longer engaging in activities in which she previously enjoyed; and wanting to jump off a bridge and leave this earth. . . . ongoing medical issues led to poor sleep, poor appetite, weight loss, hopelessness, worthless and recent suicide ideation.

A-64 – A-65; SA-42 – SA-43.

Rene disputed much of this information in both her affidavit and deposition testimony. She testified that her sleep was not substantially impacted, and any difficulty in sleeping resulted from physical pain following surgery. A-2952 (¶ 13); A-2959 (¶ 48); A-276; A-278. She denied reporting that she was not going out with friends or isolating herself. A-2959 (¶ 48); A-278. Rene testified that she never felt helpless, hopeless, or worthless, and never told anyone that she did except for perhaps feeling hopeless about her medical condition. A-279; A-336; A-2959 (¶ 49); A-2962 (¶ 59). Rene further testified that thoughts of hurting herself never crossed her mind and hence, never would have acknowledged suicidal thoughts to anyone. A-2959 (¶ 50). Rene further testified that she met

52

with Mustafa once for less than ten minutes, with some of the time being taken discussing medication Mustafa wanted Rene to take and Mustafa's plan to hospitalize her.  A-2961 – A-2962 (¶¶ 56-57);  A-285 – A-286; A-506.

Hence, drawing all inferences in favor of Rene, this Court must conclude that Mustafa's "impressions" were not taken from information gathered from Rene but taken from collateral sources, *i.e.,* other Stony Brook chart entries, which Mustafa made no attempt to corroborate before deciding to send Rene to another psychiatric hospital.  Her "impressions" amounted to conclusions drawn by Mustafa that resulted mistaken assessments by inexperienced staff that Mustafa made no attempt to confirm.

Finally, Mustafa cannot argue that it would have been reasonable to disregard Rene's assertions and give credence to the chart entries.  This is because Stastny testified that Rene was a credible witness.  A-2983 (¶ 46).  Of course, Mustafa was in no position to assess Rene's reliability as an informant because Mustafa met with her for less than ten minutes.  A-2962 (¶ 57); A-285 – A-286; A-506

Most instructive to the present case is *Rodriguez v. City of New York,* 72 F.3d at 1051.  In *Rodriguez*, the plaintiff challenged decisions by physicians to involuntarily hospitalize her.  In response to the defendants' summary judgment motion, Rodriguez asserted that she did not make statements attributed to her by

the defendant physicians. *Id.* at 1055-56. Her expert, the same Dr. Stastny, opined

that the defendant-physicians acted in a plainly incompetent manner. *Id.* at 1065.

This Court held that until a factfinder resolved such questions as what Rodriguez

said to the doctors and whether the doctors relied on the statements made by

Rodriguez, a factfinder could not properly assess whether the performance of the

doctors comported with professional standards. *Id.* at 1064-65.

      B.    <u>Mustafa Did Not Act in an Objectively Reasonable Manner When Determining That Rene Met the Civil Commitment Criteria.</u>

The qualified immunity defense protects government officials "if 'their

conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.'" *Luna v. Pico,* 356 F.3d 481, 490

(2d Cir. 2004) (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)). Moreover,

even when government officials violate clearly established law, qualified immunity

protects them if it was objectively reasonable for the officials to believe that their

action did not violate the plaintiff's rights. *See id..* The district court granted

qualified immunity to Mustafa because it concluded that an objectively reasonable

basis existed for Mustafa's decision to seek hospitalization. A-68 – A-71; SA-46 –

SA-49.

Under the objectiveness reasonableness prong of the qualified immunity

defense in the context of a Fourth Amendment claim, an official is entitled to

qualified immunity if she can establish "arguable probable cause" for her actions.

*Zalaski v. City of Hartford,* 723 F.3d 382, 390 (2d Cir. 2013).  Whether or not arguable probable cause existed for Mustafa's conclusions turns on whether (a) it was objectively reasonable for Mustafa to believe that probable cause existed or (b) clinicians of reasonable competence could disagree on whether the probable cause standard was met.  *See Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004).

When determining whether clinicians of reasonable competence could disagree on whether the probable cause standards was met, this Court must recognize a difference exists between a psychiatrist who assesses a patient's symptoms in an evaluation that comports with professional standards and a psychiatrist who has not done so.  A psychiatrist whose evaluation falls well short of comporting with professional standards is not in a position to make an informed decision about a patient whom some, but perhaps not all, psychiatrists would assess as dangerous.

The qualified immunity defense balances two interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from distraction and liability when they act reasonably.  *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).  Any psychiatrist who substantially departs from professional standards acts irresponsibly and unreasonably.  Put another way, a psychiatrist who substantially departs from standards acts in a "plainly

55

incompetent" manner, which forfeits immunity. *Hunter v. Bryant,* 502 U.S. 224, 229 (1991).

This Court has recognized that a psychiatrist acts in an objectively unreasonable, *i.e.,* plainly incompetent, manner when the psychiatrist's assessments fall "well below the generally accepted standards of professional competence." *Rodriguez,* 72 F.3d at 1065; *see also Demarco v. Sadiker,* 952 F. Supp. 134, 140 (E.D.N.Y. 1996) (conduct that constitutes a substantial departure from professional standards is objectively unreasonable conduct).

Stastny testified that Mustafa lacked an objectively reasonable basis to believe that Rene was dangerous. By conducting an evaluation that lasted no more than ten minutes, Mustafa could not have gathered enough information to make an informed decision about Rene's mental status and dangerousness, the criteria for which is set forth *supra* at 51, n.8. Moreover, Rene challenged much information in her chart. A-2985 – A-2986 (¶ 54). This included that she reported that the quality of her life had gone down, that she lost her zest for life, and that she had thoughts of wanting to leave the earth. *Id*. This is information Mustafa relied upon. A-578. Mustafa could not have attempted to corroborate this information in the ten minutes that she spent with Rene.

Moreover, Mustafa cannot argue that no questions of fact exist as to whether clinicians of reasonable competence could disagree on whether or not probable

56

cause existed to believe Rene met the standards for hospitalization under Mental Hygiene Law § 9.37. Stastny testified that between Rene had absolutely no intention of harming herself and together with an application of other factors relevant to an assessment of danger mean that no reasonable psychiatrist could have concluded that Rene posed a substantial threat of harm. A-2986 – A-2987 (¶ 58).

This Court's decision in *Rodriguez,* discussed *supra* at 53-54, is also pertinent to resolution of the qualified immunity question before this Court. Just as the expert's affidavit created issue of fact in regard to whether the defendant-physicians comported with due process because they may have acted in a plainly incompetent manner, this Court further recognized the expert affidavit impacted on the qualified immunity decision, because if a jury determined that the defendant-physicians acted in a plainly incompetent manner, then they would forfeit their qualified immunity defense. *Id.* at 1065.

C.  The District Court Incorrectly Held That Rene's Fifth Cause of Action, a Federal False Imprisonment Claim, Duplicated Her Fourth Amendment Unreasonable Seizure Claim.

Well-settled case law establishes that a plaintiff may raise a Fourth Amendment false imprisonment claim based upon state law. *Russo v. City of Bridgeport,* 479 F.3d 196, 203 (2d Cir. 2007). When analyzing the constitutional tort of false imprisonment, this Court looks to state law to determine the governing

legal criteria. *Id.* This includes not only the elements of each claim but also the law of the state regarding the party upon whom the burden of proving or disproving the legality of the confinement. *See id.* (finding burden of proving legality of confinement with the federal false imprisonment claim rested with plaintiff because state law required the same).

Under New York law, a plaintiff can recover for false imprisonment if she can establish the following: the defendant intended to confine her, she was conscious of the confinement; she did not consent to the confinement; and the confinement was not otherwise privileged. *E.g., Broughton v. State of New York,* 37 N.Y. 2d 451, 456 (1975). In a false imprisonment case under New York law, the burden of establishing that the confinement was privileged, and hence lawful, rests with the party charged with the committing the false imprisonment, in this case, the physicians who confined Rene. *See, e.g., Hollender v. Trump Village Cooperative, Inc.,* 58 N.Y. 2d 420, 425 (1983). On the other hand, as the district court noted, a plaintiff bears the burden of establishing a Fourth Amendment violation. A-63 – A-64; SA-41-SA-42. For this reason alone the district court erred when it dismissed Rene's federal false imprisonment claim on the ground that it was identical to her Fourth Amendment claim. A-72 – A-73; SA-50 – SA-51.

III.     BECAUSE UNDER RENE'S VERSION OF THE FACTS ONUOGU AND
         SIAL DID NOT EXERCISE INDEPENDENT MEDICAL JUDGEMENT
         WHEN AUTHORIZING RENE'S HOSPITALIZATION, THE DISTRICT
         COURT ERRED IN DISMISSING RENE'S SUBSTANTIVE DUE
         PROCESS CLAIM.

         A.      A Failure to Conduct Independent Medical Evaluations Rendered
                 Onuogu and Sial State Actors.

This Court has recognized that there is "'no single test to identify state

actions and state actors. Rather, there are a host of factors that can bear on the

fairness of an attribution of a challenged action to the State.'" *Fabrikant v.

French,* 691 F.3d 193, 207 (2d Cir. 2012) (quoting *Cooper v. U.S. Post Serv.,* 577

F.3d 479, 491 (2d Cir. 2009)); *see also Dieffenbach v. Attorney General of*

*Vermont,* 604 F.2d 187, 193, n.11 (2d Cir. 1979) (characterizing discret state action

tests as "conventional but largely empty categories of state action"). As the

Supreme Court has recognized, a determination of what conduct is attributable to

the State, and hence state action, "is a matter of normative judgment, and the

criteria lack rigid simplicity." *Brentwood Acad. v. Tennessee Secondary Sch.*

*Athletic Ass'n,* 531 U.S. 288, 295 (2001).

This Court has further recognized that when a court assesses whether private

defendants have engaged in state action, the court must identify "'the specific

conduct of which the plaintiff complains' rather than the general characteristics of

the entity" that employed the defendants. *Fabrikant,* 691 F.3d at 207 (quoting

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 51 (1999)). The specific behavior

59

of which Rene complains is the certification for involuntary hospitalization pursuant to the New York Mental Hygiene Law in the absence of independent medical examinations by the private physicians who certified her, but who instead, relied upon the clinical determination of a state-employed physician who applied for involuntary hospitalization.

Rene recognizes that in this Circuit, *Doe v. Rosenberg,* 166 F.3d 507 (2d Cir. 1999), *aff'g, Doe v. Rosenberg,* 996 F. Supp. 343 (S.D.N.Y. 1998), and *McGugan v. Aldana-Bernier*, 752 F.3d 224 (2d Cir. 2014), serve as binding authority for the proposition that civil commitment, *i.e.,* involuntary hospitalization, without more, does not amount to state action. However, a number of courts have recognized that notwithstanding *Rosenberg* and *McGugan,* private physicians engage in state action when they rely on a clinical determination by a state physician to involuntarily hospitalize an individual and fail to conduct an independent medical examination prior to certifying the individual for hospitalization. *See, e.g., Bryant v. Steele,* 93 F. Supp. 3d 80, 90-91 (E.D.N.Y. 2015); *Tewksbury v. Dowling,* 169 F. Supp. 103, 110 (E.D.N.Y. 2001); *see also Kenny v. Nassau Univ. Med. Ctr,* No. 14-CV-7505, 2016 WL 1056999, at * 4 (E.D.N.Y. Mar. 14, 2016) (relying on *Tewksbury* and *Bryant* to recognize that private physicians who involuntarily admit a patient to a psychiatric hospital engage in state action if they do not conduct an independent medical examination

60

but finding on a motion to dismiss that complaint did not allege a failure to conduct an independent exam); *M.C. v. Cnty of Westchester,* No. 16-CV-3013, 2018 WL 1275435, at * 11 (S.D.N.Y. Mar. 6, 2018) (relying on *Bryant* and *Tewksbury* to recognize that *Rosenberg* does not serve as controlling authority when a private physician fails to exercise clinical judgment when involuntarily admitting an individual brought to a hospital by state actors who determined individual requires hospitalization). To the best of Rene's knowledge, no court has taken a contrasting position on this issue.

The failure to conduct an independent medical exam required by state law following a certification by a state physician is akin to jointly participating in the commitment determination of the state physician. *Tewksbury,* 169 F. Supp. 2d at 109-110. Moreover, when a private physician fails to exercise independent medical judgment, his actions become an extension of the actions of the state actor who believes the individual should be hospitalized and whose actions resulted in the transport of the patient to the hospital door. *See Young v. Lugo,* No. 18-CV-04216, 2023 WL 2815718, at * 9 (E.D.N.Y. Feb. 6, 2023) (relying on *Tewksbury* to conclude that private physician who admitted patient to hospital at behest of police and who failed to conduct an independent medical examination was a state actor because his actions were an extension of that of the police).

61

While *Tewksbury*, *Bryant*, and their progeny alone serve as ample authority for the conclusion that Onuogu and Sial engaged in state action if a factfinder determines Rene's contentions are true, additional reasons exist for a finding of state action. The position of Director of Community Services is a governmental position created by the State Legislature. *See* N.Y. Mental Hyg. Law § 41.05. Rene's commitment, like any other individual hospitalized pursuant to Mental Hygiene Law § 9.37, required an examination by the Director of Community Services, or its designee. Accordingly, the civil commitment scheme set forth in Mental Hygiene Law § amounts to "an ongoing relationship . . . for the care of . . . patients in need of hospitalization[,]" which warrants a finding of state action. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 831 (7th Cir. 2009).

Under Rene's version of the facts, Onuogu and Sial did not conduct independent psychiatric evaluations. Rene testified that she met with Onuogu for less than ten minutes, with half that time involving discussion about Rene's attempts to leave the hospital by writing a letter to leave. A-2964 (¶ 73). Rene further testified that Onuogu appeared to be hand-writing information into what appeared to be a loose-leaf binder and was taking what he was writing from other documents. A-2963 – A-2964 (¶ 68). A review of the Brunswick record establishes that Brunswick received numerous chart entries from Stony Brook that

it incorporated into its own chart for Rene.  A-2321 – 2336.  This included the entries by Graziano, Kadiyala, Fining, and Mustafa.  *Id.*

Granting inferences to Rene, one can easily conclude that that Onuogu's hand-written admission note contained information, some of which was wrong, came from Stony Brook records but not Rene.  This is because Onuogu's note contained the same mistakes as did Graziano's note: Rene's fiancé died when she was twenty-seven, her first husband died in 2008 and Rene's sister died two years previously.  *Compare* A-1527 *with* A-758 – A-761; A-2176 – A-2177.  However, Rene disputed the accuracy of this information. A-2957 (¶ 40).  Beyond Rene's own testimony, Rene produced her first husband's death certificate establishing that he died in 2003.  A-2949.

Similarly, Graziano's note recorded a supposed statement from Rene's husband that they were not engaging in sex.  A-1528.  Onuogu wrote that Rene was "not sexually active."  A-759; A-2176.  However, both Rene's husband and Rene testified that they were engaging in relations.  A-1717; A-2952 (¶ 14).  Likewise, Onuogu's note stated Rene presented with a depressed mood, suicidal ideation and feeling helpless. A-758; A-2176.  Rene denied feeling this way and telling Onuogu any of this information.  A-2965 (¶ 75).  However, Kadiyala's note contained this information.  A-1475,

Rene testified in both her deposition and her affidavit that upon meeting Rene, Sial stated "you are a very sick woman." A-418 – 419; A-2965 (¶ 78). Rene further testified that her meeting with Sial lasted no more than ten minutes. 2966 ¶ 82. A-418.

Similarly, Sial diagnosed Rene as suffering from major depression even though Rene told her that she was "absolutely not depressed." As is the case with Onuogu, a jury can conclude that Sial could have derived much of her findings from the Stony Brook chart and certified her as dangerous. Sial's note stated that Rene felt helpless, hopeless and depressed, was unable to sleep, and two months ago wanted to hurt herself. A-2154. The Stony Brook entries that Brunswick received contained this information. A-2325; A-2331. However, Rene controverted this information. A-2966 (¶¶ 79-82).

B.  <u>Because Questions of Fact Exist as to Whether Onuogu and Sial Performed in a Competent Manner, the District Court Erred in Finding that They are Entitled to Qualified Immunity on Objective Reasonableness Grounds.</u>

Over forty years ago this Court recognized that substantive due process prohibits the confinement of a nondangerous mentally ill individual. *See Project Release v. Prevost,* 722 F.2d at 971-73. Since that time, this Court has reiterated this principle. *See, e.g., Rodriguez,* 72 F.3d at 1061 ("[a]s a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger to either herself or to others"). Accordingly, the district court correctly

64

recognized that the "[p]laintiff *did* enjoy a clearly-established right not to be hospitalized absent a showing of dangerousness."  A-92; SA-70 (emphasis in original).

In the context of a substantive due process challenge to one's involuntary hospitalization against the physicians who authorized confinement, this Court has held that "the availability of qualified immunity turns on whether it was objectively reasonable for the defendants to believe, at the time they examined [the plaintiff] and in light of the information that they possessed, that [the plaintiff] was dangerous." *Glass,* 984 F.3d at 57.[9]

However, in *Glass,* there was no question about whether the defendant physicians failed to gather necessary information about the plaintiff.  As detailed below, in the situation in which physicians substantially depart from clinical standards by failing to attempt to gather information required by professional

---

[9] In examining whether an objectively reasonable basis for Onuogu and Sial to believe that Rene met the criteria for hospitalization under Mental Hygiene Law § 9.37, the district court analyzed the application of the qualified immunity defense as applied to Rene's sixth cause of action, which challenged her confinement when she did not pose a danger to herself as a result of mental illness.  Because the district court did not address specifically address application of the qualified immunity defense in connection with Rene's Fourth Amendment claim and her seventh cause of action, which asserted Onuogu and Sial violated due process because their examinations did not promise some degree of accuracy, it appears that the district court dismissed these claims on state action grounds only and Rene will not address the application of the qualified immunity defense in relation to these claims except to note that evaluations that do not exceed ten minutes amount to objectively unreasonable assessments regardless of the nature of the claim that challenges such conduct. *See supra* at 49-50; 55.

standards, a court should not assess objective reasonableness by the information that the defendants possessed, but what they would have known had they acted in a professionally competent manner. *See supra* at 49-50; 55.

As is the case with Mustafa, the testimony of Stastny creates questions of fact exist as to whether Onuogu and Sial acted in a plainly incompetent, and hence, objectively unreasonable manner, when they diagnosed Rene as mentally ill and dangerous. Stastny testified that it would have been impossible for Onuogu and Sial to have gathered information relating to an assessment of dangerousness and mental illness in the ten minutes in which they met with Rene. A-2984 (¶ 49). Stastny also testified that in spending as little time as they did with Rene, they failed to gather sufficient information about her and simply assumed that Rene's loss of appetite was a sign of depression. A-2985 (¶ 53). Because Rene's loss of appetite resulted from a physical condition and clinical standards required Onuogu and Sial to gather information that would have made clear that any loss of appetite resulted from a physical disorder, Onuogu and Sial's conclusions that Rene's loss of appetite was a symptom of depression were not reasonable. *Id.* (¶ 52). Finally, Stastny also testified how Sial apparently pre-judged Rene's clinical condition as Rene testified that Sial upon meeting her stated "you are very sick woman." A-2982 – A-2983 (¶ 44). No one can seriously dispute that to reach a clinical

assessment about a person with no history of mental illness before evaluating her

amounts to a plainly incompetent, objectively unreasonable clinical assessment.

## CONCLUSION

For the reasons given in this brief, this Court should vacate the judgment of

the district court and direct the district court to set a trial date.

Dated: Port Washington, New York
      July 16, 2024

WILLIAM M. BROOKS
Center for Justice, Civil Rights and
    Liberties, Inc.
*Attorney for Plaintiff-Appellant*
P.O. Box 421
Port Washington, New York 10050
(516) 439-5169
Williamb@cjcrl.org

## CERTIFICATE OF COMPLIANCE

William M. Brooks, the attorney for the appellant, certifies pursuant to 28 U.S.C. § 2746 and Fed.R.App.P 32(a)(7)(C):

I used the tool format of Microsoft Word, the computer program used to type this brief, to obtain a word count. The program stated that this brief is 15,981 words. In an order dated June 25, 2024, this Court granted leave to the appellant for permission to file an oversized brief not to exceed 18,000 words.

Dated: Port Washington, New York
      July 16, 2024

WILLIAM M. BROOKS

# 24-936

## United States Court of Appeals
## For the Second Circuit

---

DIANA RENE,

Plaintiff-Appellant,

v.

TANZIA MUSTAFA, M.D., personally, EJIKE ONUOGU, M.D., personally,
TAHIRA SIAL, M.D., personally,  BRUNSWICK HOSPITAL CENTER,

Defendants-Appellees.

---

———————————————

## SPECIAL APPENDIX
———————————————

MARTIN CLEARWATE & BELL, LLP
Gregory Radomisli
*Attorney for Defendant-Appellee Mustafa*
220 E. 42nd Street
New York, NY
(212) 697-3122
radomg@mcblaw.com

WILLIAM M. BROOKS
Center for Justice, Civil Rights, and
　Liberties, Inc.
*Attorney for Plaintiff-Appellant*
P.O. Box 421
Port Washington, NY 1050
(516) 439-5169
Williamb@cjcrl.org

LEWIS JOHS AVALLONE AVILES, LLP
Michael J. Del Piano
*Attorney for Brunswick Defendants-Appellees*
1377 Motor Parkway
Suite 400
Islandia, NY 11749
(631) 755-0101
mjdelpiano@lewisjohs.com

## TABLE OF CONTENTS

Page

Judgment of the District Court…………………………………………………………………………1

Opinion of the District Court……………………………………………………………………...3

Rule 56(c)(4) of the Federal Rules of Civil Procedure…………………………………………..77

Fourth Amendment to the United States Constitution…………………………………………...78

Fourteenth Amendment to the United States Constitution……………………………………78

42 U.S.C. § 1983………………………………………………………………………………79

New York Mental Hygiene Law § 9.37………………………………………………………80

New York Mental Hygiene Law § 9.01……………………..…………………………………..80

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------X
DIANA RENE,

                  Plaintiff,

       - against -

TANZIA MUSTAFA, M.D., personally;
EJIKE ONUOGO, M.D., personally; TAHIRA
N. SIAL, M.D., personally; BRUNSWICK
HOSPITAL CENTER, INC.,

                  Defendants.
------------------------------------------------------X

**JUDGMENT**
CV 16-4072 (JS) (ST)

     A Memorandum and Order of Honorable Joanna Seybert, United States District Judge, having been filed on March 28, 2024; granting Defendant Tanzia Mustafa, M.D.'s Summary Judgment Motion; granting Defendants Ejike Onuogu, M.D., Tahira N. Sial, M.D., and Brunswick Hospital Center, Inc.'s ("Hospital Defendants") Summary Judgment Motion; dismissing Plaintiff's federal claims, her First, Fourth, Fifth, Sixth, and Seventh Causes of Action, with prejudice; declining to exercise supplemental jurisdiction over Plaintiff's state law claims, her Eighth, Ninth, Tenth, Eleventh, Twelfth, and Thirteenth Causes of Action, and dismissing those claims without prejudice; and directing the Clerk of Court to enter judgment in favor of Defendants and to close this case, it is

     **ORDERED AND ADJUDGED** that Plaintiff Diana Rene take nothing of Defendants Tanzia Mustafa, M.D., Ejike Onuogu, M.D., Tahira N. Sial, M.D., and Brunswick Hospital Center, Inc.; that Defendant Tanzia Mustafa, M.D.'s Summary Judgment Motion is granted; that the Hospital Defendants' Summary Judgment Motion is granted; that Plaintiff's federal claims, her First, Fourth, Fifth, Sixth, and Seventh Causes of Action, are dismissed with prejudice; that

the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, her

Eighth, Ninth, Tenth, Eleventh, Twelfth, and Thirteenth Causes of Action, and those claims are

dismissed without prejudice; and that this case is closed.

Dated: March 28, 2024
      Central Islip, New York

BRENNA B. MAHONEY
CLERK OF COURT

By:   /s/ James J. Toritto
       Deputy Clerk

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------x
DIANA RENE,

                   Plaintiff,       <u>MEMORANDUM & ORDER</u>
                                  No. 16-CV-4072(JS)(ST)

    -against-

TANZIA MUSTAFA, M.D., personally;
EJIKE ONUOGU, M.D., personally;
TAHIRA N. SIAL, M.D., personally;
BRUNSWICK HOSPITAL CENTER, INC.,

                   Defendants.
--------------------------------x
Appearances:

For Plaintiff:     William M. Brooks, Esq., Of Counsel
                   Barry Seidel and Associates
                   148-55 Hillside Avenue
                   Jamaica, New York  11435

For Defendant      Gregory J. Radomisli, Esq.
Mustafa:           Martin Clearwater & Bell LLP
                   220 East 42nd Street
                   New York, New York  10017

For the          Amy E. Bedell, Esq.
Hospital         Lewis Johs Avallone Aviles, LLP
Defendants:     One CA Plaza, Suite 225
                   Islandia, New York  11749

SEYBERT, District Judge:

        Before the Court in this Section 1983 civil rights action

arising out of the detention-for-transport of Plaintiff Diana Rene

("Plaintiff") at Stony Brook University Medical Center and her

subsequent involuntary confinement at Brunswick Hospital Center

are two summary judgment motions: one brought by Defendant Tanzia

Mustafa, M.D. ("Mustafa") (hereafter, the "Mustafa Motion") (<u>see</u>

ECF No. 116[1]); and one brought by Defendants Ejike Onuogu, M.D. ("Onuogu"), Tahira N. Sial, M.D. ("Sial"), and Brunswick Hospital Center, Inc. ("Brunswick" or "Hospital"; collectively with Onuogu and Sial, the "Hospital Defendants") (hereafter, the "Hospital Motion") (see ECF No. 120[2]).  For the reasons that follow, the Mustafa Motion is GRANTED, and the Hospital Motion is GRANTED.


[Remainder of page intentionally left blank.]


---

[1] See also Mustafa Support Memo (hereafter, "M-Support Memo") (ECF No. 118), and Reply (hereafter, "M-Reply") (ECF No. 138). Plaintiff has filed an omnibus Opposition (hereafter, "Opposition" or "Opp'n") to Mustafa's Motion and the Hospital's Motion.  (See Opp'n, ECF No. 137.)

[2] See also Hospital Support Memo (hereafter, "H-Support Memo") (ECF No. 120-1), and Reply (hereafter, "H-Reply") (ECF No. 139). As noted, supra at note 1, Plaintiff has filed an omnibus Opposition to Mustafa's and the Hospital's respective Motions.

BACKGROUND

I.   Relevant Factual Background[3]


[3]  Unless otherwise stated, the factual background is derived from the parties' Local Civil Rule 56.1 Statements. Mustafa's Rule 56.1 Statement (see ECF No. 119) shall be cited as "M-56.1 Stmt." Plaintiff's Counterstatement to Mustafa's Rule 56.1 Statement (see ECF No. 125) shall be cited as "P-M 56.1 Counter." The Hospital's Rule 56.1 Statement (see ECF No. 120-24) shall be cited as "H-56.1 Stmt." Plaintiff's Counterstatement to the Hospital's Rule 56.1 Statement (see ECF No. 126) shall be cited as "P-H 56.1 Counter."

     Herein, internal quotation marks and citations from these Statements have been omitted.  A standalone citation to a Rule 56.1 Statement or Counterstatement denotes the Court has determined the underlying factual allegation is undisputed. Further, citation to a party's Rule 56.1 Statement or Counterstatement incorporates by reference the party's citation(s), if any.  However, in its discretion, the Court may cite directly to the underlying exhibit(s).

     Mustafa's exhibits are identified by letters "A" through "U" (see ECF Nos. 117-1 through 117-22) and are attached to the Declaration of Gregory J. Radomisli, Esq., a member of the law firm of record representing Mustafa (see ECF No. 117).  To distinguish Mustafa's exhibits, the Court will cite them as "Ex. M-[letter]".

     The Hospital Defendants' exhibits are also identified by letters, but from "A" through "Y" (see ECF Nos. 120-3 through 120-28) and are attached to the Declaration of Amy E. Bedell, Esq., a partner of the law firm of record representing the Hospital Defendants (see ECF No. 120-2).  To distinguish the Hospital Defendants' exhibits, the Court will cite them as "Ex. H-[letter]".

     Further, Plaintiff has identified her exhibits by letter as well, i.e., letter "A" through "R" (see ECF Nos. 127-1 through 127-25) and are attached to the Declaration of William Brooks, one of Plaintiff's attorneys of record (see ECF No. 127).  To distinguish Plaintiff's exhibits, the Court will cite them as "Ex. P-[letter]".

     Hereafter and unless otherwise noted, the Court will reference exhibits by their respective letter designations only. Relatedly, as to page citation:  Where the notation "ECF p.[x]" is used, the Court cites to the pagination generated by the Court's Electronic Case Filing ("ECF") system; otherwise, page citation is to the internal pagination of the cited document.

A.   Regarding the July 24, 2015 Stony Brook Visit[4]

In 2015, Plaintiff suffered from parotitis, a gland disorder that is very painful. (See Third Am. Compl. ("TAC"), ECF No. 70, Preamble.)   Indeed, '[a]s of July 3rd or 4th, [she] believed there was no end in sight for her pain." (P-M 56.1 Counter. ¶ 20.)   By July 24, 2015, Plaintiff had visited approximately six doctors seeking relief from her symptoms, but to no avail. (Id. ¶ 21.)   Thus, on the morning of July 24, 2015, suffering substantial facial pain due to her gland disorder, as well as dizziness and nausea, Plaintiff went to Emergency Department ("ED") of Stony Brook University Medical Center ("Stony Brook") seeking treatment. (Id. ¶¶ 22-24.)   Among other things, while in the ED, Plaintiff told staff: she did not "know how people live with such pain in the face"; she was not sleeping; her appetite was poor and she did not have an appetite for three weeks; she was not enjoying activities she had previously enjoyed; and, "she worries nonstop and that she feels depressed because she worries that her health issues were not resolving." (Id. ¶¶ 24, 27-28, 30, 33, 35.)   She may have also told the ED doctor and/or staff: she was depressed because treatment for the bad taste in her mouth had been unsuccessful; she had lost six pounds in a

---

[4]   For this subsection, unless otherwise noted, the facts are derived from Plaintiff's Rule 56.1 Counterstatement (see ECF No. 125), which incorporates Mustafa's statements of fact (see ECF No. 119) and include Plaintiff's responses thereto.

one-week span; she had not slept in the past two weeks; she was
not socializing with friends; she goes straight to bed when she
gets home; and, for the prior three months, she was experiencing
crying episodes. (Id. ¶¶ 25, 29, 31-34, 36.) Moreover, the Stony
Brook ED doctor documented Plaintiff having "[s]tated that she
wants to take her life as a result of [her] symptoms." (P-H 56.1
Counter. ¶ 41.[5])

Thereafter, Plaintiff was transferred to Stony Brook's
psychiatric emergency room for depression and suicidal ideation.[6]
(P-M 56.1 Counter. ¶ 38.) Once there, she initially interfaced
with a psychiatric nurse who documented Plaintiff stating: the
quality of her life had gone down and she had lost her zest for
life; she had thoughts of wanting to leave this earth; she did not
want to be a burden to others; she had a history of depression; in
the month prior to her July 2015 hospitalization, she wished to be
dead; and, she felt unsafe. (Id. ¶¶ 39-43, 48.) This nurse

---

[5]   While Plaintiff does not deny the Stony Brook ED doctor
"documented that [she] wanted to take her life," she "denies that
she ever wanted to do so" (P-H Rule 56.1 Counter. ¶ 41 (citing Pl.
Aff. ¶¶ 24-25)), which is not a denial that she actually made that
statement to the ED doctor.

[6]   The psychiatric emergency room is part of Stony Brook's
Comprehensive Psychiatric Emergency Program ("CPEP"). See
generally NY Connects: Program SBUH—Comprehensive Psychiatric
Emergency Program (CPEP), available at
https://www.nyconnects.ny.gov/services/sbuh-comprehensive-
psychiatric-emergency-program-cpep-omh-pr-813707155450 (last
visited Mar. 21, 2024); (see also, e.g., Bardey Decl., Ex. H-A at
¶ 1).

completed the Columbia Suicide Severity Scale, documenting: Plaintiff's thoughts of wishing to be dead occurred two-to-five times a week in the prior month; Plaintiff was having thoughts of dying; Plaintiff's thoughts of wanting to leave the earth occurred two-to-five times a week; and, Plaintiff's rationale for suicide was to end the pain she was experiencing. (Id. ¶¶ 44-47.) Later, a supervised social work intern[7] reported Plaintiff stating, inter alia: she had not slept in two weeks; she did not feel like engaging in activities she used to enjoy; her symptoms started the previous March; she felt depressed; and, she wanted to leave the earth. (Id. ¶¶ 49-54.)

Thereafter, a Stony Brook psychiatric resident met with Plaintiff; in Plaintiff's chart, he documented Plaintiff reporting: having thoughts of passive suicidal ideation; feeling frustrated and depressed because she was experiencing an ongoing rancid taste in her mouth; not having slept in weeks; not enjoying life; not feeling like answering her home phone; not wanting to socialize with friends; isolating herself; upon coming home from work, going straight to bed, but not being able to sleep; having bad thoughts about past experiences; experiencing poor sleep for approximately three months; having a poor appetite and having lost six pounds in a week; having "crying episodes secondary to hurting

[7]  (See P-H 56.1 Counter ¶ 86.)

SA-8

her family"; experiencing helpless and hopeless ideations; experiencing occasional thoughts of hurting herself; and, previously having told her primary care provider of thoughts of jumping off a bridge. (Id. ¶¶ 55-69.) The resident also spoke with Plaintiff's husband ("Husband"), who reported that, because of the inability to determine what was causing the metallic taste in Plaintiff's mouth, Plaintiff was anxious, depressed and "down in the dumps". (Id. ¶¶ 70-71.) Husband also reported financial issues were contributing to Plaintiff feeling this way. (Id. ¶ 71.) The resident also documented: his impression that Plaintiff suffered from "Depression, NOS[8]" (id. ¶ 72); Plaintiff's "recent or presenting psychiatric symptoms included severe depression, anhedonia, mood lability, severe anxiety and difficulty controlling suicidal thoughts" (id. ¶ 78); Plaintiff had a history of depression (id. ¶ 79); Plaintiff had a number of protective factors suggesting a reduced risk of suicide (id. ¶ 80); and, having weighed Plaintiff's risk factors and protective factors

---

[8] In a medical diagnosis, "NOS" means "not otherwise specified". It "is a subcategory in systems of disease/disorder classification. It is used to note the presence of a condition where the symptoms presented indicate a general diagnosis within a family of disorders (e.g. depressive disorders, anxiety disorders), but don't meet criteria established for specific diagnoses within that family." Mental Health America: Not Otherwise Specified, Other Specified Disorder, Or Unspecified Disorder, available at https://mhanational.org/conditions/not-otherwise-specified-other-specified-disorder-or-unspecified-disorder (last visited Mar. 20, 2024).

(id. ¶ 81).   Afterwards, as recorded in Plaintiff's Stony Brook chart, the resident discussed Plaintiff's case with Mustafa, relaying Plaintiff "was a 51 year old married female with quite a few medical issues ongoing, and that she had presented to the hospital with chest pain" who was very depressed and met all the criteria of major depressive episode with suicidal ideation.  (Id. ¶¶ 82-83; see also id. at ¶¶ 84-85.)   He sought Mustafa's input regarding Plaintiff's case.  (Id. ¶ 83.)

Mustafa consulted Plaintiff's Stony Brook chart and then went with the resident to evaluate Plaintiff and discuss the severity of her symptoms; she spent between 30 and 45 minutes with Plaintiff, at which time Plaintiff was crying.  (Id. ¶¶ 88-90, 93.)   From her interaction with Plaintiff, Mustafa gathered Plaintiff "was very depressed, had suicidal thoughts of death, and posed a danger to herself unless treated."  (Id. ¶ 91.)   Even though Plaintiff denied suicidal ideation at the time, from her mental status exam, Mustafa found Plaintiff to be moderately-to-severely depressed.  (Id. ¶ 92.)   Mustafa also recorded that Plaintiff's "ongoing medical problems led to poor sleep, poor appetite, weight loss, hopelessness, worthlessness and recent suicidal ideation."  (Id. ¶ 97.)   "Based upon the symptoms as reported in the Stony Brook chart, Mustafa concluded that [Plaintiff's] depression had gotten so severe that she was not able to use her coping skills, that she felt hopeless, worthless

and helpless; she was missing work; and she was not able to have sex with her husband." (Id. ¶ 99.)

Later that day, at approximately 8:00 p.m., Mustafa had a second meeting with Plaintiff, which lasted 15-to-20 minutes. (Id. ¶¶ 100-01.) At approximately 10:00 p.m., Mustafa had a third meeting with Plaintiff, which lasted approximately 10 minutes. (Id. ¶¶ 102-03.) Sometime between 10:30 p.m. and 11:00 p.m., Mustafa had a fourth meeting with Plaintiff. (Id. ¶ 104.)

Based upon: (1) having spoken with the nurse, the supervising social worker, social work intern, and the resident (id. ¶ 105); (2) having read Plaintiff's notes from the Stony Brook ED doctor; (3) her view of Plaintiff's Stony Brook chart; and (4) her personal evaluation of Plaintiff, Mustafa concluded Plaintiff posed a moderate or substantial risk of harm to herself. (Id. ¶¶ 105-07.[9]) This conclusion was based upon Plaintiff's: meeting "all the criteria of a moderate-to-severe depression ongoing for at least three months"; past history of depression; experiencing multiple medical issues simultaneously; "relentlessly suffering and experiencing discomfort and pain"; having verbalized suicidal thoughts and frustration with her unsuccessful medical treatment; and, wanting to take her own life. (Id. ¶ 109.) Mustafa's

---

[9] (See also id. ¶ 124 (undisputed that a hospital physician may rely upon information gathered by other hospital personnel, in conjunction with their own assessment, in authorizing a MHL § 9.37 transport).)

determination was an exercise of her medical judgment, reached after Mustafa met with Plaintiff and weighed Plaintiff's risk factors and mitigating factors, and was the basis for her authorizing Plaintiff's transport to Brunswick pursuant to N.Y.S. Mental Hygiene Law ("MHL") § 9.37.  (Id. ¶¶ 110-11, 117-19; see also P-H 56.1 Counter. ¶ 115.)

B.  <u>Regarding the Brunswick Commitment and Hospitalization</u>[10]

On July 25, 2015, Brunswick accepted the transfer of Plaintiff from Stony Brook's CPEP, which transfer was made pursuant to Mustafa's MHL § 9.37 certification.  (P-H 56.1 Counter. ¶¶ 122-23.)  "When Plaintiff presented to [Brunswick], she felt defeated and her anxiety level was high."  (Id. ¶ 124.)  As a transferee, Plaintiff's documentation from Stony Brook was subject to review.  (Id. ¶ 128.)  Further, a registered nurse "interviewed and assessed Plaintiff before she underwent a psychiatric consultation performed by a psychiatrist."  (Id. ¶ 131.)

Thereafter, Onuogu conducted a psychiatric consultation of Plaintiff which consisted of a face-to-face evaluation and his review of the documents sent by Stony Brook's CPEP, with the face-to-face evaluation occurring before his review of the Stony Brook

---

[10]  For this subsection, unless otherwise noted, the facts are derived from Plaintiff's Rule 56.1 Counterstatement (see ECF No. 126), which incorporates the Hospital Defendants' statements of fact (see ECF No. 120-24) and includes Plaintiff's responses thereto.

documents.  (Id. ¶¶ 137, 139.)  The face-to-face evaluation lasted
from approximately 11:00 p.m. until 11:50 p.m.  (Id. ¶¶ 140, 155.)
During the evaluation, "Onuogu asked Plaintiff a 'barrage of
questions' but she was 'in shock,' and the only questions she could
recall were: why did she go to Stony Brook; did she feel like
hurting herself; and was she depressed."  (Id. ¶ 143.)  Onuogu
recorded Plaintiff's responses to his questions, noting, inter
alia, Plaintiff: had a depressed mood since her gland surgery two
weeks earlier; had not been able to sleep; was feeling helpless;
was having suicidal ideation, but without specific plans; had
experienced numerous loses of family members; was experiencing
menopause; and, was not sexually active.  (Id. ¶ 145.)  His
evaluation notes further state Plaintiff: had recently verbalized
thoughts of self-harm; posed a current risk to herself; presented
with: soft, low volume speech, a depressed mood, a blunted affect,
and suicidality, with suicidal ideation (no plan); and, had limited
insight and judgment.  (Id. ¶¶ 146, 148, 149.)  After completion
of his face-to-face evaluation and review of Plaintiff's Stony
Brook CPEP chart, Onuogu assessed Plaintiff as having major
depressive disorder, which determination was based upon
Plaintiff's: "more than two week history of depression;
neurovegetative symptoms; significant weight loss/appetite
disturbance; lack of sleep; psychomotoretardation [sic]; feelings
of helplessness and hopelessness; sexual disturbance; still

feeling that past losses weighing heavily upon her; suicidal ideation (during their face-to-face evaluation, at [Stony Brook], and to her primary care provider); and downward trend in overall functioning." (Id. ¶¶ 150-51.)  Having completed his face-to-face evaluation of Plaintiff, reviewed Plaintiff's Stony Brook CPEP chart, and weighed Plaintiff's risk and mitigating factors, "Onuogu determined that [Plaintiff] posed a substantial risk of danger to herself because she was suicidal." (Id. ¶ 131.)  Thus, he involuntarily admitted Plaintiff to Brunswick for a 72-hour observation period pursuant to MHL § 9.37. (Id. ¶ 156; see also id. ¶¶ 158-62.)

The next day, July 26, 2015, Hospital staff documented Plaintiff appearing depressed, anxious, and guarded. (Id. ¶ 165; see also id. ¶ 182.)  Sial, Plaintiff's treating psychiatrist during her Hospital admission, evaluated Plaintiff on July 26th. (Id. ¶¶ 167-68.)  From this first evaluation, which lasted 25-to-30 minutes, Sial documented, inter alia, Plaintiff: "had no prior significant psychiatric history, no prior psychiatric admission, no prior suicide attempt"; "had been admitted for worsening depression, anxiety, hopelessness, helplessness, decreased sleep, and vague suicidal ideation", with Plaintiff having directly told Sial about being unable to sleep and feeling helpless, hopeless and depressed; "had multiple medical issues [and] multiple somatic symptoms"; had recent parotid gland surgery for sialadenitis after

antibiotics and a tapering dose of steroids in May and June". (Id.
¶¶ 169-70, 172.) As a result of this examination, Sial made the
following mental status findings regarding Plaintiff:

> mood described as depressed; appearance sad,
> anxious, and nervous; affect flat,
> constricted, and emotionless; internally
> perplexed/preoccupied (preoccupied with own
> thoughts/issues but not able to verbalize
> same), disassociated, and disconnected;
> denied suicidal ideation, but then stated that
> she still had vague suicidal ideation but no
> plan at that time; irritable (easily annoyed
> by questions).

(Id. ¶ 171.) Thereafter, Sial diagnosed Plaintiff with "major
depressive disorder, severe" and assigned her a Global Assessment
of Functioning ("GAF") score of 30.[11]

Sial testified: her July 26th determination was based
upon Plaintiff's presentment and statements made to Sial during
Sial's evaluation (id. ¶¶ 174-77); Plaintiff's Stony Brook CPEP
records corroborated her assessment (id. ¶ 177); "Plaintiff's
symptoms caused her significant distress or impairment in social
functioning (internally preoccupied, in her own world,
disassociated, not interacting much, answers were very vague and

___

[11] "A GAF score is a 0-100 scale mental health clinicians use to
evaluate how well a person can function in society. A GAF score
of 91-100 is normal, while lower scores indicate psychosocial
problems that make life difficult for the person under evaluation."
John P. Cunha, DO, FACOEP, What is a Normal GAF Score?, eMental
Health,
https://www.emedicinehealth.com/what_is_a_normal_gaf_score/artic
le_em.htm (last visited Mar. 25, 2024).

not forthcoming, seemed like she did not want to talk, she did not interact with her family or engage in her usual activities), occupational functioning (suspected she was working without interest), and other important areas of functioning (daily life-not interacting with family, not watching television or movies, not playing games)" (id. ¶ 178); after weighing Plaintiff's risk and mitigating factors, determining "Plaintiff posed a substantial risk of danger to herself because she was suicidal and she was unable to meet her needs of food clothing, and shelter" (id. ¶ 179); because of her concerns for Plaintiff, i.e., that she "would kill herself or suffer a mental breakdown", treating Plaintiff "aggressively with three medications" (id. ¶ 181).

Sial re-evaluated Plaintiff on July 27, 2015, which included an approximate 10-to-15 minute face-to-face interaction with Plaintiff. (Id. ¶¶ 183, 185) She continued to find Plaintiff's affect to be "anxious, sad, disassociated, and perplexed". (Id. ¶ 184.) Additionally, Sial found Plaintiff was "masking and minimizing her symptoms" and was "frustrated, tearful, and pre-occupied", as well as "denied suicidal thoughts". (Id.) Thus, based upon Plaintiff's presentment on July 27th, in her clinical judgment, Sial determined: (1) Plaintiff had major depressive disorder, and (2) having considered all relevant mitigating factors, Plaintiff was, nonetheless, a danger to herself as she was suicidal. (Id. ¶¶ 186-90.)

Thereafter, with the benefit of her July 26th and 27th evaluations, as well as input from Hospital staff, Onuogu's admissions notes, and the Stony Brook CPEP records, Sial completed an Examination Within 72 Hours form (hereafter, the "72-Hour Form") regarding Plaintiff and certified Plaintiff for continued involuntary care at Brunswick pursuant to MHL § 9.37. (Id. ¶¶ 192-93, 195.) In Plaintiff's 72-Hour Form, Sial included:

> Plaintiff's pertinent/significant history was depression, hopelessness, and helplessness; her mental condition was depressed, guarded, tearful, and vague suicidal thoughts; her psychiatric signs and symptoms were preoccupied, sad, and anxious; Plaintiff showed a tendency to hurt herself because she was suicidal; and her diagnosis was major depressive disorder.

(Id. ¶ 194.) In said Form, Sial certified, inter alia, her personal examination of Plaintiff was made "with care and diligence" and that, as a result of said examination, Sial determined "Plaintiff posed a substantial threat of harm to [her]self." (Id. ¶ 196.)

On July 28, 2015, Sial re-evaluated Plaintiff in-person, at which time the Doctor found Plaintiff continued to be anxious, sad, tearful, and disassociated and during which Plaintiff admitted feeling sad, helpless, and hopeless, and experiencing decreased sleep. (Id. ¶¶ 199-200.) Sial also scheduled a July 29, 2015 family meeting with Plaintiff's family members, which she did only in high risk cases. (Id. ¶¶ 200, 203.)

SA-17

On July 29, 2015, before the meeting with Plaintiff's family, Sial: again evaluated Plaintiff, at which time she found Plaintiff to be "sad, constricted, and perplexed", as well as having a disassociated affect (id. ¶¶ 205-06); and, found "Plaintiff still posed a risk of suicide, but that it was less than when [Plaintiff] first presented to [Brunswick]" (id. ¶ 207). At the family meeting, which was held to enable Sial to assess the support level of Plaintiff's family and to educate the family about Plaintiff's depression, a July 30, 2015 discharge plan was established, with Plaintiff's family agreeing to same. (Id. ¶¶ 208-10, 212.)

On July 30, 2015, before Plaintiff's discharge, a Brunswick social worker documented Plaintiff was less depressed and was sleeping better. (Id. ¶214.) Also before her July 30th discharge, Sial conducted an in-person re-evaluation of Plaintiff; Sial documented that while Plaintiff was calm and had an improved mood, she "still had a sad affect; her affect was constricted; she was disassociated", but "she denied suicidal thoughts or plan". (Id. ¶¶ 215-16.) Sial's July 30th discharge diagnosis of Plaintiff was severe major depressive disorder; however, having weighed Plaintiff's risk and mitigating factors on that day, Sial determined Plaintiff did not pose a substantial threat of harm to herself. (Id. ¶¶ 217-18.) Further, at the time of her discharge, Sial determined Plaintiff's GAF score had increased to 60. (Id.

¶ 219.)  In conformity with the July 29th discharge plan, On July
30, 2015, Plaintiff was discharged from Brunswick.  (Id. ¶ 220.)

In accordance with her discharge plan, thereafter,
Plaintiff engaged in psychiatric treatment.  (Id. ¶ 221; see also
id. at ¶¶ 222-25.)  Her treating psychiatrist diagnosed Plaintiff
with major depressive disorder and generalized anxiety disorder.
(Id. ¶ 226.)

## II.  Relevant Procedural Background

Plaintiff commenced this action on July 22, 2016.  (See
Compl., ECF No. 1.)  After: (1) three amendments to Plaintiff's
Complaint (see, e.g., First Am. Compl., ECF No. 15; Second Am.
Compl., ECF No. 34; TAC); (2) multiple extensions to the discovery
deadlines (see Case Docket, passim); (3) two settlements, i.e.,
(a) a settlement with defendant Franoeur ("Franoeur") and third-
party defendant Bells Nurses Registry & Employment Agency, Inc.,
("Bells Nurses") resulting in their purported dismissal from this
action (see, e.g., ECF No. 80, and AYS Feb. 25, 2019 Elec. Order),
and (b) a further settlement whereby Plaintiff agreed to withdraw
certain causes of action, to wit, Plaintiff's (i) Second and Third
Causes of Action against Francoeur and the Hospital, (ii)
Fourteenth Cause of Action against Francoeur and the Hospital, and
(iii) Fifteenth Cause of Action against the Hospital; (4)
Plaintiff's voluntary withdrawal of her Eighth Cause of Action as
against the Hospital (see PMC Response, ECF No. 105, at 3); (5)

several reassignments of judges and magistrate judges presiding over this action; and (6) prior presiding Judge Gary R. Brown's having granted Plaintiff's reconsideration motion which ostensibly vacated his prior partial granting of summary judgement in favor of Mustafa (see Reconsideration Order, ECF No. 113; Minute Entry, ECF No. 108 (at pre-motion conference, deeming summary judgment motion made and granting in part said motion as to Mustafa)), the respective Summary Judgment Motions of Mustafa and the Hospital Defendants are ripe for consideration.[12]

_____

[12] For clarity, the Court deems:

(a) Francoeur and Bells Nurses to be dismissed from this action in light of (i) said defendants' February 25, 2019 letter motion (ECF No. 80), which Magistrate Judge Shields granted, (ii) the filed Stipulation of Settlement (ECF No. 87) regarding claims against Francoeur having been withdrawn by Plaintiff (ECF No. 87); and (iii) Plaintiff's subsequent course of conduct in this action, i.e., no longer pursuing her action against Francoeur and Bells Nurses;

(b) the Stipulation of Settlement (ECF No. 87) "SO ORDERED"; therefore, Plaintiff's Second, Third, Fourteenth, and Fifteenth causes of actions are withdrawn and discontinued with prejudice; and

(c) the summary judgment in favor of Mustafa, granted on March 25, 2020 (see Minute Entry, ECF No. 108), to have been vacated by Judge Brown on June 15, 2020 (see Reconsideration Order, ECF No. 113), thereby resulting in all causes of action against Mustafa to be currently pending (see June 19, 2020 Letter, ECF No. 115 (remaining parties' proposed briefing schedule); JS June 22, 2020 Elec. Sch. Order (adopting proposed briefing schedule)).

DISCUSSION

I.   Applicable Law

     A.   The Rule 56 Standard Generally

          The standard for deciding a Rule 56 summary judgment
motion is well-established.  For convenience, the Court reiterates
said standard:

          Pursuant to Rule 56(a), "[a] court shall
          grant summary judgment if the movant shows
          that there is no genuine dispute as to any
          material fact and the movant is entitled to
          judgment as a matter of law."  FED. R. CIV. P.
          56(a).   "A fact is 'material' for these
          purposes when it might affect the outcome of
          the suit under the governing law." Adamson v.
          Miller, 808 F. App'x 14, 16 (2d Cir. 2020).
          Additionally, "'[a]n  issue  of  fact  is
          'genuine' if the evidence is such that a
          reasonable jury could return a verdict for the
          nonmoving party.'"  Id. (quoting Jeffreys v.
          City of N.Y., 426 F.3d 549, 553 (2d Cir.
          2005)).  "If, as to the issue on which summary
          judgment is sought, there is any evidence in
          the record from which a reasonable inference
          could be drawn in favor of the opposing party,
          summary judgment is improper."  Hetchkop v.
          Woodlawn at Grassmere, Inc., 116 F.3d 28, 33
          (2d Cir. 1997).  Moreover, "the court is not
          to make assessments of the credibility of
          witnesses" on a motion for summary judgment,
          as  "[c]redibility  assessments,  choices
          between conflicting versions of events, and
          weighing of the evidence are matters for the
          jury."  Id.
               On a motion for summary judgment the
          court considers "the pleadings, depositions,
          answers to interrogatories and admissions on
          file, together with any other firsthand
          information including but not limited to
          affidavits." Nnebe v. Daus, 644 F.3d 147, 156
          (2d Cir. 2011).  Further, while the court "may
          consider other materials in the record," it

SA-21

"need consider only the cited materials" in ruling on a summary judgment motion. FED. R. CIV. P. 56(c)(3); see also Pennington v. D'Ippolito, 855 F. App'x 779, 782 (2d Cir. 2021) ("[I]n ruling on a summary judgment motion the court need consider only the cited materials in the parties' submissions." (internal citations and alterations omitted)).

In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sheet Metal Workers' Nat'l Pension Fund v. Vardaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)). When drawing inferences from evidence in the record in favor of the non-moving party, however, a court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1318 (2d Cir. 1990)).

"Once the movant has 'demonstrat[ed] the absence of a genuine issue of material fact . . . the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim.'" Pennington, 855 F. App'x at 781 (alteration in original) (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)). To do this, "[t]he non-moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" Id.

Lavender v. Verizon N.Y. Inc., No 17-CV-6687, 2023 WL 1863245, at *8 (E.D.N.Y. Feb. 9, 2023); see also Butler v. County of Suffolk, No. 11-CV-2602, 2023 WL 5096218, at *18-20 (E.D.N.Y. Aug. 8, 2023) (similarly articulating summary judgment standard; additionally

discussing consideration of: Local Rule 56.1 statements;
admissibility of expert reports; and affidavits).

      B.    <u>Consideration of Affidavits
           in Support of Summary Judgment</u>

        "It is well settled in this circuit that
a party's affidavit which contradicts his own
prior deposition testimony should be
disregarded on a motion for summary judgment."
<u>Colvin v. Keen</u>, No. 13-cv-3595, 2016 WL
5408117, at *3 (E.D.N.Y. Sept. 28, 2016).
Indeed,

> a party may not create an issue of
> fact by submitting an affidavit in
> opposition to a summary judgment
> motion that, by omission or
> addition, contradicts the affiant's
> previous deposition testimony.
> <u>Perma Research & Dev. Co. v. Singer
> Co.</u>, 410 F.2d 572, 578 (2d Cir.
> 1969) (examining omission in four-
> day deposition); <u>Martin v. City of
> New York</u>, 627 F. Supp. 892, 896
> (E.D.N.Y. 1985) (examining direct
> contradiction between deposition
> and affidavit). "If a party who has
> been examined at length on
> deposition could raise an issue of
> fact simply by submitting an
> affidavit contradicting his own
> prior testimony, this would greatly
> diminish the utility of summary
> judgment as a procedure for
> screening out sham issues of fact."
> <u>Perma</u>, 410 F.2d at 578. Thus,
> factual issues created solely by an
> affidavit crafted to oppose a
> summary judgment motion are not
> "genuine" issues for trial. <u>Id.</u>

Hayes v. N.Y.C. Dep't of Corrs., 84 F.3d 614,
619 (2d Cir. 1996); <u>see also</u> <u>In re Fosamax
Prods. Liab. Litig.</u>, 707 F.3d 189, 193 (2d
Cir. 2013) (holding that a party is prohibited
"from defeating summary judgment simply by
submitting an affidavit that contradicts the

party's previous sworn testimony"); Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity."); Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995) ("[I]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." (quotations and citation omitted)); Pierre v. Hilton Rose Hall Resort & Spa, No. 14-cv-3790, 2016 WL 4742281, at *10 (E.D.N.Y. Sept. 12, 2016) (finding plaintiff unable to produce competent evidence to defeat defendant's summary judgment motion where plaintiff's affidavit contradicted his deposition testimony); Ciliberti v. Int'l Bhd. of Elec. Workers Local 3, No. 08-cv-4262, 2012 WL 2861003, at *11 (E.D.N.Y. July 10, 2012) (rejecting plaintiff's attempt to create disputed issues of fact via affidavit, when his prior deposition testimony foreclosed any such disputes); Jeffrey v. Montefiore Med. Ctr., No. 11-cv-6400, 2013 WL 5434635, at *15 (S.D.N.Y. Sept. 27, 2013) (finding, where inconsistencies existed between a non-movant's affidavit and corresponding deposition testimony, which inconsistencies the non-movant party made no effort to reconcile or otherwise explain, the court did not consider those statements) (collecting cases).

Haxton v. PL Smithtown, LLC, No. 17-CV-3979, 2020 WL 1244849, at
*7 (E.D.N.Y. Mar. 16, 2020).  "Where inconsistencies exist between
a non-movant's affidavit and corresponding deposition testimony,
which inconsistencies the non-movant party makes no effort to
reconcile or otherwise explain, a court may disregard those
statements."  Patacca v. CSC Holdings, LLC, No. 16-CV-0679, 2019
WL 1676001, *6 (E.D.N.Y. Apr. 17, 2019) (citing Jeffrey, 2013 WL
5434637, at *15 (collecting cases)).

    C.    MHL § 9.37

         "Cognizant of the gravity of such an event, New York law
establishes detailed procedures for hospitalizing an individual
against his or her will.  One such procedure [is] codified in New
York Mental Hygiene Law ("MHL") § 9.37," which, under certain
circumstances, permits the hospitalization of persons with a
mental illness.  Jackson v. Barden, No. 12-CV-1069, 2018 WL 340014,
at *1 (S.D.N.Y. Jan. 8, 2018).  In relevant part, § 9.37 provides:

> The director of a hospital, upon application
> by a director of community services or an
> examining physician duly designated by him or
> her, may receive and care for in such hospital
> as a patient any person who, in the opinion of
> the director of community services or the
> director's designee, has a mental illness for
> which immediate inpatient care and treatment
> in a hospital is appropriate and which is
> likely to result in serious harm to himself or
> herself or others.
>
> The need for immediate hospitalization shall
> be confirmed by a staff physician of the
> hospital prior to admission.  Within

> seventy-two hours, excluding Sunday and
> holidays, after such admission, if such
> patient is to be retained for care and
> treatment beyond such time and he or she does
> not agree to remain in such hospital as a
> voluntary patient, the certificate of another
> examining physician who is a member of the
> psychiatric staff of the hospital that the
> patient is in need of involuntary care and
> treatment shall be filed with the hospital.
> From the time of his or her admission under
> this section the retention of such patient for
> care and treatment shall be subject to the
> provisions for notice, hearing, review, and
> judicial approval of continued retention or
> transfer and continued retention provided by
> this article for the admission and retention
> of involuntary patients, provided that, for
> the purposes of such provisions, the date of
> admission of the patient shall be deemed to be
> the date when the patient was first received
> in the hospital under this section.

MHL § 9.37(a).

II. <u>Application</u>

A. <u>Preliminary Ruling</u>

As an initial matter, Plaintiff asks the Court to rely upon her post-deposition affidavit ("Pl.'s Aff.") (<u>see</u> ECF No. 129), in finding there are material disputed facts regarding her detention-for-transport and confinement which thwarts the granting of summary judgment. (<u>See</u> Opp'n at 15-16.) To support this position, Plaintiff relies upon <u>Rodriguez v. City of New York</u> for the proposition that where, by way of affidavit, a plaintiff challenges the accuracy or completeness of doctors' notes made in hospital records, such "denials creat[e] issues of fact as to what

the plaintiff-patient told the doctor." (Id. at 16 (quoting
Rodriguez v. City of N.Y., 72 F.3d 1051, 1055 (2d Cir. 1995); and
citing id. at 1064-65).)  Plaintiff then proceeds to articulate
various information she contends is false, inaccurate, or lacks
credibility.  (See id. at 16-18.)  Plaintiff also advances the
argument that she is a more credible witness than the medical
personnel who interviewed her in late July 2015 at Stony Brook and
at Brunswick; she relies upon affidavits from her husband, best
friend, and boss to support this contention.  (See id. at 18-20.)

        The  Court  rejects  Plaintiff's  reliance  upon  her
Affidavit (see ECF No. 129) to establish disputed facts, which the
Court finds to be inconsistent with her prior deposition testimony
and which inconsistencies Plaintiff fails to adequately reconcile
or otherwise explain.  See Patacca, 2019 WL 1676001, *6.  Indeed,
it is well-established in this Circuit that a court need not rely
upon such a "sham affidavit".  See Moll v. Telesector Res. Grp.,
Inc., 760 F.3d 198, 205 (2d Cir. 2014) ("The 'sham issue of fact'
doctrine prohibits a party from defeating summary judgment simply
by submitting an affidavit that contradicts the party's previous
sworn  testimony."  (emphasis  omitted));  Prophete-Camille  v.
Stericycle, Inc., No. 14-CV-7268, 2017 WL 570769, at *5 (E.D.N.Y.
Feb. 13, 2017) ("The Second Circuit has held that a party cannot
manufacture  issues  of  fact  by  submitting  an  affidavit  that
contradicts  her  prior  deposition  testimony."  (citation  and

internal quotation marks omitted)). Plaintiff's time to explain
what she meant by her responses to various Stony Brook and Hospital
personnel evaluators, including Mustafa and the Hospital Doctors,
was during her deposition when those issues were being explored.
See Patacca, 2019 WL 1676001, *14 ("A 'plaintiff may not create
material issues of fact by submitting affidavits that dispute their
own prior testimony' regarding issues which have been thoroughly
or clearly explored." (quoting In re World Trade Ctr. Lower
Manhattan Disaster Site Litig., 758 F.3d 202, 213 (2d Cir. 2014);
further citation omitted)). Her attempts to provide such
explanations via her post-deposition affidavit is unavailing to
create disputed issues of fact which would defeat summary judgment.
See Vuona v. Merrill Lynch & Co., Inc., 919 F. Supp. 2d 359, 391
(S.D.N.Y. 2013) (finding that, where deponent had opportunity to
address relevant issue during deposition, later declaration
testimony directly contradicting deposition testimony would not be
considered in opposing summary judgment). Further, many of
Plaintiff's statements in her Affidavit are little more than
speculation.[13] Moreover, other of Plaintiff's statements do not

---

[13] (See, e.g., Pl. Aff. ¶¶ 21 ("Because of the pain and discomfort
following surgery, I may not have wanted to go out socially
immediately following the surgery [or] may not have wanted to
answer the phone . . . ."), 25 ("I believe this statement most
likely came from the emergency department doctor asking whether I
had thoughts of hurting myself or killing myself."), 29 ("Perhaps
[Nurse] Fining interpreted my statements as indicating that the
quality of my life had recently gone down."), 31 ("I may have said,

address material facts going towards her causes of action. Therefore, Plaintiff's post-deposition Affidavit will not be considered by the Court.  In turn, to the extent Plaintiff relies upon her Affidavit to dispute the Defendants' respective Local Rule 56.1 statements of fact, such reliance is unavailing, with the Court deeming such facts to be undisputed.

B. <u>Mustafa's Summary Judgment Motion</u>

Plaintiff brings two federal causes of action against Mustafa:  (1) the First Cause of Action, brought pursuant to Section 1983, alleging violations of the Fourth and Fourteenth Amendments premised upon the alleged violation of MHL § 9.37; and (2) the Fifth Cause of Action, alleging a Section 1983 violation based upon Mustafa's purported departure from accepted professional standards when Mustafa determined Plaintiff should be

'I do not like being a burden to my family.'  By this I meant that I did not like that my husband often had to take me to doctor appointments.  It was a little unfair to him."), 38 ("If I said I was not sleeping for two weeks, it was a statement not to be taken literally.  Rather, I meant, I had difficulty sleeping the last two weeks."), 44 ("It is doubtful I would have said I was depressed, although I found my medical condition depressing."), 52 ("When Dr. Kadiyala went to take what he wrote down on pad and place it in the computer-generated form, he may have jumbled all of this information together, including confusing my situation with that of the patient named Lisa."), 59 ("[W]hile I do not remember every bit of conversation with Dr. Mustafa, I would have never said I felt hopeless, worthless or helpless."), 75 (in disavowing information contained in Onuogu's notes, stating "Dr. Onuogu had to receive this information from the papers he was looking at and copying from when I entered the room"), 91 ("I believe Dr. Rosen slightly misinterpreted what I said.").)

detained-for-transport. Plaintiff further brings several state law claims against Mustafa: (3) two claims alleging false imprisonment, i.e., the Ninth and Tenth Causes of Action; and (4) two medical malpractice claims, i.e., the Twelfth and Thirteenth Causes of Action.

Mustafa moves for summary judgment requesting judgment in her favor as to all claims brought against her.

> 1. The Parties' Positions

> a. Mustafa's Position

Regarding First Cause of Action: Relying upon a 2019 case from the Eastern District of New York, Aouatif v. City of New York, Mustafa argues that, as the doctor who determined Plaintiff should be transported from Stony Brook to Brunswick and not the doctor who determined Plaintiff should be committed, there is no basis to bring a Fourteenth Amendment claim against her. (M-Support Memo at 6-7 (citing Aouatif v. City of N.Y., No 07-CV-1302, 2019 WL 2410450 (E.D.N.Y. May 31, 2019)).) Mustafa also draws the Court's attention to Green v. City of New York, a Second Circuit case holding that when the conduct at issue is the patient's transportation to a hospital to undergo treatment--and, not commitment to the hospital--, no Fourteenth Amendment due process violation is had. (See id. at 6 (citing Green v. City of N.Y., 465 F.3d 65, 95 (2d Cir. 2006)).)

Alternatively, Mustafa seeks qualified immunity.  (See M-Support Memo at 8-16.)  She generally argues qualified immunity is warranted because, given the circumstances presented when Mustafa examined Plaintiff, it was objectively reasonable for her to believe Plaintiff posed a threat to herself, thereby authorizing her transfer to Brunswick.  (See id. at 8-10.)  Mustafa's expert confirms that Mustafa's actions were, at the very least, objectively reasonable (see id. at 12-13), and Plaintiff's expert concedes a doctor acting in the manner Mustafa did when making her determination regarding Plaintiff would be considered acting in an objectively reasonable manner.  (See id. at 13-14.)  Finally, Mustafa would have the Court reject Plaintiff's argument that Mustafa did not act reasonably based upon Plaintiff's deposition testimony denying making many suicidal ideation statements attributed to her by the Stony Brook staff since, under case law, such "bare denials of statements allegedly made by patients under such circumstances [are not] enough to defeat summary judgment." (Id. at 15-16 (quoting Aouatif, 2019 WL 2410450, at *8 (further citation omitted; internal quotation marks omitted)).)  Indeed, Mustafa contends, "[g]iven the notations in the Stony Brook chart, [she] would have acted unreasonably if she had not authorized the [P]laintiff be transported to Brunswick Hospital."  (Id. at 16 (emphasis in original); see also M-Reply at 7 (quoting Torcivia v. Suffolk County, 409 F. Supp. 3d 19, 48 (E.D.N.Y. 2019)).)

SA-31

Regarding Fifth Cause of Action: Mustafa asks the Court to dismiss this cause of action because Plaintiff bases her claimed Section 1983 violation on Mustafa's alleged departure from accepted medical practices, which is neither a federal statutory nor constitutional right. (See M-Support Memo at 7-8.) Thus, there is no federal right to be vindicated pursuant to Section 1983. (See id. at 7 (citing Jackson, 2018 WL 340014, at *13).) Moreover, to the extent Plaintiff bases this cause of action on the time she remained at Stony Brook before being transported to Brunswick, Mustafa contends this cause of action is duplicative of Plaintiff's First Cause of Action, thereby warranting its dismissal. (See M-Reply at 8.)

Regarding Ninth and Tenth Causes of Action: Mustafa contends Plaintiff cannot succeed on her state law false imprisonment claims because even if Plaintiff is able to establish confinement that Mustafa intended and to which Plaintiff was conscious but did not consent, Mustafa can show her actions were "otherwise privileged" since she complied with the applicable MHL and did not commit malpractice. (See M-Support Memo at 16-17 (omitting citations).) Moreover, because Mustafa's actions were objectively reasonable, she should be immune under both federal and state law. (See id. at 18 (citing Mesa v. City of N.Y., No. 09-CV-10464, 2013 WL 31002, at * 12 (S.D.N.Y. Jan. 3, 2013) (stating "where an officer's actions are deemed objectively

reasonable, that officer will be immune under both federal and state law"); further citation omitted); see also id. at 19 (discussing further cases where courts found defendants immune from false imprisonment state claims based upon similar immunity to false imprisonment federal claims); M-Reply at 9.)  Thus, Mustafa is able to defend against Plaintiff's false imprisonment claims warranting summary judgment in her favor.

Regarding Twelfth and Thirteenth Causes of Action: Mustafa asserts Plaintiff's medical malpractice claims should be dismissed if the Court finds she is entitled to qualified immunity as to Plaintiff's Section 1983 claims.  That is so because the "objectively reasonable" prong of qualified immunity is the equivalent of a reasonable medical judgment.  Mustafa argues "[a] determination made pursuant to Article 9 of the Mental Hygiene Law . . . constitutes a medical judgment," and her "decision to authorize the [P]laintiff to be transported to Brunswick Hospital was based on her medical judgment."  (M-Support Memo at 21.)  Moreover, "Plaintiff's expert[14] concedes that a doctor could reasonably conclude that [P]laintiff had recurrent thoughts of death and recurrent thoughts of suicidal ideation."  (Id. at 22 (citing Stastny Dep. Tr., Ex. Q., at 100-01).)  In light of these and other concessions, therefore, it is undisputed Mustafa

---

14 Plaintiff's medical expert is Peter Stastny, M.D. ("Stastny"), a board certified psychiatry.  (See Stastny Decl., ECF No. 128.)

exercised appropriate medical judgment.  Further, without more, it is not enough to establish psychiatric malpractice simply because another doctor might have pursued a different course of treatment. (See id. at 23 (citation omitted); see also id. (similarly asserting purported erroneous judgment is not the same as plain incompetence).)  Additionally, because New York common law recognizes the doctrine of government immunity, since Mustafa's duties involved "the exercise of . . . . discretion and judgment" in deciding to have Plaintiff transported to the Hospital, Mustafa should be relieved from liability for any injurious consequences of her determination regarding Plaintiff.  (See id. at 24 (first quoting Mon v. City of N.Y., 78 N.Y.2d 309, 313 (1991); then quoting Sean M. v. City of N.Y., 20 A.D.3d 146, 158 (1st Dep't 2005) (further citation omitted)); see also M-Reply at 10.)  Hence, in this instance, because her medical judgment was reasonable and because her acts were discretionary, involving the exercise of her expert judgment, Mustafa should be found immune from Plaintiff's medical malpractice causes of action.

b.   Plaintiff's Counter-Position

Regarding First Cause of Action: The crux of Plaintiff's opposition regarding her First Cause of Action is that it "is premised on her detainment for transport and not confinement." (Opp'n at 23 (citing Radomisli Decl., Ex P-H, ¶ 72).)  She relies upon Glass v. Mayas in furtherance of her claim that one "who has

been detained for transport to, and further evaluation at, a
psychiatric [hospital for] evaluation without probable cause"
suffers a violation of her Fourth Amendment rights. (Id. (citing
Glass v. Mayas, 984 F.2d 55, 57 (2d Cir. 1993).)

Regarding Fifth Cause of Action: Plaintiff generally
argues that if she is able to establish the doctors--including
Mustafa--engaged in medical malpractice, then defendant doctors
cannot claim her confinement was "otherwise privileged". (See
Opp'n at 26.) Under such a scenario, Plaintiff's confinement not
only subjects the defendant doctors to false imprisonment
liability under state law, but also subjects them to Section 1983
liability. (See Opp'n at 26.) Then, relying upon her medical
expert, Stastny, Plaintiff asserts "[q]uestions of fact exist as
to whether the defendants acted with an insufficient basis and
engaged in medical malpractice when they certified [Plaintiff] for
involuntary detainment, transport and confinement," as well as to
whether Plaintiff suffered from a mental illness and posed a
substantial threat of harm to herself. (Id. at 27 (citing Stastny
Decl., ¶¶ 19-34, 35-48, 49-63).) Plaintiff does not develop these
cursory arguments.

In a similarly skeletal manner, Plaintiff asserts the
arguable probable cause standard which governs false arrest and
imprisonment claims pursuant to Section 1983 equally applies to
Mustafa's claim of qualified immunity to Plaintiff's Fifth Cause

of Action, _i.e._, her Fourth Amendment-based cause of action.  (<u>See</u> Opp'n at 32.)

    <u>Regarding Plaintiff's State Law Claims</u>:  First, as to Mustafa's claims of immunity, Plaintiff maintains "the government immunity doctrine 'has no application in cases where the State engages in a proprietary function . . . such as providing medical and psychiatric care.'"  (Opp'n at 35 (quoting <u>Applewhite by Applewhite v. Accuhealth, Inc.</u>, 21 N.Y.3d 420, 433 (2013) (further citation omitted); internal quotation marks omitted).)  Therefore, Mustafa's claim of immunity based upon her exercise of discretion and judgment is without merit.  (<u>Id.</u>)  Second, as to Plaintiff's request this Court maintain her state law false imprisonment and medical malpractice claims, Plaintiff does not mention Mustafa.  (<u>See</u> Opp'n at 35-36.)  Finally, Plaintiff simply contends the Court should retain supplemental jurisdiction over her state law claims because "[t]he defendants[15] have been supported by deep-pocketed malpractice insurance carriers."  (<u>See</u> <u>id.</u> at 36.)

    c.  <u>Mustafa's Reply</u>

    Mustafa takes issue with Plaintiff's trying to create disputed issues of fact by relying upon her affidavit and the affidavits of others, _i.e._, Husband, friend, and boss, as a means

---

[15]  It is unclear whether this argument also encompasses Mustafa.

of contesting the accuracy of the Stony Brooks records.  (See Reply
at 2.)  Mustafa contends:

> [P]laintiff's counsel devised a simple
> strategy to oppose [D]efendants' motions for
> summary judgment based upon qualified
> immunity: submit an Affidavit from the
> [P]laintiff refuting almost all the statements
> attributed to her by healthcare professionals
> in the medical records that were
> contemporaneously written while the
> [P]laintiff was in the hospital.

(Id.)  She contends Plaintiff's counsel used this same tactic to
defeat summary judgment decades earlier in Rodriguez v. City of
New York, but that this case is distinguishable from Rodriguez
since, here, four doctors, a nurse, and a social worker all made
entries to Plaintiff's chart, as compared to two medical personnel
doing the same in Rodriguez.  (See id.)  Therefore, this Court
should reject Plaintiff's reliance upon a simple "deny, deny, deny"
strategy to create disputed issues of fact, which, if adopted
"would essentially vitiate the doctrine of qualified immunity at
the summary judgment stage."  (Id.)

Mustafa also highlights Plaintiff's counsel retaining
the same medical expert here, i.e., Stastny, as in Rodriguez to
challenge whether the defendant doctors' actions were objectively
reasonable or were a departure from generally accepted medical
standards.  (See id. at 2, 5-6.)  Mustafa argues Stastny's
assessment should not be afforded weight since "his explanation as
to why the [P]laintiff did not meet the criteria [for a mental

illness] is based upon information that was not available to Dr. Mustafa." (Id. 5-6.)

### 2. The Court's Analysis

Regarding First Cause of Action: While Plaintiff's First Cause of Action was based upon her alleged unreasonable seizure, which she contends violated her Fourth and Fourteenth Amendment rights (see TAC ¶ 72), in her Opposition, Plaintiff explains it was her detention-for-transport to Brunswick that is the impetus for this Cause of Action. (See Opp'n at 23.) In so stating, Plaintiff implicitly concedes her First Cause of Action states only a violation of the Fourth Amendment. (See id. (asserting one who has been detained for transport to another facility for a psychiatric evaluation without probable cause suffers a Fourth Amendment violation and stating "[r]eference to the Fourteenth Amendment was technically required because the Fourth Amendment becomes applicable to the states through the Fourteenth Amendment").) What remains, therefore, is Plaintiff's Section 1983 claim of a Fourth Amendment violation premised upon Mustafa's decision to have Plaintiff transported to Brunswick. See, e.g., Eze v. City Univ. of N.Y. at Brooklyn Coll., No. 11-CV-2454, 2011 WL 6780652, at *3 (E.D.N.Y. Dec. 27, 2011) ("The act of transporting someone to a hospital against her will to be committed, as distinct from the commitment itself, is properly

analyzed only as a Fourth Amendment violation." (citations omitted)).

It is well-established:

Section 1983 provides for an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects or causes to be subjected, any citizen of the Unite[d] States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and law." 42 U.S.C. § 1983; see also, e.g., Herring v. Suffolk County Police Dep't, No. 17-cv-5904, 2018 WL 7150387, at *4 (E.D.N.Y. Oct. 19, 2018) ("[T]o prevail on any claim brought pursuant to Section 1983, a plaintiff must demonstrate that he has been denied a constitutional right or federal statutory right and that the deprivation occurred under color of state law.") (further citation and internal quotations omitted) (report and recommendation), adopted by 2019 WL 402859 (E.D.N.Y. Jan. 31, 2019). It "is not itself a source of substantive rights"; rather, it "merely provides a method for vindicating federal rights elsewhere conferred . . . ." Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004)(quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)); see also Lockwood v. Town of Hempstead, No. 16-cv-3756, 2017 WL 3769253, at *2 (E.D.N.Y. Aug. 28, 2017) (stating § 1983 provides only a procedure for redress for the deprivation of rights established elsewhere) (adopting report & recommendation). "Therefore, to prevail on a claim arising under Section 1983, a plaintiff must establish: '(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law.'" Lockwood, 2017 WL 3769253, at *2 (quoting Hawkins v. Nassau County Corr. Facility, 781 F. Supp.2d 107, 111 (E.D.N.Y. 2011)).

SA-39

*Estate of Keenan v. Hoffman-Rosenfeld*, No. 16-CV-0149, 2019 WL 3410006, at *13 (E.D.N.Y. July 29, 2019), aff'd 833 F. App'x 489 (2d Cir. Nov. 5, 2020).

To begin, there is no dispute Mustafa, who is a doctor-employee of Stony Brook, which, as part of the SUNY system is a public institution and, therefore, a state actor, is also deemed a state actor. See generally, *NCAA v. Tarkanian*, 488 U.S. 179, 183, 192 (1988) ("A state university without question is a state actor" and its executives "unquestionably act under color of state law" when "performing their official functions."); see also, e.g., *Jones v. Nickens*, 961 F. Supp. 2d 475, 485-86 (E.D.N.Y. 2013) (finding no dispute that Stony Brook is a public institution); *Capellupo v. Nassau Health Care Corp.*, No. 06-CV-4922, 2009 WL 1705749, at *6 (E.D.N.Y. June 16, 2009) (finding doctor employees of a public benefit corporation were state actors for purposes of a Section 1983 claim). The issue, then, is whether Plaintiff has established a deprivation of her constitutional right to be free of an unreasonable seizure guaranteed by the Fourth Amendment. See, e.g., *Aouatif*, 2019 WL 2410450, at *9 ("Involuntary transport to a hospital may also constitute a seizure for purposes of the Fourth Amendment.").

The Second Circuit has "held that in order to constitutionally seize a person to transport him to a hospital, the person must be dangerous, presumably to himself or others."

Green, 465 F.3d at 83 (citing Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993)). The crux of Plaintiff's position is her detention-for-transport to Brunswick was unconstitutional since Mustafa's examination was insufficient to conclude Plaintiff was a danger to herself, i.e., Mustafa's determination regarding Plaintiff's danger to herself fell below acceptable levels of medical competence, making it unreasonable.

> A seizure for transportation
>
> does not violate the Fourth Amendment . . . if there is probable cause for it, meaning that there existed "'reasonable grounds for believing that the person seized' is dangerous to herself or to others." Anthony v. City of New York ("Anthony II"), 339 F.3d 129, 137 (quoting Glass, 984 F.2d at 58). "For a mental health seizure," the law requires only "a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." Heller[ v. Bedford Cent. Sch. Dist.], 144 F. Supp. 3d [596,] 622 [(S.D.N.Y. 2015)] (internal quotation marks omitted) (citation omitted). To determine whether probable cause existed to justify a mental health seizure, courts must look to "the specific observations and information available" at the time of the seizure. Myers [v. Patterson], 819 F.3d [625,] 633 [(2d Cir. 2016)]; see also Mizrahi [v. City of N.Y., No. 15-CV-6084], 2018 WL 3848917, at *20 [(E.D.N.Y. Aug. 13, 2018)].

Aouatif, 2019 WL 2410450, at *9 (emphasis added). Moreover, the "plaintiff bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those

standards." Id. at *8 (quoting Kraft v. City of N.Y., 696 F. Supp. 2d 403, 413 (S.D.N.Y. 2010); internal quotation marks and further citation omitted).

Plaintiff has failed to establish a constitutional violation of the Fourth Amendment. There is ample undisputed evidence that at the time she presented to the Stony Brook CPEP, the specific observations and information available established a probability that Plaintiff was a danger to herself. In addition to Plaintiff's evaluation by Stony Brook ED personnel, which evaluation notes Mustafa reviewed, by the time Mustafa first met Plaintiff, Plaintiff had been evaluated by several Stony Brook CPEP personnel, i.e., a psychiatric nurse, a social work intern under the supervision of a social worker, and a resident doctor. (See supra BACKGROUND, Part I(A), at 5-8.) From those interactions, there were multiple, consistent notations regarding Plaintiff reporting, inter alia, she was: feeling depressed; suffering episodes of crying; feeling badly about past events; having protracted trouble sleeping and not being able to sleep; not enjoying life as exemplified by not wanting to socialize with friends and isolating herself and by no longer engaging in activities which she had previously enjoyed; and, wanting to jump off a bridge and leave this earth. (See id.) Despite these preliminary observations recorded in Plaintiff's Stony Brook chart, which Mustafa also reviewed, as well as Mustafa's

SA-42

consultation with the resident, Mustafa further engaged in at least three face-to-face interactions with Plaintiff ranging from upwards of 45 minutes to a 10-minute evaluation. (See id. at 8-9.) Based upon Mustafa's multiple personal evaluations of Plaintiff, in conjunction with her consideration of the information from collateral sources, it was reasonable for Mustafa to conclude Plaintiff exhibited a probability or substantial chance of danger to herself. Indeed, Mustafa recorded her impression that Plaintiff's ongoing medical issues led to poor sleep, poor appetite, weight loss, hopelessness, worthlessness and recent suicidal ideation, which supported her medical judgment that Plaintiff was a possible danger to herself, thereby warranting her transport to Brunswick for further assessment. (See P-M Counter. ¶¶ 109-11.) Thus, during the time of Plaintiff's presentation at Stony Brook, when Mustafa was addressing Plaintiff's emergent situation, in light of the substantial contemporary collateral information available to Mustafa, including the multiple, consistent observations of the Stony Brook ED personnel and the Stony Brook CPEP personnel, which Mustafa confirmed by way of at least three face-to-face evaluations of Plaintiff, there was sufficient evidence for Mustafa to conclude Plaintiff posed a danger to herself; in turn, detention-for-transport was justified and there was no violation of Plaintiff's Fourth Amendment rights. See Bryant, 462 F. Supp. 3d at 260 ("For a mental health seizure,

the law requires only 'a probability or substantial chance of dangerous behavior, not an actual showing of such behavior.'" (quoting Heller v. Bedford Cent. Sch. Dist., 144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015)); see also Aouatif, 2019 WL 2410450, at *9-10.

Even if that were not so, given the facts of this case, Mustafa would be entitled to qualified immunity. As the Aouatif Court stated:

> The doctrine of qualified immunity protects public officials from liability for violating clearly established constitutional rights, so long as it was objectively reasonable for the official to believe that his conduct did not violate such rights. See Katzman [v. Khan], 67 F. Supp. 2d [103,] 109 [(E.D.N.Y. 1999)]; Brown [v. Catania, No. 3:06-CV-0073,] 2007 WL 879081, at *6 [(D. Conn. Mar. 21, 2007)] (citing Anderson v. Creighton, 483 U.S. 635, 638-39 (1987)). Qualified immunity is a two-step inquiry: first, the Court examines whether the official's conduct violated a clearly established constitutional right; second, even if the official did violate such a right, he "is still entitled to qualified immunity if it was objectively reasonable for him to believe that his conduct did not violate [that right]." Brown, 2007 WL 879081, at *6 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001); Anderson, 483 U.S. at 638-39). "To be deprived of the defense of qualified immunity, a public official must not simply violate plaintiff's rights; rather, the violation of plaintiff's rights must be so clear that no reasonable public official could have believed that his actions did not violate such rights." Stanley v. Cooper, 996 F. Supp. 316, 320-21 (S.D.N.Y. 1998) (citing Anderson, 483 U.S. at 640); see also Birmingham v. Ogden, 70 F. Supp. 2d 353, 375 (S.D.N.Y. 1999) ("[W]here the law is clearly settled, summary judgment may be

granted on qualified immunity grounds if the
only conclusion a rational jury could reach is
that reasonable officials would disagree about
the legality of the defendants['] conduct
under the circumstances." (internal brackets
omitted) (internal quotation marks omitted)
(citation omitted)).

In the context of involuntary transport
to the hospital, the availability of qualified
immunity turns on whether, at the time [the
doctor authorized the transport] and in light
of the information he then possessed, it was
objectively reasonable for him to believe that
[the plaintiff] posed a risk of serious harm
to herself or others. See Rodriguez, 72 F.3d
at 1065; Sumay v. City of New York Health &
Hosp. Corp., No. 97-CV-3606 (SS), 1998 WL
205345, at *6 (S.D.N.Y. Apr. 28, 1998). Even
assuming that his determination was incorrect,
qualified immunity shields him from liability
unless his determination was "plainly
incompetent" or amounted to a knowing
violation of the law. See Hunter [v. Bryant],
502 U.S. [224,] 229 [(1991)] ("The qualified
immunity standard 'gives ample room for
mistaken judgments' . . . ." (quoting Malley
v. Briggs, 475 U.S. 335, 341 (1986))).

2019 WL 2410450, at *11 (emphasis added). Indeed, the Second

Circuit instructs that "qualified immunity provides a broad

shield," thereby giving officials "'breathing room to make

reasonable but mistaken judgments' without fear of potentially

disabling liability." Zalaski v. City of Hartford, 723 F.3d 382,

389 (2d Cir. 2013) (quoting Messerschmidt v. Millender, 565 U.S.

535, 546 (2012)). It employs a deliberately "forgiving" standard

of review that "provides ample protection to all but the plainly

incompetent or those who knowingly violate the law." Id.

(citations omitted).

Assuming, <u>arguendo</u>, a Fourth Amendment violation was committed by Mustafa, a contention which the Court has rejected, it was objectively reasonable for Mustafa to determine Plaintiff posed a probable or substantial chance of danger to herself based upon the facts Mustafa knew at the time of her evaluations of Plaintiff. Moreover, there is no record evidence that Mustafa was plainly incompetent or knowingly violated the law. In that vein, the Court finds Plaintiff's "blanket denial of the accuracy of medical records [to establish Mustafa's] incompetency is untenable; as stated in <u>Kulak</u>, 'bare denials of statements allegedly made by patients under such circumstances [are not] enough to defeat summary judgment.'" <u>Aouatif</u>, 2019 WL 2410450, at *8 (quoting <u>Kulak v. City of N.Y.</u>, 88 F.3d 63, 76 (2d Cir. 1996)). Rather, the Stony Brook CPEP "records, created contemporaneously by trained medical professionals, bely [Plaintiff's] bald claims that she was" detained-for-transport without probable cause. <u>Id.</u>

Further, Plaintiff's reliance on her medical expert's Declaration fares no better; the Court finds the Stastny Declaration inadequate to establish a disputed issue of fact as to whether Mustafa's diagnosis fell substantially below accepted professional judgment. Of note, in making his Declaration, Stastny stated "when there was a factual dispute in the testimony, I have assumed as true the factual version that was more favorable to [Plaintiff]." (Stastny Decl. ¶ 6.) Thereafter, Stastny baldly

SA-46

relied upon Plaintiff's blanket denials that, when she presented on July 24, 2015, she was not depressed (see id. ¶¶ 23, 24, 26-31) in support of his contention that "the conclusion that [Plaintiff] suffered from a primary depressive or major depressive disorder amounted to a substantial departure from clinical standards." (Id. ¶ 34.)  Stastny also relied upon non-contemporaneous information to support his conclusion.  (Id. ¶ 40 (relying upon: Plaintiff's 2018 deposition; Plaintiff's 2018 office visit and follow-up phone call with Stastny; Plaintiff's 2020 post-deposition affidavit (which the Court has declined to consider); and, the 2020 affidavits of Plaintiff's Husband, friend, and employer).)  Yet, it is well-settled that "courts must look to 'the specific observations and information available' at the time of the seizure" when determining whether probable cause existed to justify the detention-for-transport.  Aouatif, 2019 WL 2410450, at *9 (emphasis added; citations omitted).  To the extent Stastny implies there was a pre-determination to detain Plaintiff (see Stastny Decl. ¶¶ 39, 64), the Court finds Stastny's assertion to be bald, conclusory, and speculative and, therefore, insufficient to preclude summary judgment.  See Bryant, 462 F. Supp. 3d at 258 (instructing a party may not rely upon conclusory allegations or unsubstantiated speculation to defeat a summary judgment motion).

Additionally, the Court finds Stastny's Declaration fails to establish disputed issues of fact regarding whether

Mustafa's determination to detain-for-transport Plaintiff fell below acceptable standards of medical care thereby warranting a denial of qualified immunity. Stastny baldly premises his opinion upon Plaintiff's unfounded position that Mustafa engaged in only one, 10-minute in-person evaluation of Plaintiff. (See, e.g., Stastny Decl. ¶¶ 49, 62.) First, there is no per se rule that a 10-minute evaluation is insufficient for a doctor to make a medical determination such as Mustafa's. But, cf., Bryant, 462 F. Supp. 3d at 264 (finding defendant-doctor lacked reasonable basis to conclude patient-plaintiff posed a substantial threat to others where, inter alia, defendants were unable to substantiate doctor "could reach an informed decision based on an interview that lasted only between three and five minutes"). Second and more important, Plaintiff has failed to present competent evidence disputing Mustafa's deposition testimony that she met with Plaintiff at least three times, with only one of those meetings lasting approximately 10 minutes. Because Stastny's 10-minute contention derives from his misplaced reliance upon Plaintiff's Affidavit, which the Court has declined to consider having found it to be a "sham" affidavit, his opinion regarding Mustafa's determination is unavailing. (Compare, e.g., Pl. Aff. ¶57, with Mustafa Dep. Tr., Ex. M-L, at pp. 46-48 (testifying to having met with Plaintiff four times with meetings ranging from upwards of 45 minutes to 10 minutes).) Indeed, given the ample undisputed evidence that, in addition to

considering collateral sources of information, Mustafa spent appropriate time with Plaintiff to sufficiently evaluate her before determining Plaintiff was a probable danger to herself warranting her transport to Brunswick for further evaluation, at the very least, a rational jury would be compelled to find reasonable doctors could disagree about the legality of Mustafa's conduct given the circumstances presented.  Hence, under such a scenario, Mustafa is entitled to qualified immunity.  In sum, "[i]n light of the delicate circumstances" presented by Plaintiff on July 24, 2015, "and the decision that [Mustafa] was compelled to make between ensuring [Plaintiff's] safety and ignoring possible warning signs of a dangerous psychotic episode, [Mustafa] should not be held liable for making the decision [s]he did."  Aouatif, 2019 WL 2410450, at *11.  Rather, granting "[q]ualified immunity under these circumstances seems particularly appropriate when considering how we would judge the legality of a contrary decision by [Mustafa]."  Id. (quoting Anthony v. City of N.Y., No. 00-CV-4688, 2001 WL 741743, at *6 (S.D.N.Y. July 2, 2001)).

Regarding Fifth Cause of Action:  The Court agrees with Mustafa that it is not readily apparent Plaintiff is putting forth a Fourth Amendment claim via his Fifth Cause of Action, but rather, that this cause of action reads as being based upon a violation of MHL § 9.37.  Thus, presented with a Section 1983 claim based upon a violation of a state statute, this cause of action is not

sustainable.  See Aouatif, 2019 WL 2410450, at *6 (identifying the
deprivation of "a right, privilege or immunity secured by the
Constitution and laws of the United States" as a necessary
component of a Section 1983 claim); cf. Keenan, 2019 WL 3410006,
at *13 (articulating necessary components of a Section 1983 cause
of action).  Hence, having failed to identify a deprivation of a
right pursuant to the Constitution and its laws in her Fifth Cause
of Action, Plaintiff cannot succeed on this claim.

        To the extent Plaintiff seeks to clarify her Fifth Cause
of Action, explaining it should be read as raising a Fourth
Amendment false imprisonment claim (see Opp'n at 26), the Court
rejects that attempt.  It is settled law that one may not amend
one's complaint via an opposition to a summary judgment motion.
See, e.g., Smith v. City of N.Y., 385 F. Supp. 3d 323, 338 (S.D.N.Y.
2019) ("Because 'a party may not use his or her opposition to a
dispositive motion as a means to amend the complaint, it is
inappropriate to raise new claims for the first time in submissions
in opposition to summary judgment.'" (first quoting Shah v. Helen
Hayes Hosp., 252 F. App'x 364, 366 (2d Cir. 2007); then quoting
Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y.
2000)) (collecting cases) (cleaned up)).  However, even if the
Court were to construe Plaintiff's Fifth Cause of Action as raising
a Fourth Amendment claim, the Court agrees with Mustafa that there
would then be no discernable difference between Plaintiff's First

and Fifth Causes of Action.   Thus, the Court's finding of no
violation of Plaintiff's Fourth Amendment rights by Mustafa would
apply equally to Plaintiff's Fifth Cause of Action, as would the
Court's alternative finding that Mustafa would be entitled to
qualified immunity based upon the record presented.   Hence, even
if deemed to be a Fourth Amendment-based cause of action,
Plaintiff's Fifth Cause of Action against Mustafa fails.

> Regarding Plaintiff's State Law Claims:  The reader is
referred to Part II(B)(2) of the Court's DISCUSSION (see infra at
71-73) for the Court's ruling regarding Plaintiff's state law
claims against all Defendants.

> B.   The Hospital Defendants' Summary Judgment Motion

> Plaintiff raises four Section 1983 claims against Onuogu
and Sial (together, the "Hospital Doctors"), to wit, her: (1)
Fourth Cause of Action, alleging the Hospital Doctors violated the
Fourth and Fourteenth Amendments by involuntarily hospitalizing
Plaintiff without probable cause, in violation of MHL § 9.37; (2)
Fifth Cause of Action, alleging her confinement was not otherwise
privileged since she did not meet the criteria for hospitalization
under MHL § 9.37; (3) Sixth Cause of Action, alleging a violation
of her Fourteenth Amendment substantive due process rights
resulting from her involuntary confinement which was not justified
since she did not pose a danger to herself due to mental illness;
(4) Seventh Cause of Action, alleging a violation of her Fourteenth

Amendment substantive due process rights since the Hospital Doctors failed to spend the necessary amount of time to accurately assess Plaintiff's level of harm to herself.  As to Onuogu only, Plaintiff brings another federal claim, _i.e._, the Eighth Cause of Action, in which she alleges, due to the Hospital's policy of accepting transferred patients for admission without a psychiatric evaluation, Onuogu violated Plaintiff's Fourteenth Amendment procedural due process rights.

Plaintiff also brings state law claims against the Hospital Doctors, _i.e._, her: (1) Tenth Cause of action, alleging false imprisonment; (2) Twelfth Cause of Action, alleging medical malpractice; and (3) Thirteenth Cause of Action, also alleging medical malpractice.  Plaintiff also raises another false imprisonment claim against Onuogu only in her Eleventh Cause of Action.

Plaintiff's claims against Brunswick are all based upon state law; they are her: (1) Tenth Cause of Action, alleging false imprisonment as a result of a departure from accepted clinical standards; (2) Eleventh Cause of Action, alleging false imprisonment as a result of violating MHL § 9.37; (3) Twelfth Cause of Action, alleging medical malpractice as a result of a departure from accepted clinical standards since the Hospital Doctors failed to spend adequate time in assessing Plaintiff; and (4) Thirteenth Cause of Action, alleging medical malpractice as a result of a

departure from accepted clinical standards when the Hospital doctors ignored Plaintiff's statements that she did not have suicidal thoughts or intents.

The Hospital Defendants request the entry of summary judgment in their favor dismissing all claims and causes of action asserted against them by Plaintiff.

     1.   <u>The Parties' Positions</u>

       a.   <u>The Hospital Defendants' Position</u>

<u>Regarding Fifth Cause of Action</u>:  Similar to Mustafa, the Hospital Defendants argue this claim should be dismissed because Plaintiff "does not identify a constitutional or federal statutory right that is separate and apart from the violation of the Fourth and Fourteenth Amendments alleged in the other causes of action."  (H-Support Memo at 4.)  Thus, since Section 1983 is not an independent source of substantive rights, this cause of action should be dismissed.  (See <u>id.</u>)

<u>Regarding Fourth, Sixth, and Seventh Causes of Action</u>: Asserting they are not state actors since Brunswick is a private hospital and the Hospital Doctors are private psychiatrists on the Hospital's staff,[16] the Hospital Defendants argue Plaintiff's Section 1983 claims against them are not sustainable.  (H-Support

---

[16]  Indeed, the Hospital Defendants contend Plaintiff's failing to have alleged they are state actors in her TAC is a fatal pleading defect.  (See <u>id.</u> at 6 n.1 (citing <u>Gomez v. Toledo</u>, 446 U.S. 635, 640 (1980); further citation omitted).)

Memo at 6 (further articulating Plaintiff cannot satisfy any of the three tests for determining state action); see also id. at 7 (asserting case law "makes clear that a private hospital and private psychiatrists cannot be deemed state actors simply because they confine patients pursuant to [MHL], as this does not satisfy any of the three tests for state action under § 1983" (citations omitted).) The Hospital Defendants proceed to focus on the third state action test, i.e., the "public function" test. (See id. at 5 (defining the three state action tests); see also id. 7-8 (re: Onuogu), 8-9 (re: Sial).) They contend the record evidence demonstrates the Hospital Doctors each acted independently, personally conducting face-to-face evaluations of Plaintiff, in addition to relying upon other collateral sources of input as to Plaintiff's then-presenting condition. (See id. at 7-9.) Indeed, "the documented history [the Hospital Doctors] obtained directly from the Plaintiff--through her statements and their mental status examination findings--demonstrates that [the Hospital Doctors] primarily utilized independent judgment, thereby separating themselves from the preceding state action on the part of Dr. Mustafa." (Id. at 9 (citing Jackson, 2018 WL 340014, *17).) Hence, similar to Judge Spatt in Bryant v. Steele, here, the Court should find that "[h]aving examined the Plaintiff, the Brunswick Defendants are not state actors, thus eliminating a necessary condition to being sued under § 1983." (Id. at 10 (quoting Bryant

v. Steele, 462 F. Supp. 3d 249, 268 (E.D.N.Y. 2020)).) And, similar to Bryant, this Court should reject Plaintiff's self-serving claims of truncated examinations by the Hospital Doctors, in an attempt to create disputed issues of fact to defeat summary judgment, especially when the summary judgment record shows otherwise. (See id. at 10-11.)

Further Regarding Fourth Cause of Action: Recognizing an involuntary emergency commitment is entitled to due process that comports with a reasonable degree of medical accuracy as defined, for example by MHL § 9.37, the Hospital Doctors also assert "MHL § 9.37 implicitly defers to medical judgment[, which] requires a physician to make a medical decision guided by standards that are generally accepted within the medical community." (H-Support Memo at 14 (citing Rodriguez, 72 F.3d at 1062-63).) In accordance therewith, the Hospital Doctors argue "[d]ue process does not 'require a guarantee that a physician's assessment of the likelihood of serious harm be correct.'" (Id. (quoting Rodriguez, 72 F.3d at 1062).) Rather, as they maintain they have done here, a doctor need only comport with accepted judgment, practice or standards. (See id. at 14 -15 ("In their respective determinations pursuant to MHL § 9.37, Dr. Onuogu and Dr. Sial exercised their independent medical judgment after considering the history they obtained from Plaintiff, her presentation, and their mental status exam findings, as well as the CPEP records that accompanied

[Plaintiff] to Brunswick Hospital."].)  The Hospital Doctors would
have this Court reject Plaintiff's assertion that it was improper
for them to consider the collateral information from Mustafa
arguing "[t]here is no authority supporting Plaintiff's contention
that a physician must corroborate collateral information when
there is no indication that it is unreliable."  (Id. at 15
(citations omitted).)  In any event, the Hospital Doctors lay out
their respective evaluations of Plaintiff evincing their having
reasonably exercised their medical judgment well within the range
of competent care.  (See id. at 16-17 (re: Onuogu); see also id.
at 17-19 (re: Sial).)  And, said evaluations substantiate that, at
the time of her presentation, there were reasonable grounds for
believing Plaintiff had a mental illness for which immediate
hospitalization was appropriate since Plaintiff was a danger to
herself.  (See id. at 19-20 (further relying upon an expert opinion
to support Hospital Doctors' position they "acted within the
standard of care in diagnosing Plaintiff with major depressive
order and in determining that she presented a substantial risk of
harm due to her suicidality during her involuntary admission"
(citing Bardey Decl., Ex. H-A)).)  Hence, because the Hospital
Doctors acted reasonably in making their then-present assessments
of Plaintiff, as a matter of law, they are entitled to judgment in
their favor as to Plaintiff's Fourth Cause of Action.  (See id. at
20.)

Regarding Eighth Cause of Action:   The Hospital
Defendants remind the Court that Plaintiff currently maintains
this cause of action against Onuogu only.  (H-Support Memo at 12.)
They characterize this claim as a "Monell-type claim" whereby
Plaintiff asserts her Fourteenth Amendment rights have been
violated due to the Hospital's purported policy of accepting
transferred patients for admission without the benefit of an
independent psychiatric evaluation. (See id.)  However, since a
Monell claim requires action taken under color of law and Onuogu
is not a state actor, this cause of action is untenable.  (See id.
(stating the requirements of a Monell claim (quoting Roe v. City
of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008))).)   Moreover,
according to the Hospital Defendants, Plaintiff has failed to
assert any facts supporting her contention the Hospital has a
policy or custom of admitting psychiatric patients without
performing independent evaluations of such patients.  (See id. at
12-13.)   Relatedly, they argue it is not enough to infer the
Hospital has a policy or custom simply because Brunswick
psychiatrists agree with assessments made by referring CPEP
psychiatrists determining patients require involuntary
hospitalization, especially given the lack of evidence supporting
such a contention.   (See id. at 13.)   Hence, the Hospital
Defendants contend Plaintiff's Eighth Cause of Action must fail.

Regarding Alternative Claim of Qualified Immunity:
While not conceding Plaintiff is able to establish any Section
1983 claims against them, the Hospital Doctors alternatively argue
that upon the assumption of same, they would be entitled to
qualified immunity since they "had more than sufficient
information from their personal interactions with Plaintiff and
their review of her CPEP records to reasonably determine that she
was depressed and suicidal . . . ." (H-Support Memo at 20, 22.)
Likewise, there is no summary judgment evidence showing the
Hospital Doctors "were plainly incompetent or knowingly violated
the law." (Id. at 22.) Accordingly, neither Hospital Doctor
violated Plaintiff's Fourth or Fourteenth Amendment rights. (See
id.) "[A]nd, in any event, any alleged violation was not so clear
that no reasonable psychiatrist could have believed that their
actions did not violate such right. On the contrary, at most,
reasonable officials would disagree on whether [the Hospital
Doctors] violated Plaintiff's rights, which is sufficient for
qualified purposes." (Id.) Accordingly, the Hospital Doctors
would be entitled to qualified immunity. (See id.)

Regarding Plaintiff's State Law Claims: As to
Plaintiff's medical malpractice claims, the Hospital Doctors
contend the record evidence demonstrates they each "performed
sufficient examinations and met the accepted standards for
reasonable care." (See H-Support Memo at 23.) Moreover, the

Hospital Doctors' medical expert's opinion confirmed same. (See id.) Hence, the Hospital "Defendants are entitled to summary judgment with respect to Plaintiff's Twelfth and Thirteenth Causes of Action." (Id.)

As to Plaintiff's false imprisonment claims, the Hospital Defendants contend Plaintiff has not pled a cause of action pursuant to Section 1983. (See H-Support Memo at 23.) More particularly, they argue that because the record evidence demonstrates the Hospital Doctors complied with the statutory requirements of the applicable MHL, thereby establishing a lack of medical malpractice, their involuntary confinement of Plaintiff is privileged; hence, false imprisonment is not had. (See id.)

For completeness, the Hospital Defendants also contend that, if the Court determines they are state actors entitled to qualified immunity as to Plaintiff's federal and constitutional law claims, then the Court should also afford them qualified immunity as to Plaintiff's state law claims. (See id. at 24 (collecting cases).) Based upon such immunity, Plaintiff's medical malpractice and false imprisonment causes of action should be dismissed.

Regarding Alternative Request to Decline Supplemental Jurisdiction: If the Court dismisses Plaintiff's federal constitutional claims against them, the Hospital Defendants ask the Court, in its discretion, to decline supplemental jurisdiction

over Plaintiff's state law claims.  (See H-Support Memo at 24-25.)
They assert the relevant factor, i.e., judicial economy,
convenience, fairness, and comity, weigh in favor of such
declination.  (See id.)  Moreover, "[g]iven that discovery has
already been completed, refiling in state court would present
little inconvenience and no prejudice to the parties."  (Id.
(citing Jackson, 2018 WL 340014, at *21).)  Therefore, the Hospital
Defendants request Plaintiff's pendent state law claims be
dismissed.  (See id.)

b.    Plaintiff's Counter-Position

Regarding Hospital Doctors' State Actors Status:
Plaintiff argues the Hospital Doctors engaged in state action
because they relied upon state-actor-Mustafa's evaluation of
Plaintiff made in deciding to have Plaintiff transported to
Brunswick.  (See Opp'n at 21.)  In other words, Plaintiff contends
"the civil commitment scheme set forth in Mental Hygiene Law § 9.37
created 'an ongoing relationship . . . for the case of . . .
patients in need of hospitalization,' which warrants a finding of
state action."  (Id. at 21-22 (quoting Rodriguez v. Plymouth
Ambulance Serv., 577 Ff.3d 816, 831 (7th Cir. 2009)).)  Plaintiff
also maintains "[q]uestions of fact exist as to whether Drs. Onuogu
and Sial exercised independent medical judgment" since no doctor
can make a mental illness and dangerousness assessment in five
minutes, as Onuogu purportedly did, or reach a conclusion about a

patient's clinical state upon initial introduction, as Sial
purportedly did. (Id. at 22.)

Regarding Presence of Probable Cause: Relying upon
Stastny's opinion, Plaintiff advances the argument that the
Hospital Doctors lacked any reasonable basis for concluding she
posed a substantial threat of harm. (See Opp'n at 24.) Stastny
generally testified: a psychiatrist requires an adequate
face-to-face evaluation of a patient to determine the patient's
mental status and level of risk (see id. at 24 (citing Stastny
Decl. ¶¶ 9, 39)); and, while permitted to rely upon information
from collateral sources, a psychiatrist is still required to verify
such information from the patient (see id. at 24-25 (citing Stastny
Decl. ¶ 10)). Then, relying upon her post-deposition Affidavit,
Plaintiff contends "she never felt depressed, never had a
suicide[al] thought in her life, and never felt unsafe" and that
"[a]ll of this information was available to Drs. Onuogu and Sial
if they simply took the time to evaluate her in a way that comported
with professional standards," but "[t]hey did not." (Id. at 25.)
Thus, the implication is that, since Plaintiff's recollection of
what transpired during the Hospital Doctors' evaluations of her
differs from the Hospital Doctors' recollections, disputed issues
of fact are present precluding summary judgment.

Regarding Fifth Cause of Action: The reader is referred
to Part II(B)(1)(b) of the Court's DISCUSSION (see supra at 33-34),

for Plaintiff's counter-position regarding her Fifth Cause of
Action.

Regarding Sixth and Seventh Causes of Action: Beginning
with the well-established axiom that "[a]s a substantive matter,
due process does not permit the involuntary hospitalization of a
person who is not a danger to either herself or others" (Opp'n at
28 (quoting Rodriguez, 72 F.3d at 1061)), Plaintiff maintains
"[q]uestions of fact exist as to whether [she] posed a danger to
herself or others." (Id. at 29.) Again, she makes this claim
based upon her post-deposition Affidavit and the Stastny
Declaration, which Declaration substantially relies upon
Plaintiff's post-deposition Affidavit (especially regarding the
amount of time the Hospital Doctors spent evaluating Plaintiff).
(See id.) Plaintiff further argues Stastny's Declaration
sufficiently contradicts the Hospital Doctors' claims that they
made their decision to involuntarily commit Plaintiff pursuant to
MHL § 9.37 in accordance with appropriate medical standards. (See
id. at 29-30.) Hence, according to Plaintiff, factual disputes
remain which cannot be decided upon summary judgment. (See id.)

Regarding Hospital Defendants' Claimed Qualified
Immunity: Without citation to the record, Plaintiff generally
contends questions of fact exist regarding the Hospital Doctors'
assessments of Plaintiff. (See Opp'n at 32.) Relying upon the
Stastny Declaration, Plaintiff argues "[i]t is well-settled that

conflicting expert testimony on medical issues creates an issue of fact that requires resolution by a jury." (Id. at 34 (citing Rodriguez, 72 F.3d at 1063); see also id. ("The plaintiff has submitted expert testimony explaining why the determination by Drs. Onuogu and Sial substantially departed from professional standards." (citing Stastny Decl., ¶¶ 34; 49-64))).) Hence, the implied conclusion is the Hospital Doctors are not entitled to qualified immunity. (See id. ("[I]t was not reasonable for [the Hospital Doctors] to believe that their cursory assessments of the plaintiff could produce accurate assessments." (citing Stastny Decl., ¶¶ 66-68)).)

Regarding Retention of Supplemental Jurisdiction: The reader is referred to Part II(B)(1)(b) of this Memorandum's DISCUSSION section (see supra at 34), for a summary of Plaintiff's position regarding retention of supplemental jurisdiction.

c.   The Hospital Defendants' Reply

As to Plaintiff's federal law claims, the Hospital Defendants initially reiterate their position that Plaintiff's bare denials regarding the accuracy of the Hospital's charts documenting Plaintiff's depression and suicidal ideation, which she supports with reliance upon the Second Circuit's Rodriguez case, is untenable given the Circuit Court's subsequent Kulak decision. (See H-Reply at 1.) They proceed to re-state their position that they are not state actors; as such, Plaintiff cannot

maintain Section 1983 causes of action against them. (See id. at 2-3.) Moreover, to the extent Plaintiff contends the Hospital Defendants are state actors, her state action position rests upon whether or not the Hospital Doctors examined Plaintiff. (See id. at 4.) Because there is ample evidence the Hospital Doctors, indeed, performed their own assessments of Plaintiff, "Plaintiff's flat denials and self-serving assertions that the examinations lasted no more than ten minutes and no psychiatrist could possibly gather sufficient information in the duration of their meeting[s] are not only insufficient in law, but also inconsistent, self-serving, and implausible." (Id.; see also id. at 4-7 (highlighting record evidence demonstrating sufficient examinations of Plaintiff by Hospital Doctors, thereby debunking Plaintiff's bare denials of same).) Further, the Hospital Defendants push for alternative relief of qualified immunity if they are found to be state actors. (See id. at 7-8.) They assert the summary judgment record supports a finding they acted reasonably in their examinations of Plaintiff and Plaintiff has not presented evidence the Hospital Doctors knowingly violated the MHL. (See id. ("As documented in the copious and contemporaneous medical records, [the Hospital Doctors'] opinions were objectively reasonable and in accordance with accepted medical []practice." (citing Jackson, 2018 WL 340014, at *21)).)

SA-64

As to Plaintiff's state law claims, the Hospital Defendants first contend those claims should be dismissed since they, too, are based upon Plaintiff's contention the Hospital Doctors did not spend sufficient time evaluating her, which the summary judgment record debunks. (See id. at 9.) Moreover, "because the [Hospital] Defendants' determinations were indisputably discretionary in nature, they are entitled to dismissal of the[] state law claims on qualified immunity grounds." (Id. (citing Torcivia, 409 F. Supp. 3d at 49).) Alternatively and finally, the Hospital Defendants continue to press for the Court's declining to exercise supplemental jurisdiction over Plaintiff's state law claims, contending both that Plaintiff's "deep pockets" argument is inappropriate and "re-filing in state court would present only minor inconvenience to the parties." (Id. at 10.)

2.  The Court's Decision

Regarding Plaintiff's Federal Claims:  The Court first examines Plaintiff's federal claims, which are all premised upon Section 1983.  See, e.g., Bryant v. Steele, 462 F. Supp. 3d 249, 265 (E.D.N.Y. 2020).

Section 1983 allows for injured parties to take action against people acting under color of state law. Fabrikant v. French, 691 F.3d 193, 206 (2d Cir. 2012) (citing 42 U.S.C. § 1983). "'Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged

conduct constitutes state action.'"   Id.
(citing Flagg v. Yonkers Sav. & Loan Ass'n,
396 F.3d 178, 196 (2d Cir. 2005) (internal
quotation marks omitted)).   Thus, the § 1983
plaintiff bears the burden of showing state
action on the part of the defendant.   Tancredi
v. Metro. Life Ins. Co., 316 F.3d 308, 312 (2d
Cir. 2003); see Brentwood Acad. v. Tenn.
Secondary Sch. Athletic Ass'n, 531 U.S. 288,
295 n.2, 121 S. Ct. 924, 148 L. Ed. 2d 807
(2001) ("If a defendant's conduct satisfies
the state-action requirement of the Fourteenth
Amendment, the conduct also constitutes an
action 'under color of state law' for § 1983
purposes.").

Id. at 266.

For the purposes of [S]ection 1983, the
actions of a nominally private entity are
attributable to the state when: (1) the entity
acts pursuant to the 'coercive power' of the
state or is 'controlled' by the state ('the
compulsion test'); (2) when the state provides
'significant encouragement' to the entity, the
entity is a 'willful participant in joint
activity with the [s]tate,' or the entity's
functions are 'entwined' with state policies
('the joint action test' or 'close nexus
test'); or (3) when the entity 'has been
delegated a public function by the [s]tate'
('the public function test').

Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255,

257 (2d Cir. 2008) (quoting Brentwood Acad., 531 U.S. at 296); see

also Caballero v. Shayna, No. 18-CV-1627, 2019 WL 2491717, *3

(E.D.N.Y. June 14, 2019) (quoting Sybalski); Herring v. Suffolk

County Police Dep't, No. 17-CV-5904, 2018 WL 7150357, *4 (E.D.N.Y.

Oct. 19, 2018) (same).   "The fundamental question under each test

is whether the private entity's challenged actions are 'fairly

attributable' to the state." <u>Fabrikant</u>, 691 F.3d at 207 (quoting
<u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 838 (1982)); <u>Caballero</u>, 2019
WL 2491717, at *3 (quoting <u>Fabrikant</u>).

"Private medical facilities are generally not state
actors for purposes of Section 1983." <u>Jones v. Nickens</u>, 961 F.
Supp. 2d 475, 484 (E.D.N.Y. 2013) (omitting citations); <u>see also</u>
<u>Jackson</u>, 2018 WL 340014, at *14 (finding private hospital and its
doctors are not state actors); <u>see also generally</u> <u>Garramone v.</u>
<u>SUNY</u>, No. 23-CV-0066, 2023 WL 4471957, at *7 (E.D.N.Y. July 11,
2023) ("[P]rivate parties are not generally liable under Section
1983." (collecting cases)).  There is no dispute Brunswick is a
private psychiatric hospital and the Hospital Doctors were private
psychiatrists on staff at the Hospital.  (See P-H 56.1 Counter. ¶¶
117 (re: Hospital), 135 (re: Onuogu), 166 (re: Sial).)

In advancing their position that they are not state
actors, the Hospital Defendants press for a state actor analysis
under the "public function test", which Plaintiff does not
contest.[17]  "To satisfy the state action requirement under the

_____

[17] The Court finds that by having acquiesced to the Court focusing
only upon the state actor public function test, as evidenced by
Plaintiff having failed to advance arguments in support of the
Court analyzing whether the Hospital Defendants are state actor
pursuant to either the compulsion test or the joint-action test,
Plaintiff is deemed to have abandoned the application of those
tests.  <u>See, e.g.</u>, <u>Butler</u>, 2023 WL 5096218, at *29 n.34 (finding,
where non-movant did not meaningfully respond to an argument raised
in support of summary judgment, court may deem claim abandoned)
(collecting cases).  Yet, given the summary judgment record, it is

'public function' test, the private entity must 'perform a function that is traditionally the exclusive prerogative of the state.'" Archer v. Econ. Opportunity Comm'n, 30 F. Supp. 2d 600, 606 (E.D.N.Y. 1998) (quoting Rendell-Baker, 457 U.S. at 842); see also Caballero, 2019 WL 2491717, at *3 ("Under the public function test, '[s]tate action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity.'" (quoting Grogan v. Blooming Grove Volunteer Ambulance Corps, 768 F.3d 259, 264-65 (2d Cir. 2014) (internal quotations and citation omitted)); Herring, 2018 WL 7150387, at *5 (quoting Archer).  Upon the summary judgment record presented, Plaintiff cannot establish state action under the public function test since "the hospitalization authority that the MHL bestows on hospitals and physicians is not the sort of power traditionally reserved for the State because '[t]he responsibility for invalid commitment lies with the physician as a private individual,' and thus fails to satisfy the public-function test."  Jackson, 2018 WL 340014, at

_____

unlikely Plaintiff could have established the Hospital Defendants were state actors pursuant any of the state actor tests.  See, e.g., Bryant v. Steele, 93 F. Supp. 3d 80, 90 (E.D.N.Y. 2015) (ruling upon dismissal motion, collecting cases where district courts in this Circuit "have found that none of the three tests for state action—'state compulsion,' 'public function,' and 'close nexus'—were satisfied"); cf., e.g., Jackson, 2018 WL 340014, at *14-15 (discussing compulsion test), and at *15-17 (discussing joint-action test); Keenan, 2019 WL 3410006, at *20 (discussing compulsion test), and at *19 (discussing joint-action test).

*14 (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 353
(1974)).  Moreover, "[t]he Second Circuit has recognized that
private hospitals, though 'clearly affected with a public
interest, have not been traditionally associated with sovereignty,
and have long been relegated to the private domain, rather than
treated as traditionally the exclusive prerogative of the State.'"
Id. at *17 (quoting Schlein v. Milford Hosp., Inc., 561 F.2d 427,
429 (2d Cir. 1997); further citation omitted; further internal
quotation marks omitted); see also, e.g., Keenan, 2019 WL 3410006,
at *20 ("As an initial matter, 'care of patients by doctors is not
a function that is 'exclusively reserved by the state''" (quoting
Herring, 2018 WL 7150387, at *5 (further citations omitted)).
Plaintiff offers no evidence to rebut this presumption.  "Thus, in
the absence of any evidence to the contrary, the Court shall assume
the same in the more specific context of involuntary
hospitalizations."  Id. (citing Turturro v. Cont'l Airlines, 334
F. Supp. 2d 383, 396-97 (S.D.N.Y. 2004)).  Given this dearth of
evidence, "Plaintiff has failed to establish [the Hospital
Defendants] acted at the behest of the State in a sense that would
render them subject to constitutional scrutiny."  Id. at *18.
Therefore, as a matter of law, no Section 1983 liability may be
claimed against the Hospital Defendants; accordingly, summary
judgment is awarded in the Hospital Defendants' favor as to all of
Plaintiff's federally based Causes of Action.

SA-69

Furthermore, even if the Hospital Defendants were found to be state actors, upon the summary judgment record presented, qualified immunity would shield them from Section 1983 liability. There is no dispute "Plaintiff <u>did</u> enjoy a clearly-established right not to be hospitalized absent a showing of dangerousness." <u>Jackson</u>, 2018 WL 340014, at *20 (emphasis in original); <u>see also</u> MHL § 9.37. However, in making their determination to commit Plaintiff to Brunswick, the Hospital Doctors acted reasonably in determining Plaintiff was a danger to herself. A state actor's decisions "must be viewed as objectively reasonable unless 'no [state actor] of reasonable competence could have made the same choice in similar circumstances.'" <u>Id.</u> (quoting <u>Green</u>, 465 F.3d at 92; further citation omitted).

Here, as to Onuogu, the undisputed facts establish he acted reasonably in applying for Plaintiff's commitment to Brunswick pursuant to MHL § 9.37. There is ample competent, undisputed evidence that Onuogu consulted collateral sources regarding Plaintiff, as well as conducted his own face-to-face evaluation of Plaintiff. (See <u>supra</u> BACKGROUND, Part I(B), at 10-11.) The record evidence further establishes that from both, Onuogu determined Plaintiff as having major depressive disorder and, after weighing Plaintiff's risk and mitigating factors, posing a substantial risk of danger to herself, thereby warranting commitment. (See <u>id.</u> at 11-12.) Thus, Onuogu's determination

SA-70

regarding Plaintiff fell within acceptable clinical standards. Indeed, at the very least, even applying the applicable medical standards articulated by Stastny (see Stastny Decl. ¶¶ 9-18), reasonable psychiatrists could disagree as to whether Plaintiff was dangerous. (Cf. id. at ¶ 18 ("Professional standards further require that psychiatrists make a reasoned assessment about the magnitude of risk that a person poses. There are some instances in which the level of risk is not so high or so low that reasonable psychiatrists can, and will, disagree as to whether the patient is dangerous.").) To the extent Stastny contends Onuogu acted in a manner falling below acceptable clinical standards, asserting Onuogu failed to spend sufficient time with Plaintiff before making his commitment determination, the Court rejects same. Stastny's position is flawed because he bases it upon Plaintiff's unsubstantiated claim that Onuogu spend no more than 10 minutes with her in conducting a face-to-face evaluation. The undisputed summary judgement record establishes otherwise. (See supra BACKGROUND, Part I(B), at 10-12.) Hence, as a matter of law, Onuogu would be entitled to qualified immunity from Plaintiff's Section 1983 claims. See Aouatif, 2019 WL 2410450, at *11; (see also supra at 44-47 (articulating Court's rationale for finding Mustafa entitled to qualified immunity, which rationale the Court finds equally applies here to Onuogu).

Similarly, as to Sial, the undisputed facts establish she acted reasonably in continuing Plaintiff's hospitalization at Brunswick pursuant to MHL § 9.37. Again, the Court finds ample competent, undisputed evidence as to Sial both consulting collateral sources regarding Plaintiff, as well as conducting several face-to-face evaluations of Plaintiff. (See supra BACKGROUND, Part I(B), at 12-16.) Said evidence demonstrates Sial determined Plaintiff to have major depressive disorder and, after weighing Plaintiff's risk and mitigating factors, posed a substantial risk of danger to herself, thereby warranting commitment. (See id. at 13-14.) Nothing in the record evidence shows Sial's determination regarding Plaintiff fell below acceptable clinical standards; at most it evinces, reasonable psychiatrists could disagree as to whether Plaintiff was dangerous. This is so even, again, applying the applicable medical standards articulated by Stastny. (See Stastny Decl. ¶¶ 9-18.) And, for the same reason the Court rejected Stastny's contention that Onuogu acted in a manner falling below acceptable clinical standards, i.e., not having spent sufficient time personally evaluating Plaintiff, which the Court rejected as a flawed assumption, it likewise rejects Stastny same claim of Sial spending insufficient time with Plaintiff to properly evaluate Plaintiff. (See supra at 44-47.) Thus, upon the record presented, Sial would be entitled to qualified immunity from Plaintiff's Section 1983

claims.  See Aouatif, 2019 WL 2410450, at *11; (see also supra at
43 (articulating Court's rationale for finding Mustafa entitled to
qualified immunity, which rationale the Court finds equally
applies here to Sial).

 Regarding Plaintiff's State Law Claims:  While "the
district court[] shall have supplemental jurisdiction over all
other claims that are related to claims in the action within such
original jurisdiction that they form part of the same case or
controversy under Article III of the United States Constitution,"
in its discretion, the it "may decline to exercise supplemental
jurisdiction over a claim" where it "has dismissed all claims over
which it has original jurisdiction."  28 U.S.C. § 1367(a), (c)(3);
see also Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.
Inc., 712 F.3d 705, 727 (2d Cir. 2013) ("It is well to recall that
'in the usual case in which all federal-law claims are eliminated
before trial, the balance of factors to be considered under the
pendent jurisdiction doctrine—judicial economy, convenience,
fairness, and comity—will point toward declining to exercise
jurisdiction over the remaining state-law claims.'"); see also One
Communications Corp. v. J.P. Morgan SBIC LLC, 381 F. App'x 75, 82
(2d Cir. 2010) ("If all of a plaintiff's federal claims are
dismissed, a district court is well within its discretion to
decline to assert supplemental jurisdiction over any state law
claims").  Here, having granted summary judgment in the Defendants'

favor dismissing all of Plaintiff's Section 1983-based claims, the Court finds the interest of judicial economy, convenience, fairness, and comity weigh in favor of not exercising supplemental jurisdiction over Plaintiff's remaining state law claims against all Defendants.  See Keenan, 2019 WL 3410006, at *22 ( "[H]aving determined that the [defendants] are entitled to summary judgment on all of [plaintiff's] § 1983 claims, the Court declines to exercise supplemental jurisdiction over [plaintiff's] remaining state law claims." (citations omitted)).

Finally, even if the Court did not decline supplemental jurisdiction over Plaintiff's state law claims, the Court would find all Defendants are entitled to qualified immunity against Plaintiff's state law claims because the record evidence established the Defendants acted reasonably, i.e., within accepted clinical standard, in making their respective MHL § 9.37 determinations.[18]  See, e.g., Mesa, 2013 WL 31002, at *12 (finding, where the state law "reasonableness standard is the same standard

---

[18]  The Court rejects Plaintiff's reliance on the Applewhite case for the proposition that "the government immunity doctrine 'has no application in cases where the State engages in a proprietary function . . . such as providing medical and psychiatric care.'" (Opp'n at 35 (quoting Applewhite, 21 N.Y.3d at 433).)  The quoted language from Applewhite comes from a concurrence opinion in which the concurring judge stated:  "I concur in the result, but not the reasoning of the majority opinion." Applewhite, 21 N.Y.3d at 432. The Applewhite majority found the state actors, who were EMTs, were performing a governmental function and therefore, were entitled to immunity.

as that applied in federal qualified immunity analysis", "where an officer's actions are deemed objectively reasonable, that officer will be immune under both federal and state law"); see also Triolo v. Nassau County, N.Y., No. 16-CV-2085, 2019 WL 5742623, *7 (E.D.N.Y. Nov. 4, 2019) (same; quoting Mesa), aff'd in part, 24 F.4th 98, 109-10 (2d Cir. 2022).

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

I.   As to **Mustafa**'s Summary Judgment Motion (ECF No. 116), it is **GRANTED**; as a result:

(a)   Plaintiff's federal claims, i.e., her First and Fifth Causes of Action, are dismissed with prejudice; and

(b)   having declined to exercise supplemental jurisdiction over Plaintiff's state law claims, i.e., her Ninth, Tenth, Twelfth, and Thirteenth Causes of Action, they are dismissed without prejudice; and

II.   As the **Hospital Defendants'** Summary Judgment Motion (ECF No. 120), it is **GRANTED**; as a result:

(a)   Plaintiff's federal claims, i.e., her Fourth, Fifth, Sixth, and Seventh Causes of Action, are dismissed with prejudice; and

(b)   having declined to exercise supplemental jurisdiction over Plaintiff's state law claims, i.e., her Eighth,

Tenth, Eleventh, Twelfth, and Thirteenth Causes of

Action, they are dismissed without prejudice; and

III. Once Judgment has entered, the Clerk of Court is directed to

CLOSE this case.


**SO ORDERED.**

/s/ JOANNA SEYBERT
JOANNA SEYBERT, U.S.D.J

Dated:    March 28, 2024
          Central Islip, New York

Rule 56 of the Federal Rules of civil Procedure provides in relevant part the following:

> An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. 56(c)(4).

The Fourth Amendment to the United States Constitution provides in relevant part the following:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.

U.S. CONST. amend. IV.

The Fourteenth Amendment to the United States Constitution provides in relevant part:

> nor shall any state deprive any person of life, liberty or property, without due process of law.

U.S. CONST. amend. XIV, § 1.

42 U.S.C. § 1983 provides in relevant part the following:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party inured in an action at law, suit in equity, or other proper proceeding for redress.

The relevant portions of the New York Mental Hygiene Law provide as follows:

> The director of a hospital, upon application by a director of community services or an examining physician duly designated by him or her, may receive and care for in such hospital as a patient any person who, in the opinion of the director of community services or the director's designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others.
> The need for immediate hospitalization shall be confirmed by a staff physician of the hospital prior to admission. Within seventy-two hours, excluding Sunday and holidays, after such admission, if such patient is to be retained for care and treatment beyond such time and he or she does not agree to remain in such hospital as a voluntary patient, the certificate of another examining physician who is a member of the psychiatric staff of the hospital that the patient is in need of involuntary care and treatment shall be filed with the hospital.

N.Y. Mental Hyg. Law § 9.37

> "[L]ikelihood to result in serious harm" or "likely to result in serious harm" means (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

N.Y. Mental Hyg. Law § 9.01

SA-80